# EXHIBIT 1

July 29, 2020 SIP Revision and Agreed Orders ("SIP Revision")

REVISIONS TO THE STATE OF TEXAS AIR QUALITY
IMPLEMENTATION PLAN



TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. BOX 13087
AUSTIN, TEXAS 78711-3087

**AGREED ORDERS REGARDING PLANNED MAINTENANCE,
STARTUP AND SHUTDOWN EMISSIONS FOR CERTAIN
ELECTRIC GENERATING UNITS**

PROJECT NUMBER 2020-028-SIP-NR

Adoption
July 29, 2020

[blank]

## EXECUTIVE SUMMARY

On October 30, 2014, the Environmental Integrity Project (EIP) filed a public petition (Pirkey Petition) seeking United States Environmental Protection Agency (EPA) objection to Southwestern Electric Power Company's (SWEPCO) Title V permit minor permit revision for the H.W. Pirkey power plant. Further, on May 27, 2015 the EIP, Air Alliance Houston, Environment Texas, Texas Campaign for the Environment, Downwinders at Risk, Neighbors for Neighbors, Public Citizen's Texas Office, and Sustainable Energy and Economic Development Coalition filed a citizen petition (Citizen Petition) raising broader state implementation plan (SIP) and Title V issues regarding planned maintenance, startup and shutdown (MSS)[1] emission limits SIP compliance at certain coal-fired electric generating units (EGU).

The Citizen Petition poses several arguments supporting the petitioners' position that preconstruction new source review (NSR) permit amendment applications to authorize planned MSS activities resulted in TCEQ's "exempting" certain coal-fired EGUs from emissions limits during these activities. The EIP argues such exemptions violate the Federal Clean Air Act (FCAA) requirement that SIPs contain continuous emission limits, including limits in NSR permits; and violate federal rules that Title V permits must include all applicable requirements including SIP limits and NSR permit limits. The Citizen Petition requests the EPA find that the TCEQ is violating the SIP and the approved Title V program, establish a federal implementation plan (FIP) to address MSS if the TCEQ fails to comply within two years, and reopen Title V permits for the identified EGUs. On December 2, 2015, the TCEQ provided an interpretive letter  to the EPA in response to the Citizen Petition explaining the history and factual basis supporting the TCEQ's interpretation that 30 Texas Administrative Code (TAC) §111.111(a)(1) and §111.153(b) opacity and particulate matter (PM) limits are not applicable to the startup or shut down of coal-fired EGUs equipped with electrostatic precipitator (ESP) control devices.

On February 3, 2016, the EPA Administrator issued an Order granting the Pirkey Petition's claim that the Title V permit incorporates an NSR permit that improperly exempts planned MSS activities from opacity and PM limits in 30 TAC § 111.111(a)(1) and § 111.153(b) (*In the Matter of Southwestern Electric Power Company, H.W. Pirkey Power Plant, Permit No. O31*, Petition No. VI-2014-01, (Order)). In addition, the EPA directed the TCEQ to reopen SWEPCO's Title V permit and permit record to ensure such PM and opacity limits apply at all times, including periods of planned MSS.

The TCEQ responded to the EPA Order on the Pirkey Petition in a February 26, 2016 letter and attached the December 2, 2015 interpretive letter as part of the response. Consistent with the TCEQ's interpretation of its rules, the TCEQ does not believe that it was subject to any additional procedural requirements that would have been necessary

---

[1] NOTE: In several instances, the proposal narrative referred to the work practices and operational limits contained in the agreed orders as applying to periods of planned (i.e scheduled) startup and shutdown.  Planned maintenance activities that occur when the EGU is shut down are also covered in the agreed orders.  In response to public comment requesting consistency, the narrative now refers to these activities by the commonly used term "planned maintenance, startup and shutdown (MSS)".

for SIP revisions. However, the EPA interprets the FCAA to require SIP rules to include emission limitations covering all periods of operation, including planned MSS.

In an effort to resolve the Citizen Petition and fully respond to the Order granting the Pirkey Petition, the EPA agreed to consider a revision to the Texas SIP. The revision would incorporate into the SIP voluntary agreed orders (AO) with certain coal-fired electric EGUs equipped with ESPs. The AOs incorporate conditions from those EGUs' NSR permits pertaining to opacity and PM operational limits and work practices during periods of planned MSS activities.

The SIP revision consists of eight voluntary AOs covering thirteen EGUs: (1) the Southwestern Electric Power Company (SWEPCO) H.W. Pirkey Power Plant in Harrison County, (Project No. 2020-021-SIP-NR; Docket No. 2020-0078-SIP); (2) the Lower Colorado River Authority (LCRA) Sam Seymour Fayette Power Project in Fayette County (Project No.2020-022-SIP-NR; Docket No. 2020-0077-SIP); (3) the Luminant Generation Company, LLC Martin Lake Steam Electric Station in Rusk County (Project No. 2020-023-SIP-NR; Docket No. 2020-0076-SIP); (4) the NRG Texas Power, LLC Limestone Electric Generating Station in Limestone County (Project no. 2020-024-SIP-NR; Docket No. 2020-0075-SIP); (5) the San Miguel Electric Cooperative, Inc. San Miguel Electric Plant in Atascosa County (Project No. 2020-025-SIP-NR; Docket No. 2020-0074-SIP); (6) the Southwestern Public Service Company (SPS) Harrington Station in Potter County (Project No. 2020-026-SIP-NR; Docket No. 2020-0073-SIP); (7) the Texas Municipal Power Agency (TMPA) Gibbons Creek Steam Electric Station in Grimes County (Project No. 2020-032-SIP-NR; Docket No. 2020-0178-SIP); and (8) the Public Service Company of Oklahoma (PSO) Oklaunion Power Station in Wilbarger County (Project No. 2020-027-SIP-NR; Docket No. 2020-0072-SIP). In addition, the SIP revision meets FCAA, §110(l) (42 United States Code, §7410(l)) and does not interfere with any applicable requirement concerning attainment and reasonable further progress or any other requirement of the FCAA.

The SIP revision makes the opacity and PM operational limits and work practices for periods of planned MSS at the listed EGUs federally enforceable in the SIP so that emission limitations apply on a continuous basis (at all times of operation) (*see* FCAA, §110(a)(2)(A) — SIP must contain emission limits, measures, etc. and §302(k) — emission limits apply on a continuous basis to assure continuous emission reduction). The SIP revision, through the AOs, establish SIP limitations for opacity and PM from planned MSS at these EGUs when the SIP limits for opacity and PM contained in §111.111(a)(1) and §111.153(b)[2] do not apply due to the technical and safety limitations of the ESPs at the EGUs that will be subject to the AOs. The AOs, if approved as a SIP revision by the EPA, will be incorporated into the listed EGUs' Title V permits as applicable requirements in accordance with FCAA, §504(a) and 40 Code of Federal Regulations §70.7.

---

[2] 30 TAC §111.153(b) refers to solid fossil fuel-fired steam generators. Coal is a solid fossil fuel used in steam generators to produce electricity. The coal-fired EGUs covered by the voluntary AOs are a subset of solid fossil-fuel fired steam generators referred to in this subsection.

## SECTION V-A: LEGAL AUTHORITY

General
The Texas Commission on Environmental Quality (TCEQ) has the legal authority to implement, maintain, and enforce the National Ambient Air Quality Standards (NAAQS) and to control the quality of the state's air, including maintaining adequate visibility.

The first air pollution control act, known as the Clean Air Act of Texas, was passed by the Texas Legislature in 1965. In 1967, the Clean Air Act of Texas was superseded by a more comprehensive statute, the Texas Clean Air Act (TCAA), found in Article 4477-5, Vernon's Texas Civil Statutes. The legislature amended the TCAA in 1969, 1971, 1973, 1979, 1985, 1987, 1989, 1991, 1993, 1995, 1997, 1999, 2001, 2003, 2005, 2007, 2009, 2011, 2013, 2015, and 2017. In 1989, the TCAA was codified as Chapter 382 of the Texas Health and Safety Code.

Originally, the TCAA stated that the Texas Air Control Board (TACB) was the state air pollution control agency and was the principal authority in the state on matters relating to the quality of air resources. In 1991, the legislature abolished the TACB effective September 1, 1993, and its powers, duties, responsibilities, and functions were transferred to the Texas Natural Resource Conservation Commission (TNRCC). In 2001, the 77th Texas Legislature continued the existence of the TNRCC until September 1, 2013 and changed the name of the TNRCC to the TCEQ. In 2009, the 81st Texas Legislature, during a special session, amended section 5.014 of the Texas Water Code, changing the expiration date of the TCEQ to September 1, 2011, unless continued in existence by the Texas Sunset Act. In 2011, the 82nd Texas Legislature continued the existence of the TCEQ until 2023. With the creation of the TNRCC (and its successor the TCEQ), the authority over air quality is found in both the Texas Water Code and the TCAA. Specifically, the authority of the TCEQ is found in Chapters 5 and 7. Chapter 5, Subchapters A - F, H - J, and L, include the general provisions, organization, and general powers and duties of the TCEQ, and the responsibilities and authority of the executive director. Chapter 5 also authorizes the TCEQ to implement action when emergency conditions arise and to conduct hearings. Chapter 7 gives the TCEQ enforcement authority.

The TCAA specifically authorizes the TCEQ to establish the level of quality to be maintained in the state's air and to control the quality of the state's air by preparing and developing a general, comprehensive plan. The TCAA, Subchapters A - D, also authorizes the TCEQ to collect information to enable the commission to develop an inventory of emissions; to conduct research and investigations; to enter property and examine records; to prescribe monitoring requirements; to institute enforcement proceedings; to enter into contracts and execute instruments; to formulate rules; to issue orders taking into consideration factors bearing upon health, welfare, social and economic factors, and practicability and reasonableness; to conduct hearings; to establish air quality control regions; to encourage cooperation with citizens' groups and other agencies and political subdivisions of the state as well as with industries and the federal government; and to establish and operate a system of permits for construction or modification of facilities.

Local government authority is found in Subchapter E of the TCAA. Local governments have the same power as the TCEQ to enter property and make inspections. They also may make recommendations to the commission concerning any action of the TCEQ that affects their territorial jurisdiction, may bring enforcement actions, and may execute cooperative agreements with the TCEQ or other local governments. In addition, a city or town may enact and enforce ordinances for the control and abatement of air pollution not inconsistent with the provisions of the TCAA and the rules or orders of the commission.

Subchapters G and H of the TCAA authorize the TCEQ to establish vehicle inspection and maintenance programs in certain areas of the state consistent with the requirements of the Federal Clean Air Act; coordinate with federal, state, and local transportation planning agencies to develop and implement transportation programs and measures necessary to attain and maintain the NAAQS; establish gasoline volatility and low emission diesel standards; and fund and authorize participating counties to implement vehicle repair assistance, retrofit, and accelerated vehicle retirement programs.

<u>Applicable Law</u>
The following statutes and rules provide necessary authority to adopt and implement the state implementation plan (SIP). The rules listed below have previously been submitted as part of the SIP.

<u>Statutes</u>
All sections of each subchapter are included, unless otherwise noted.
    TEXAS HEALTH & SAFETY CODE, Chapter 382        September 1, 2019
    TEXAS WATER CODE        September 1, 2019
Chapter 5: Texas Natural Resource Conservation Commission
    Subchapter A: General Provisions
    Subchapter B: Organization of the Texas Natural Resource Conservation
            Commission
    Subchapter C: Texas Natural Resource Conservation Commission
    Subchapter D: General Powers and Duties of the Commission
    Subchapter E: Administrative Provisions for Commission
    Subchapter F: Executive Director (except §§5.225, 5.226, 5.227, 5.2275, 5.231,
            5.232, and 5.236)
    Subchapter H: Delegation of Hearings
    Subchapter I: Judicial Review
    Subchapter J: Consolidated Permit Processing
    Subchapter L: Emergency and Temporary Orders (§§5.514, 5.5145, and 5.515 only)
    Subchapter M: Environmental Permitting Procedures (§5.558 only)

Chapter 7: Enforcement
    Subchapter A: General Provisions (§§7.001, 7.002, 7.0025, 7.004, and 7.005 only)
    Subchapter B: Corrective Action and Injunctive Relief (§7.032 only)
    Subchapter C: Administrative Penalties
    Subchapter D: Civil Penalties (except §7.109)
    Subchapter E: Criminal Offenses and Penalties: §§7.177, 7.179-7.183
<u>Rules</u>

All of the following rules are found in 30 Texas Administrative Code, as of the following latest effective dates:

Chapter 7: Memoranda of Understanding, §§7.110 and 7.119
December 13, 1996 and August 22, 2019

Chapter 19: Electronic Reporting                                November 11, 2010

Chapter 35: Emergency and Temporary Orders and Permits;
Temporary Suspension or Amendment of Permit Conditions
    Subchapter A: Purpose, Applicability, and Definitions    December 10, 1998
    Subchapter B: Authority of Executive Director    December 10, 1998
    Subchapter C: General Provisions    March 24, 2016
    Subchapter K: Air Orders    July 20, 2006

Chapter 39: Public Notice, Subchapter H: Applicability and General Provisions, §§39.402(a)(1) - (6), (8), and (10) - (12), 39.405(f)(3) and (g), (h)(1)(A) - (4), (6), (8) - (11), (i) and (j), 39.407, 39.409, 39.411(a), (e)(1) - (4)(A)(i) and (iii), (4)(B), (5)(A) and (B), and (6) - (10), (11)(A)(i) and (iii) and (iv), (11)(B) - (F), (13) and (15), and (f)(1) - (8), (g) and (h), 39.418(a), (b)(2)(A), (b)(3), and (c), 39.419(e), 39.420 (c)(1)(A) - (D)(i)(I) and (II), (D)(ii), (c)(2), (d) - (e), and (h), and Subchapter K: Public Notice of Air Quality Permit Applications, §§39.601 - 39.605                                May 14, 2020

Chapter 55: Requests for Reconsideration and Contested Case Hearings; Public Comment, all of the chapter except §55.125(a)(5) and (6)                                May 14, 2020

Chapter 101: General Air Quality Rules                                May 14, 2020

Chapter 106: Permits by Rule, Subchapter A                                July 19, 2018

Chapter 111: Control of Air Pollution from Visible Emissions and Particulate Matter                                August 3, 2017

Chapter 112: Control of Air Pollution from Sulfur Compounds                                July 16, 1997

Chapter 113: Standards of Performance for Hazardous Air Pollutants and for Designated Facilities and Pollutants                                December 29, 2016

Chapter 114: Control of Air Pollution from Motor Vehicles                                April 26, 2018

Chapter 115: Control of Air Pollution from Volatile Organic Compounds                                January 5, 2017

Chapter 116: Control of Air Pollution by Permits for New Construction or Modification                                November 22, 2018

Chapter 117: Control of Air Pollution from Nitrogen Compounds                                June 25, 2015

Chapter 118: Control of Air Pollution Episodes                                May 26, 1989

Chapter 122: §122.122: Potential to Emit                                  February 23, 2017

Chapter 122: §122.215: Minor Permit Revisions                                  June 3, 2001

Chapter 122: §122.216: Applications for Minor Permit Revisions                  June 3, 2001

Chapter 122: §122.217: Procedures for Minor Permit Revisions         December 11, 2002

Chapter 122: §122.218: Minor Permit Revision Procedures for Permit
Revisions Involving the Use of Economic Incentives, Marketable
Permits, and Emissions Trading                                                  June 3, 2001

## SECTION VI: CONTROL STRATEGY

A.   Introduction (No change)
B.   Ozone (No change)
    1.  Dallas-Fort Worth (No change)
    2.  Houston-Galveston-Brazoria (No change)
    3.  Beaumont-Port Arthur (No change)
    4.  El Paso (No change)
    5.  Regional Strategies (No change)
    6.  Northeast Texas (No change)
    7.  Austin Area (No change)
    8.  San Antonio Area (No change)
    9.  Victoria Area (No change)
C.   Particulate Matter (No change)
D.   Carbon Monoxide (No change)
E.   Lead (No change)
F.   Oxides of Nitrogen (No change)
G.   Sulfur Dioxide (No change)
H.   Conformity with the National Ambient Air Quality Standards (No change)
I.   Site Specific (**Revised**)
J.   Mobile Sources Strategies (No change)
K.   Clean Air Interstate Rule (No change)
L.   Transport (No change)
M.   Regional Haze (No change)

**TABLE OF CONTENTS**

Executive Summary

Section V-A: Legal Authority

Section VI: Control Strategy

Table of Contents

List of Tables

List of Appendices

Chapter 1: General

    1.1 Background

    1.2 Public Hearing and Comment Information

    1.3 Social and Economic Considerations

    1.4 Fiscal and Manpower Resources

Chapter 2: State Implementation Plan Revision and Federal Clean Air Act, Section 110(l) Demonstration

    2.1 Overview and Background

        2.1.1 History of planned MSS permitting and 30 TAC section 101.222

    2.2 The Agreed Orders do not relax the SIP and do not interfere with Texas' ability to continue to meet the NAAQS for Particulate Matter

        2.2.1 Status of Air Quality for Particulate Matter

        2.2.2 The NSR Permit Conditions for Planned MSS Establish Best  Available Control Technology (BACT)

        2.2.3 Air Quality Analysis

        2.2.4 The Agreed Orders

    2.3 Conclusion

## LIST OF TABLES

Table 2-1: The NAAQS Design Values for $PM_{2.5}$ and $PM_{10}$ (2016-2018)

Table 2-2: Annual $PM_{2.5}$ Design Values

Table 2-3: 24-Hour $PM_{2.5}$ Design Values

LIST OF APPENDICES

| Appendix | Appendix Name |
| --- | --- |
| Appendix A | Responses to Comments Received |
| Appendix B | Agreed Order with Southwestern Electric Power Company (SWEPCO) H.W. Pirkey Power Plant in Harrison County, (Project No. 2020-021-SIP-NR; Docket No. 2020-0078-SIP) |
| Appendix C | Agreed Order with Lower Colorado River Authority (LCRA) Sam Seymour Fayette Power Project in Fayette County (Project No.2020-022-SIP-NR; Docket No. 2020-0077-SIP) |
| Appendix D | Agreed Order with Luminant Generation Company, LLC Martin Lake Steam Electric Station in Rusk County (Project No. 2020-023-SIP-NR; Docket No. 2020-0076-SIP) |
| Appendix E | Agreed Order with NRG Texas Power, LLC Limestone Electric Generating Station in Limestone County (Project no. 2020-024-SIP-NR; Docket No. 2020-0075-SIP) |
| Appendix F | Agreed Order with San Miguel Electric Cooperative, Inc. San Miguel Electric Plant in Atascosa County (Project No. 2020-025-SIP-NR; Docket No. 2020-0074-SIP) |
| Appendix G | Agreed Order with Southwestern Public Service Company (SPS) Harrington Station in Potter County (Project No. 2020-026-SIP-NR; Docket No. 2020-0073-SIP) |
| Appendix H | Agreed Order with Texas Municipal Power Agency (TMPA) Gibbons Creek Steam Electric Station in Grimes County (Project No. 2020-032-SIP-NR; Docket No. 2020-0178-SIP) |
| Appendix I | Agreed Order with Public Service Company of Oklahoma (PSO) Oklaunion Power Station in Wilbarger County (Project No. 2020-027-SIP-NR; Docket No. 2020-0072-SIP) |

# CHAPTER 1: GENERAL

## 1.1 Background

The State Implementation Plan (SIP) Revision Regarding Planned MSS Emissions for Certain EGUs (Non-Rule Project No. 2020-028-SIP-NR) includes voluntary agreed orders (AOs) with (1) the Southwestern Electric Power Company (SWEPCO) H.W. Pirkey Power Plant in Harrison County, (Project No. 2020-021-SIP-NR; Docket No. 2020-0078-SIP); (2) the Lower Colorado River Authority (LCRA) Sam Seymour Fayette Power Project in Fayette County (Project No.2020-022-SIP-NR; Docket No. 2020-0077-SIP); (3) the Luminant Generation Company, LLC Martin Lake Steam Electric Station in Rusk County (Project No. 2020-023-SIP-NR; Docket No. 2020-0076-SIP); (4) the NRG Texas Power, LLC Limestone Electric Generating Station in Limestone County (Project no. 2020-024-SIP-NR; Docket No. 2020-0075-SIP); (5) the San Miguel Electric Cooperative, Inc. San Miguel Electric Plant in Atascosa County (Project No. 2020-025-SIP-NR; Docket No. 2020-0074-SIP); (6) the Southwestern Public Service Company (SPS) Harrington Station in Potter County (Project No. 2020-026-SIP-NR; Docket No. 2020-0073-SIP); (7) the Texas Municipal Power Agency (TMPA) Gibbons Creek Steam Electric Station in Grimes County (Project No. 2020-032-SIP-NR; Docket No. 2020-0178-SIP); and (8) the Public Service Company of Oklahoma (PSO) Oklaunion Power Station in Wilbarger County (Project No. 2020-027-SIP-NR; Docket No. 2020-0072-SIP) establishing opacity and PM operational limits and work practices for periods of planned MSS at those EGUs as federally enforceable SIP emission limits. The SIP revision would not interfere with any applicable requirement concerning attainment and reasonable further progress or any other requirement of the Federal Clean Air Act (FCCA) and supports EPA approval in accordance with FCAA Section 110(l).

## 1.2 Public Hearing and Comment Information

In accordance with 40 CFR § 51.102, the commission offered a public hearing for this SIP revision in Austin on May 18, 2020 at 2 p.m.. Due to COVID-19 concerns and Governor Abbotts' suspension of various provisions of the Texas Open Meetings Act, the hearing was offered telephonically.  Prominent notice of this contingency was published in newspapers in the areas of the EGUs subject to the AOs, the *Austin American Statesman*, and the *Texas Register*.  The public was directed to the agency web site (see links to the announcement pages on the following page) for information and instructions on how to register and participate in the public hearing. The public hearing was not opened because there were no attendees who signed in to speak.

The public comment period opened April 10, 2020 and closed on May 26, 2020. Written comments were accepted via mail, fax, or through the eComments (https://www6.tceq.texas.gov/rules/ecomments/) system. During the comment period, the commission received comments from the United States Environmental Protection Agency (EPA); Environmental Integrity Project (EIP) on behalf of EIP, Sierra Club, Texas Campaign for the Environment, Environment Texas and Public Citizen; American Electric Power on behalf of Southwestern Electric Power Company (SWEPCO) and Public Service Company of Oklahoma (PSO); Luminant Generation Company, LLC (Luminant); San Miguel Electric Cooperative (SMEC); and the Lower Colorado River Authority (LCRA).

An electronic version of the proposed SIP revision and appendices was available during the comment period at the TCEQ's NSR and Title V announcements webpages: https://www.tceq.texas.gov/permitting/air/nav/nsr_news.html https://www.tceq.texas.gov/permitting/air/nav/titlev_news.html.

## 1.3 Social and Economic Considerations (NO CHANGE)

## 1.4 Fiscal and Manpower Resources (NO CHANGE)

## CHAPTER 2: FEDERAL CLEAN AIR ACT, SECTION 110(l) DEMONSTRATION

### 2.1 Overview and Background

The AOs listed below and submitted as appendices to this SIP revision establish enforceable operational limitations and work practice conditions for control of opacity and PM emissions during planned MSS activities at coal-fired EGUs equipped with ESPs.

- Appendix B: *Agreed Order with Southwestern Electric Power Company (SWEPCO) H.W. Pirkey Power Plant in Harrison County, (Project No. 2020-021-SIP-NR; Docket No. 2020-0078-SIP)*

- Appendix C: *Agreed Order with Lower Colorado River Authority (LCRA) Sam Seymour Fayette Power Project in Fayette County (Project No. 2020-022-SIP-NR; Docket No. 2020-0077-SIP)*

- Appendix D: *Agreed Order with Luminant Generation Company, LLC Martin Lake Steam Electric Station in Rusk County (Project No. 2020-023-SIP-NR; Docket No. 2020-0076-SIP)*

- Appendix E: *Agreed Order with NRG Texas Power, LLC Limestone Electric Generating Station in Limestone County (Project No. 2020-024-SIP-NR; Docket No. 2020-0075-SIP)*

- Appendix F: *Agreed Order with San Miguel Electric Cooperative, Inc. San Miguel Electric Plant in Atascosa County (Project No. 2020-025-SIP-NR; Docket No. 2020-0074-SIP)*

- Appendix G: *Agreed Order with Southwestern Public Service Company (SPS) Harrington Station in Potter County (Project No. 2020-026-SIP-NR; Docket No. 2020-0073-SIP)*

- Appendix H: *Agreed Order with Texas Municipal Power Agency (TMPA) Gibbons Creek Steam Electric Station in Grimes County (Project No. 2020-032-SIP-NR; Docket No. 2020-0178-SIP)*

- Appendix I: *Agreed Order with Public Service Company of Oklahoma (PSO) Oklaunion Power Station in Wilbarger County (Project No. 2020-027-SIP-NR; Docket No. 2020-0072-SIP)*

The SIP limits for opacity and PM in 30 Texas Administrative Code (TAC) §111.111(a)(1) and §111.153(b) do not apply to coal-fired EGUs (sometimes referred to as electric generating facility boilers (EGF boilers)) equipped with ESPs during planned MSS  activities due to the safety and technological limitations of the control devices. This SIP revision adds specific federally enforceable opacity and PM operational limits and work practices to the SIP for planned MSS activities. Therefore, although the terms of the AOs are currently in the EGU NSR permits, this SIP revision will not substitute or modify applicable control measures or relax the SIP and would not interfere with attainment or maintenance of the $PM_{10}$ and $PM_{2.5}$ National Ambient Air Quality Standards (NAAQS) or any other applicable requirement of the Federal Clean Air Act (FCAA).

### 2.1.1 History of planned MSS permitting and 30 TAC Section 101.222

In 2005, the TCEQ adopted amendments to its General Rules in 30 TAC § 101.222. The purpose of the amendments was to provide an incentive for owners and operators to authorize existing planned MSS activities and associated emissions. Under the amended rules, owners and operators of facilities with emissions from planned MSS activities could no longer rely on the affirmative defense for these unauthorized emissions after the applicable application deadline. For electric utility generating

facilities, the deadline to submit NSR permit amendment applications pursuant to 30 TAC Chapter 116 requirements was January 5, 2011.[3]  Section 101.222(j) required the executive director to process these applications according to the application review schedule in 30 TAC §116.114.

Electric utility generating facilities operating in 2011 filed timely applications to authorize their existing planned MSS activities and the associated emissions. These amended permits were issued between 2013 and 2016. Although these planned MSS activities and emissions occurred after facilities began operation, they had not necessarily been fully authorized in an NSR permit prior to these permit amendments. Because these emissions already existed, the permit amendments did not involve any physical modifications or changes in method of operation to the facilities with regard to the planned MSS activities. Eight of these electric generating facilities, which operate thirteen coal-fired EGUs that utilize ESPs as the control device for opacity and PM emissions, are the subjects of the AOs and this SIP revision.

On December 2, 2015, in response to petitions to the United States Environmental Protection Agency (EPA)[4] requesting the administrator enforce opacity and PM Chapter 111 applicable requirements and object to EGU Title V permits, the TCEQ submitted a letter to EPA Administrator McCarthy that provided a history of the development of two TCEQ rules, 30 TAC §111.111(a)(1) and §111.153(b), which are in the approved Texas SIP. In part, the letter explained that certain opacity and PM limits in these rules have never applied and do not apply during periods of startup and shutdown activities at EGUs that use ESPs. The letter indicated that, in order for an ESP to meet the control efficiency levels necessary to meet the PM and opacity limits in Chapter 111, the ESP control device must be at the proper temperature. This is also necessary for safe operation of the ESP. During periods of the EGU boiler startup and shutdown, the temperature of the flue gas routed to the ESP is not at the proper temperature for safe operation of the ESP. The lower capture efficiency of ESPs during these activities have been well documented in a report from Radian, which was attached to the 2015 TCEQ letter, and in several studies conducted by the EPA and predecessor agencies as early as 1970.[5] The Chapter 111 PM and opacity limits were developed to apply during routine operations when the ESPs were at proper operating temperature to achieve the appropriate capture efficiency levels and operate safely.

On March 13, 2017, the EPA requested that the TCEQ submit, as a SIP revision, the opacity and PM permit conditions from the permit amendments for planned MSS

---

[3] Title 30 TAC §101.222(h)(1)(D): for facilities in SIC code 4911 (Electric Services), five years after the effective date of this section

[4] Citizen Petition for Action to Enforce the Texas State Implementation Plan and Title V of the Clean Act Act (submitted by Environmental Integrity Project and others, May 27, 2015) and Petition Requesting that the EPA Administrator Object to the Issuance of the Proposed Title V Operating Permit for the H. W. Pirkey Power Plant, Permit Number O31 (submitted by Environmental Integrity Project, October 30, 2014; their Notice of Intent to Sue EPA regarding both of these petitions was filed July 1, 2016.

[5] *An Electrostatic Precipitator Systems Study: Final Report to The National Air Pollution Control Administration*, Southern Research Institute, Contract CPA 22-69-73, October 30, 1970; *Effects of Transient Operating Conditions on Steam-Electric Generator Emissions*, EPA-600/2-75-022, August 1975; *Controlling Particulate Emissions from Coal-Fired Boilers*, EPA-600/8-79-016, June 1979.

activities by use of voluntary AOs for EGUs equipped with ESPs. Therefore, the TCEQ is submitting eight AOs, provided in Appendices B through I, covering 13 EGUs.

## 2.2 The Agreed Orders do not relax the SIP and do not interfere with Texas' ability to continue to meet the NAAQS for Particulate Matter

Section 110(l) of the FCAA[6] establishes requirements for SIP revisions.

> Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

Section 110(a)(1) - (2) of the FCAA establishes content requirements for NAAQS state implementation plans, including enforceable emission limitations and other control measures, means or techniques, together with schedule and timetable for compliance to meet the requirements of the FCAA, and a program to provide for the enforcement of these measures, including regulation for modification and construction of any stationary source, and major NSR permitting, as applicable. This section of the FCAA also includes requirements for establishment and operation of appropriate methods and procedures necessary to monitor, compile and analyze data on ambient air quality.

The Texas SIP contains all of the necessary programs, data and representations to meet the requirements of FCAA, §110. In particular, the Texas minor NSR permitting program is an EPA-approved part of the Texas SIP, and the permit amendments authorizing the planned MSS activities meet all applicable permit requirements, including a demonstration that the conditions are considered Best Available Control Technology (BACT) during these periods.

The emissions associated with the planned MSS activities that were added to the EGUs' NSR permits were existing emissions and, therefore, were not new emissions in any airshed in which the EGUs are located. The planned MSS permit amendments established work practice conditions and operational limitations for the EGUs during planned MSS activities to control existing opacity and PM emissions for which SIP limits do not apply.

### 2.2.1 Status of Air Quality for Particulate Matter

All eight electric generating facilities (or power plants) and all thirteen of the EGUs at those plants subject to this SIP revision are located in areas that are designated as "attainment" or "unclassifiable/attainment" by the EPA for the $PM_{10}$ and $PM_{2.5}$ NAAQS.[7] TCEQ monitoring network data show that no EGU subject to this SIP revision is located in an area that is violating the current $PM_{10}$ or $PM_{2.5}$ NAAQS. The eight power plants are

---

[6] 42 U.S.C. § 7410(l).

[7] Go to https://www.tceq.texas.gov/airquality/sip to see current air quality status for air quality planning areas across Texas.

spread across a wide area of the state, and none are located in close proximity to another plant such that transport of opacity and PM emissions from planned MSS activities from one plant would adversely impact the air quality in another area.

The areas where the EGUs are located are in attainment even though the opacity and PM limits in §111.111(a)(1) and §111.153(b) do not and cannot apply during planned MSS activities at these EGUs. Emissions from these planned MSS activities have existed since the EGUs began operation. The purpose of these AOs is to require the opacity and PM operational limitations and work practices in the NSR permits that are now contained in the ordering provisions of the AOs be subject to change only through the SIP revision process required by 40 Code of Federal Regulations (CFR) Parts 51 and 52. These are emissions from intermittent and infrequent planned MSS activities from EGUs that are not located in close proximity to each other. In order to protect the reliability of the electric grid, the grid operating authorities must be notified in advance of planned outages at an EGU. The grid operators strictly regulate when plants and/or units go offline to ensure adequate generation is put on the grid. The loss of several units at one time can have significant impact on the reliability of power generation to the areas covered by the grid operators. The TCEQ obtained data from the Electric Reliability Council of Texas (ERCOT) that demonstrates that startups are intermittent and infrequent activities for five of the eight plants that have EGUs in this demonstration. The data ERCOT provided to the TCEQ is for the year 2018 and is the specific time and date of each startup of each coal-fired EGU in the ERCOT electric grid (ERCOT represents approximately 90% of the state's overall electric load). These data show that of all the startups in 2018, only two coal-fired EGUs started up on the same day. In addition, the total number of startups for all of the EGUs in this demonstration was 46 for calendar year 2018. This information further demonstrates that the emissions from these planned MSS activities are intermittent and infrequent.

### 2.2.2 NSR Permit Conditions for Planned MSS Establish Best Available Control Technology (BACT)

Each permit application to authorize the emissions from planned MSS activities was subject to a source analysis and technical review. These reviews are available in the TCEQ online permits database. In issuing the planned MSS permit amendments, TCEQ Air Permits Division conducted a BACT review for each application, and BACT was specifically established for emissions from planned MSS activities. In a typical coal-fired EGU, coal is delivered to and combusted in a boiler to produce steam that is then used to power a turbine to produce electricity. These coal-fired EGUs use ESPs as the primary control device for PM emissions from the flue gas produced by combustion of coal in the boiler. After combustion occurs, coal ash is carried in flue gas to the ESP where the particulates in the gas are collected. ESPs are highly efficient (up to 99% collection) when operating at sufficiently high temperature and flow rate.[8] At optimal operation, ESPs can meet established BACT and SIP limits for PM and opacity. Their efficiency varies during transient operation periods when temperature, inlet loading and gas flow rate are not uniform, such as during startup and shutdown.[9] During

---

[8] Effects of Transient Operating Conditions on Steam-Electric Generator Emissions, EPA-600/2-75-022, page 15.
[9] Controlling Particulate Emissions from Coal-Fired Boilers, EPA-600/8-79-016, page 12.

startup of the boiler, the ESP is energized when the flue gas temperature at the inlet to the ESP reaches a specified temperature. The temperature must be high enough to avoid collection of wet ash that can foul the ESP causing inefficient collection and worse, potentially unsafe conditions.

Special conditions in the EGUs' NSR permits were designed to provide a federally enforceable limit for emissions during planned MSS activities when the ESPs are operated outside the optimal range. The conditions define the startup and shutdown periods and establish durational limits for these activities in order to minimize emissions. The time limits in the special conditions reflect best management practices and promote the safe, effective operation of the respective boiler and ESP. Minimizing emissions using good air pollution control procedures and best management practices are considered BACT for the planned MSS activities. These conditions are specifically incorporated into the AOs for the respective EGUs.

### 2.2.3 Air Quality Analysis

Opacity and PM emissions associated with EGU planned MSS for these types of power plants are intermittent and short in duration. In addition, the individual EGU startups and shutdowns do not typically coincide with startups and shutdowns at the other EGUs. The decisions regarding the timing of startups and shutdowns are based on several factors unique to the plant's operation including equipment maintenance needs, weather, market conditions, and the demands of Texas' main grid operators, ERCOT and Southwest Power Pool (SPP). Each EGU owner/operator must notify its respective electric grid coordinating organization when such planned shutdowns and subsequent startups will occur so that the grid operator can account for the lost generation and prevent other units from going offline at the same time to avoid possible power shortages to the grid. In addition, as previously indicated, the EGUs are not located in close proximity, so the opacity and PM emissions from the planned MSS activities do not impact other individual EGU startups and shutdowns.

Also, the TCEQ maintains a robust PM monitoring network consisting of over 130 PM samplers (all forms) located at 76 monitoring stations across the state. This network meets or exceeds federal PM monitoring requirements in all areas of the state and provides data for regional air quality assessments and NAAQS compliance determinations. The EPA confirmed, in a letter dated October 19, 2018, that the monitoring network meets the requirements of 40 CFR Part 58 and its appendices. The EPA concluded that the 2018 Annual Monitoring Network Plan and proposed monitoring network modifications "ensure the air quality surveillance system continues to meet applicable requirements."[10]

Table 2-1 displays valid $PM_{2.5}$ design values and the number of $PM_{10}$ expected exceedances per year from areas within Texas. The design value for each region is the maximum design value of all monitoring sites in the region that measure the parameter in question, have valid data, and meet necessary monitoring requirements.

---

[10] Letter to Richard C. Chism TCEQ Director, Monitoring Division, from Guy R. Donaldson EPA Region VI Associate Director, Air, Multimedia Division, October 19, 2018.

- The 2012 Annual $PM_{2.5}$ NAAQS is 12.0 µg/m³

- The 24-Hour $PM_{2.5}$ NAAQS is 35 µg/m³

- The maximum number of allowable $PM_{10}$ expected exceedances per year is 1.0.

**Table 2-1: The NAAQS Design Values for $PM_{2.5}$ and $PM_{10}$ (2016-2018)**

| Area | Design Values* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Annual $PM_{2.5}$ Design Value (µg/m³) | | | 24-Hour $PM_{2.5}$ Design Value (µg/m³) | | | 24-Hour $PM_{10}$ Expected Exceedances (# of expected exceedances) | | |
| | 2016 | 2017 | 2018 | 2016 | 2017 | 2018 | 2016 | 2017 | 2018 |
| ARR | 9.6 | 9.6 | 9.8 | 19 | 20 | 22 | 0.0 | 0.0 | 0.0 |
| CC | 9.9 | 9.3 | 9.1 | 25 | 24 | 25 | 0.0 | - | - |
| DFW | 9.5 | 8.9 | 8.9 | 19 | 18 | 20 | 0.0 | 0.0 | 0.0 |
| ELP | 9.4 | 8.9 | 9.1 | 25 | 23 | 24 | 0.0 | 2.0** | 4.4** |
| HGB | 11.2 | 10.7 | 10.2 | 22 | 22 | 25 | 0.0 | 0.0 | 0.0 |
| LAR | - | - | - | - | - | - | 0.0 | 0.0 | - |
| LRG | - | - | 9.9 | - | - | 25 | - | - | - |
| MEM | 10.1 | 10.2 | 10.7 | 25 | 26 | 28 | 0.0 | 0.0 | 0.0 |
| NET | 8.8 | 8.6 | 8.5 | 17 | 17 | 18 | 0.0 | 0.0 | - |
| SAN | 8.4 | 8.4 | 8.1 | 19 | 20 | 19 | 0.0 | 0.0 | 0.0 |

*Only valid design values are included in this table.
**These data include potential Exceptional Events. Please see
https://www.tceq.texas.gov/airquality/monops/pm_flags.html for additional information.
ARR (Austin-Round Rock); CC (Corpus Christi); DFW (Dallas-Fort Worth); ELP (El Paso); HGB (Houston-Galveston-Brazoria); LAR (Laredo); LRG (Lower Rio Grande Valley); MEM (McAllen-Edinburg-Mission); NET (Northeast Texas); SAN (San Antonio)

From 2016 through 2018, all areas in Texas have met the NAAQS for $PM_{2.5}$. For $PM_{10}$, only the El Paso area recorded expected exceedance values calculated above 1.0. These values are from the Socorro Hueco monitoring site in both 2017 and 2018 and are currently under review due to proposed exceptional event flags. Based on data from this network, no areas of the state in proximity to the thirteen EGUs are currently monitoring a violation of the $PM_{2.5}$ and $PM_{10}$ standard, and all the EGUs subject to this SIP revision continue to operate in areas designated as "attainment" or "unclassifiable/attainment" by the EPA. Tables 2-2 and 2-3 contain more extensive data with six years of valid $PM_{2.5}$ design values from areas within Texas.

**Table 2-2: Annual PM$_{2.5}$ Design Values**

| Annual PM$_{2.5}$ Design Value (µg/m³)* | | | | | | |
|---|---|---|---|---|---|---|
| Area | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| ARR | 9.6 | 9.4 | 9.2 | 9.6 | 9.6 | 9.8 |
| CC | 10.2 | 10.1 | 10.1 | 9.9 | 9.3 | 9.1 |
| DFW | 10.8 | 10.7 | 10.2 | 9.5 | 8.9 | 8.9 |
| ELP | 11.3 | 11.0 | 9.9 | 9.4 | 8.9 | 9.1 |
| HGB | 11.8 | 11.6 | 11.6 | 11.2 | 10.7 | 10.2 |
| LAR | - | - | - | - | - | - |
| LRG | - | - | - | - | - | 9.9 |
| MEM | - | - | - | 10.1 | 10.2 | 10.7 |
| NET | 10.5 | 9.5 | 9.0 | 8.8 | 8.6 | 8.5 |
| SAN | 8.9 | 8.5 | 8.5 | 8.4 | 8.4 | 8.1 |
| *Only valid design values are included in this table. ARR (Austin-Round Rock); CC (Corpus Christi); DFW (Dallas-Fort Worth); ELP (El Paso); HGB (Houston-Galveston-Brazoria); LAR (Laredo); LRG (Lower Rio Grande Valley); MEM (McAllen-Edinburg-Mission); NET (Northeast Texas); SAN (San Antonio) | | | | | | |

**Table 2-3: 24-Hour PM$_{2.5}$ Design Values**

| 24-Hour PM$_{2.5}$ Design Value (µg/m³)* | | | | | | |
|---|---|---|---|---|---|---|
| Area | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| ARR | 24 | 24 | 22 | 19 | 20 | 22 |
| CC | 31 | 31 | 26 | 25 | 24 | 25 |
| DFW | 24 | 24 | 22 | 19 | 18 | 20 |
| ELP | 30 | 31 | 29 | 25 | 23 | 24 |
| HGB | 23 | 24 | 24 | 22 | 22 | 25 |
| LAR | - | - | - | - | - | - |
| LRG | - | - | - | - | - | 25 |
| MEM | - | - | - | 25 | 26 | 28 |
| NET | 22 | 22 | 20 | 17 | 17 | 18 |
| SAN | 23 | 21 | 22 | 19 | 20 | 19 |
| *Only valid design values are included in this table. ARR (Austin-Round Rock); CC (Corpus Christi); DFW (Dallas-Fort Worth); ELP (El Paso); HGB (Houston-Galveston-Brazoria); LAR (Laredo); LRG (Lower Rio Grande Valley); MEM (McAllen-Edinburg-Mission); NET (Northeast Texas); SAN (San Antonio) | | | | | | |

**2.2.4 Agreed Orders**

The permit conditions for planned MSS activities and the associated emissions are enforceable and include the representations in each application. The specific ordering provisions in the AOs regarding planned MSS activities and emissions incorporate the opacity and PM operational limits and work practices that are in those NSR permit conditions. These ordering provisions include limitations on opacity and PM emissions associated with planned MSS and include methods for demonstrating compliance with appropriate monitoring, recordkeeping and reporting requirements.

**2.3 Conclusion**

This SIP revision and associated voluntary AOs meet the requirements of FCAA, §110(l). The AOs and SIP revision establish federally enforceable conditions for opacity and PM emissions from planned MSS activities. As this demonstration shows, these relatively low, short-term and infrequent emissions from planned MSS at a few EGUs are not new emissions and have occurred for several years. These EGUs are located in areas currently attaining the $PM_{10}$ and $PM_{2.5}$ NAAQS. Therefore, inclusion of these AOs in the SIP does not increase opacity and PM emissions and would not worsen air quality or interfere with continued maintenance of the NAAQS.[11] Lastly, the AOs will establish federally enforceable limits on existing PM emissions and opacity occurring in areas attaining the PM NAAQS, and thus do not relax the SIP or interfere with attainment or maintenance of the PM NAAQS.

---

[11] "The critical question for this Court becomes whether the EPA's interpretation that the CAA § 110(l) allows the agency to approve a SIP revision unless the agency finds it will make the air quality worse is a permissible reading of the statute.  This reading of the statue is reasonable and thus entitled to deference." *Kentucky Resources Council, Inc. v. EPA*, 467 F.3d 986, 995 (6th Cir. 2006)

Appendix A: *Responses to Comments*

RESPONSES TO COMMENTS RECEIVED CONCERNING AGREED ORDERS REGARDING
PLANNED MAINTENANCE, STARTUP AND SHUTDOWN EMISSIONS FOR CERTAIN
ELECTRIC GENERATING UNITS

The commission offered a public hearing on May 18, 2020 at 2p.m.  The hearing was
held remotely due to COVID-19 restrictions.  The public hearing was not opened
because there were no attendees who signed in to speak.

During the comment period, which closed on May 26, 2020, the commission received
comments from the United States Environmental Protection Agency (EPA);
Environmental Integrity Project (EIP) on behalf of EIP, Sierra Club, Texas Campaign for
the Environment, Environment Texas and Public Citizen; American Electric Power on
behalf of Southwestern Electric Power Company (SWEPCO) and Public Service Company
of Oklahoma (PSO);  Luminant Generation Company, LLC (Luminant); San Miguel
Electric Cooperative (SMEC); and the Lower Colorado River Authority (LCRA).

*Comment*

The EPA stated its understanding that the proposed AOs are intended to establish
certain operational limits and work practices for periods of planned Maintenance,
Startup and Shutdown (MSS) activities as federally enforceable emission limitations
and revisions to the Texas SIP for the affected units at the eight (8) coal-fired plants
identified below. After these revisions are adopted, emissions from the affected units
at these plants will be subject to the opacity limit in 30 TAC §111.111(a)(1) and the PM
limit in 30 TAC §111.153(b) during normal operations and the alternative emission
limitation requirements established in their corresponding AO during planned MSS
activities.

**Response**

**The EPA's understanding of the purpose and intent of the AOs is correct.**

*Comment*

The EPA stated the language in 30 TAC §111.153(b) specifically refers to "*solid fossil
fuel-fired steam generator units*," while throughout the AOs the term "*coal-fired Electric
Generating Units (EGUs)*" is used. Given that the State is not revising the rule language
in 30 TAC Chapter 111 with this action, EPA assumes these two terms are being used
interchangeably. For clarity, EPA recommends the submittal include a clarification
statement concerning the use of these two terms.

**Response**

**The coal-fired EGUs covered by these AOs are "solid fossil fuel-fired steam
generator units" as the term is used in 30 TAC § 111.153(b). The AOs apply
specifically to a subset of solid fossil fuel-fired steam generators that use coal. The
commission has added clarifying language regarding the use of these two terms in
the SIP submittal.**

*Comment*

The EPA requested confirmation that the proposed revisions to the Texas SIP (Project No. 2020-028-SIP-NR; Docket No. 2020-0071-SIP) and the AOs apply *only* to certain coal-fired EGUs equipped with ESPs, and is *not* intended to extend to coal-fired EGUs equipped with a PM control device other than an ESP (i.e., a baghouse as the PM control device).

*Response*

**The commenter is correct. The AOs apply only to the specific coal-fired EGUs identified in the AOs which are equipped with ESPs.**

*Comment*

The EPA requested confirmation that the proposed revisions to the Texas SIP and the AOs apply *specifically* to sources in the above-mentioned sector (i.e., certain coal-fired EGUs equipped with ESPs) and *not* to another sector or category of sources subject to 30 TAC Chapter 111 requirements for SIP purposes.

*Response*

**The commenter is correct. The AOs only apply to the specific coal-fired EGUs identified in the AOs that are equipped with an ESP as the PM control device and no other sector or category of sources.**

*Comment*

The EPA requested clarification of the commission's intention that upon adoption *only* the AOs are expected to become part of EPA-approved SIP for Texas, or is it the State's expectation that upon adoption *both* the AOs *and* the state-issued air permit(s) together to become part of EPA-approved SIP for Texas.

*Response*

**The commission is submitting only the AOs for inclusion in the SIP and is not submitting the air permits to become part of the EPA-approved SIP.**

*Comment*

The EPA stated that the ordering provisions within the AOs pertain to planned MSS activities. For example, Docket No. 2020-0178-SIP for the Texas Municipal Power Agency Gibbons Creek Steam Electric Station in Grimes County, Boiler Unit 1, reads: "*A planned startup of the Boiler shall not exceed 2,880 minutes,…*" and "*An extended planned startup is defined as a startup that lasts more than 48 hours. The total amount of incremental time the extended startups exceed 48 hours shall not exceed 600 hours on an annual calendar year basis.*" …"*A planned shutdown of the Boiler shall not exceed 600 minutes,… " also, "Periods of opacity greater than 20 percent from the Boiler from the following planned online and offline maintenance activities is authorized for no more than 500 hours in a calendar year."* EPA requested TCEQ explain in the record the basis and calculations supporting the time limits contained in the ordering

provisions for each AO (i.e. "2880 minutes," the "600 hours," the "600 minutes," and the "500 hours"); and if these time limits are based on actual data and considered representative of the past historical operations of this particular unit.

*Response*

**The Executive Director based the NSR permit reviews on the application material provided by the owners/operators of each site specific EGU. Specifically, for the Texas Municipal Power Agency, Gibbons Creek Steam Electric Station in Grimes County, Boiler Unit 1, NSR Permit 5699, the application included the referenced quantities within their estimates/durations of startup and shutdown. They stated in the application that the time periods proposed were based on review of their operations records from 2005 to present.**

**For the remaining EGUs in the other AOs, NSR permit applicants reviewed their case-by-case operations to quantify the emissions during the MSS activities and identify ways to reduce the durations. Prior to submitting applications, TCEQ staff also met with applicants in pre-application meetings to assist in these efforts.  Each EGU had defined case-by-case durations for their specific planned MSS. Minimizing those durations, which previously were unrestricted, reduces those emissions. Also, applicants were asked during each case-by-case permit review to identify the durations within their applications. The statements within their applications are federally enforceable. Several applicants requested that durations identified in hours be shown as minutes within the Special Conditions of their permits to have operational flexibility. Those conversions assume the expected 60 minutes per hour. The TCEQ Central Records online database (https://www.tceq.texas.gov/agency/data) contains the permit applications containing the planned MSS calculations and their basis.**


*Comment*

The EPA requested confirmation that the revised SIP would not increase emissions associated with the planned MSS activities from these units, and it is the State's interpretation that implementation of work practice measures set forth within the AOs could assist with lowering of such emissions.

*Response*

**The commenter is correct that the revised SIP would not increase emissions associated with planned MSS. These opacity and PM emissions are from pre-existing planned MSS activities that have been authorized through new source review (NSR) permits for several years. Because the planned MSS emissions at these facilities are now authorized, previous emissions from those activities did not have restrictions and were potentially higher. Adding the AOs to the SIP will establish federally enforceable limits in the form of work practices and operational limits to assist with lowering those previously unrestricted opacity and PM emissions.**

**The EPA has previously determined that a proposed SIP revision that also related to an attainment area and that would not relax the SIP would not interfere with attainment of the NAAQS. (See, e.g., 83 Fed. Reg. 14758 (April 6, 2018)).**

*Comment*

The Environmental Integrity Project (EIP) stated that the Executive Director's claim that § 111.111(a)(1) and § 111.153(b) emission limits do not apply to power plants that use ESPs to control particulate matter emissions during planned MSS activities is contrary to the clear language of the regulations establishing those limits. The argument made in the Interpretive Letter and offered in support of the Executive Director's characterization of the proposed SIP revision project is frivolous. The Executive Director's interpretation of SIP opacity and particulate matter limits is contrary to the TCEQ's past practice. The Executive Director only claimed that § 111.111 and § 111.153 emission limits did not apply to power plants with ESPs during planned MSS activities after Commenters decisively refuted his claim of authority to create exemptions to the SIP limits.

*Response*

**The commission disagrees with the Commenter's assertions regarding the December 2, 2015 letter.  First, as the Executive Director clearly indicated in that letter, states are in the best position to interpret their rules, and those interpretations are entitled to deference, as the EPA has acknowledged in several SIP approvals. Second, the regulatory provisions in Chapter 111 have been historically interpreted and applied in a manner independent of the planned MSS rules in Chapter 101, creating some ambiguity. The primary purpose of the interpretive letter was to clear up that ambiguity and address several misstatements and inaccurate comprehension in the Citizen Petition and H.W. Pirkey Petition. As the Executive Director's letter and this SIP revision recognize, the PM emission limitations in Chapter 111 should be interpreted and apply only in the context of the comprehensive regulatory program that has always been Texas law, which includes the Chapter 101 MSS rules. The EPA's longstanding use of interpretive letters to clarify perceived ambiguity in the provisions of a SIP submittal is a permissible, and sometimes necessary, approach under the FCAA. (Letter to Ron Curry, Regional Administrator, EPA Region 6 from Zak Covar, Executive Director TCEQ, December 9, 2013). The commenter's mischaracterization of the December 2, 2015 letter does not diminish the correctness of this SIP revision, in particular when the EPA has indicated that (by letter dated March 13, 2017 from Guy Donaldson, EPA Region 6 to Steve Hagle, Deputy Director, Office of Air, TCEQ) source-specific SIP revisions are appropriate tools to establish federally enforceable SIP limits for all phases of operation. The AO SIP revision is the mutually agreed upon approach between the EPA and TCEQ to resolve issues related to PM and opacity limits during periods of planned MSS at the EGUs specifically identified.**

*Comment*

EIP stated that the Executive Director has already admitted that the permit conditions reflected in the proposed agreed orders were intended to create exemptions to § 111.111 and § 111.153 emission limits. Beginning in 2010, the Executive Director issued a series of NSR permit amendments for power plants, including the eight power plants that would be subject to the proposed agreed orders, that drastically increased

hourly particulate matter emission limits during periods of planned MSS and established exemptions from SIP requirements at § 111.111(a)(1) and § 111.153(b) during planned MSS. Commenters and other groups submitted comments opposing the incorporation of these exemptions into Title V permits for the H.W. Pirkey Power Plant, and several of the EGUs subject to these proposed AOs:  the Sam Seymour Fayette Power Project, the Martin Lake Power Plant, the San Miguel Power Plant, the Harrington Power Plant, the Oklaunion Power Plant, the Gibbons Creek Power Plant, and the Welsh Power Plant. In the Pirkey Title V RTC, the Executive Director acknowledged that the work-practice standards incorporated by the H.W. Pirkey Title V permit and reflected in the proposed agreed order for that plant established exemptions to Texas SIP § 111.111 and § 111.153 requirements.

*Response*

**The commission disagrees with the assertion that the planned MSS permit amendments were intended to create exemptions.  The Executive Director made no such claim and categorically stated in the December 2, 2015 letter that the permit conditions were "not created as an exemption from requirements, but to clarify that [Chapter 111 requirements] are not applicable for certain defined activities for specific durations." Without repeating the interpretive letter verbatim, the Chapter 111 opacity and PM limits do not apply to EGUs that use an ESP as the only PM control device during startup and shutdown of the EGU.  As explained in the SIP narrative, authorization of planned MSS emissions was necessary for many sources in Texas because the affirmative defense for excess planned emissions was being phased out.  Section 101.222(h) established a schedule for source categories to submit applications for their planned MSS emissions that were not authorized but would no longer be able to avail themselves of the affirmative defense.**

*Comment*

EIP stated the Executive Director's demonstration of non-interference with the SIP for particulate matter does not fulfill federal SIP revision requirements. The work-practice standards listed in the proposed agreed orders is not BACT. The Executive Director's air quality analysis does not comply with federal demonstration requirements for SIP revisions, nor does it demonstrate that the proposed SIP revision will not interfere with Clean Air Act requirements.

*Response*

**The Executive Director's demonstration provides information on how the site-specific SIP revisions will not relax, replace, or modify any pre-existing applicable SIP limit. The demonstration emphasizes the robust monitoring network throughout the State of Texas; that the permit conditions established BACT for MSS emissions; and that EGU emissions are pre-existing or intermittent (do not occur at the same time) and are from sources that are not located in close proximity to each other.**

**As part of the NSR permit evaluation for new or amended permits, the permit reviewer audits all sources of air contaminants at the proposed facility and assures that the facility will be using the best available control technology (BACT) applicable for the sources and types of contaminants emitted. The BACT is based upon control measures that are designed to minimize the level of emissions from specific sources at a facility. Applying BACT results in requiring technology that**

**best controls air emissions with consideration given to the technical practicability and economic reasonableness of reducing or eliminating emissions.** *See* **TCAA § 382.0518; Title 30 TAC §§ 116.10(1) and 116.111. BACT may be numerical limitations, the use of an add-on control technology, design considerations, the implementation of work practices, or operational limitations. The combination of all of the data the TCEQ provided in the SIP demonstration shows that each site-specific agreed order will comply with federal requirements.**

*Comment*

EIP stated that the proposed exemptions from Texas SIP requirements are unnecessary. The proposed exemptions are unfair to those operators that have already borne the reasonable expense necessary to comply with Texas SIP limits. The Executive Director's proposal to allow broad exemptions to current pollution control requirements without even considering whether the eight subject plants can install controls that will comply with those standards without undue financial hardship places the interests of industry over the public's interest in clean air. The proposal is unnecessary, unreasonable, and it should be abandoned.

*Response*

**The commission disagrees that AOs are exemptions from SIP requirements or that they are unnecessary.  As stated previously, when approved into the SIP the AOs will establish source-specific, federally enforceable work practices and operational limits for planned MSS at the EGUs. These limits are already authorized in new source review permits, meet established BACT, and do not interfere with attainment and maintenance of air quality standards.**

*Comment*

EIP stated that the Executive Director obtained data from the Electric Reliability Council of Texas for start-ups to demonstrate that start-ups are intermittent and infrequent activities for five of the eight plants that have EGUs in this demonstration. Explain how these startups at these five plants are intermittent and infrequent and will not jeopardize compliance with applicable Clean Air Act requirements.

*Response*

**The Executive Director's demonstration contained data from the Electric Reliability Council of Texas (ERCOT) for start-ups in calendar year 2018.  The data demonstrates that of approximately 75% of the EGU's in this demonstration (some of the units are in the Southwest Power Pool) had only one day in a calendar year where two coal-fired EGUs in this demonstration (in ERCOT) had a start up on the same day.  In addition, it showed that of these units they were in start-up mode a total of 46 days (12% of the total days of the year).**

In addition, the EGUs covered by the AOs provide base load power to the ERCOT and SPP grids.  As such, they are operated to generate electricity for prolonged periods without interruption.  In order to provide reliable electricity for sustained periods, the grid operators must ensure that adequate generating capacity is readily available. This includes knowing when large load sources will be shut down for maintenance or other reasons. As explained in Section 2.2.3 of the SIP narrative (Project no. 2020-028-SIP-NR), "Each electric utility must notify their respective grid coordinating organization when such planned shutdowns and subsequent startups will occur so that the planning authority can account for the lost generation and prevent other units from going offline at the same time to avoid possible power shortages to the grid." As a large source of base load power in Texas, all these units, or a significant number of units, cannot be offline simultaneously in order to keep electric supply at adequate levels to meet demand. Therefore, this data confirms that the planned MSS is intermittent and infrequent and will not jeopardize compliance with the NAAQS or any other FCAA requirements.

*Comment*

EIP stated that the work-practice standards allow emissions that are much higher than the subject power plants would typically emit. To establish that the proposed agreed orders will protect the NAAQS, the Executive Director must, at least, produce modeling based on the maximum emissions authorized by the proposed agreed orders in support of this project.

*Response*

The Executive Director's demonstration contains a qualitative analysis of numerous factors which includes monitoring network data, EGU start-up data, proximity of the EGUs to one another, NSR BACT analyses, and the fact that the MSS activities were pre-existing emissions. This demonstration contains information to establish that the proposed AOs will comply with the FCAA requirements. Furthermore, during the permit application reviews for the EGUs, the existing short-term (hourly limit) PM emissions from planned MSS activities were evaluated and compared to the $PM_{10}$ and $PM_{2.5}$ NAAQS. The air quality impacts analysis completed for each EGU confirmed that the ground level concentration from projected short-term PM emissions from planned MSS activities would not cause or contribute to an exceedance of the NAAQS.

*Comment*

Southwestern Electric Power Company (SWEPCO), Public Service Company of Oklahoma (PSO), Luminant Generation Company, LLC (Luminant), Lower Colorado River Authority (LCRA), San Miguel Electric Cooperative (SMEC) expressed appreciation for the significant time and effort of the TCEQ staff in bringing these matters to the Commission, and fully support adoption of the proposed Agreed Orders for the electrical generating units at their respective power plants and the corresponding revisions to the State Implementation Plan to incorporate operational limits and work practices for periods of planned Maintenance, Startup and Shutdown activities (MSS)

into the Texas SIP. SWEPCO, PSO, Luminant, SMEC, and LCRA also expressed support of the Texas Commission on Environmental Quality's ("TCEQ") approval of Agreed Orders Regarding Planned Startup and Shutdown Emissions for Certain Electric Generating Units and 110(l) Demonstration State Implementation Plan ("SIP").

*Response*

**The commission appreciates the commenters' support.**

*Comment*

SWEPCO, PSO, Luminant, SMEC, and LCRA stated that the MSS work practices in the EGU NSR Permits are presently federally enforceable by virtue of being in the EGUs' federally enforceable new source review permits. The last paragraph of the Executive Summary, Sections 1.1, 2.1, and 2.3 of the proposed SIP revision therefore, should clarify that the Agreed Orders will set the MSS work practices as enforceable source-specific SIP limits for the EGUs.

*Response*

**The commission agrees with the comment that the new source review permit limits are federally enforceable. The AOs establish source-specific PM limits and opacity for planned MSS that once approved by EPA will be enforceable through the SIP, as alternative PM/opacity limits.  Submittal of the AOs as source-specific SIPs is an approach agreed upon with the EPA that resolves an issue raised in the H.W. Pirkey Order and a Citizen Petition regarding PM SIP limits. The commission believes this is clear in the Project no. 2020-028-SIP-NR narrative. To the extent this intent is not clear, the commission provides this response for the record.**

*Comment*

SWEPCO, PSO, Luminant, SMEC, and LCRA stated that the Executive Summary for the proposed SIP revision should emphasize that the SIP revision will not relax the SIP and will not interfere with attainment of the $PM_{10}$ or $PM_{2.5}$ National Ambient Air Quality Standards ("NAAQS") or compliance any other applicable requirement of the federal Clean Air Act, as is discussed in Section 2.2.3, Air Quality Analysis, of the Section 110(l) Demonstration. The subject EGUs, with the same ESP emission controls and technological limitations, have operated with the MSS work practices in place for almost a decade and for many years before that under less stringent SIP approved limitations. As Section 2.2.3 makes clear, Texas's EPA-approved monitoring network data shows no areas of the state in proximity to or affected by the thirteen EGUs in violation of either of the $PM_{2.5}$ or $PM_{10}$ NAAQS. The Executive Summary should underscore that these long-existing EGUs and their associated MSS emissions have not interfered with attainment of the $PM_{10}$ or $PM_{2.5}$ NAAQS in Texas. EPA has previously determined that a proposed SIP revision that also related to an attainment area and that would not relax the SIP would not interfere with attainment of the NAAQS. (See, e.g., 83 Fed. Reg. 14758 (April 6, 2018)).

*Response*

**The commission appreciates the commenters' emphasis that the SIP revision will not relax the SIP or interfere will attainment and maintenance of the $PM_{10}$/$PM_{2.5}$ NAAQS or other FCAA requirements. The Executive Director concluded that these planned MSS emissions subject to the AOs are existing emissions that, as evidenced by the extensive monitoring network in the state, have not produced or contributed to NAAQS violations for several years ($PM_{2.5}$ and $PM_{10}$ monitoring data is contained in the SIP demonstration for years 2013-2018). The commission agrees that the EPA's analysis that a recent Colorado SIP revision would not relax the SIP and thus not interfere with attainment provides appropriate justification for approval of this revision into the Texas SIP.**

*Comment*

SWEPCO, PSO, LCRA and SMEC stated that the end of the sixth paragraph of the Executive Summary and the end of Section 1.1 of the proposed SIP revision should be revised to more accurately characterize the Federal Clean Air Act ("FCAA") §110(l) requirements for EPA approval. More specifically, according to FCAA §110(l), EPA is not to approve a SIP revision that applies to areas that are in attainment with the national ambient air quality standards ("NAAQS"), such as the areas where all of the EGUs are located, if EPA determines the SIP revision "would", rather than "could", interfere with the ability of that area to remain in attainment with all NAAQS and to comply with other applicable requirements of the FCAA. Therefore, FCAA §110(l) does not require that the SIP revision provide support to ensure that it "would not" interfere with NAAQS compliance. The Kentucky Resources Council, Inc. v. EPA case that is cited in a footnote to Section 2.3 of the proposed SIP revision states that "Congress did not intend that the EPA reject [a] SIP revision that presents some remote possibility for interference [such that] where the EPA does not find that a SIP revision would interfere with attainment, approval of the revision does no violence to the statute." (Emphasis added) (Kentucky Resources Council, Inc. v. EPA, 467 F.3d 986, 994 (6th Cir. 2006)).

*Response*

**The commission agrees with commenters that FCAA § 110(l) does not require that EPA disapprove a revision if it could interfere with FCAA requirements. The interference must be demonstrable and not based on conjecture. The commission supports the Executive Director's conclusions based on the facts and monitoring data that these long existing emissions have not made air quality worse in Texas. In accordance with § 110(l), the EPA has no basis to disapprove this revision to the SIP.**

*Comment*

SWEPCO, PSO, LCRA and SMEC suggest that the first paragraphs of Sections 2.2.1 and 2.2.3 of the proposed SIP revision be revised to clearly state that there will be no cumulative impact of the EGUs' $PM_{10}$ or $PM_{2.5}$ emissions.

*Response*

**The commission believes that the Executive Director's explanation of the intermittent nature of the planned MSS emissions, coupled with the geographic spread of the EGUs subject to the AOs demonstrate there are no cumulative impacts**

from existing planned PM emissions and opacity. The lack of monitored $PM_{10}$ and $PM_{2.5}$ NAAQS violations over a period of several years (2013–2018) supports this conclusion.

*Comment*

SWEPCO, PSO, LCRA and SMEC stated the proposed SIP revision uses somewhat interchangeably the terms "startup and shutdown," "maintenance, startup, and shutdown" and "planned startup and shutdown" to describe the category of emissions that are the subject of this proposal. For purposes of consistency and clarity, we suggest that the proposed SIP revision use only the term "planned MSS" in describing these emissions.

*Response*

**The commission acknowledges and appreciates the suggestion. Where appropriate, the terms "startup and shutdown", "maintenance, startup and shutdown", and "planned startup and shutdown", will be revised to "planned maintenance, startup and shutdown" to be consistent with commission rules.**

*Comment*

PSO requests that the project number in the header of the voluntary agreed order for its Oklaunion Power Station be corrected from "Project No. 200-027-SIP-NR" to "Project No. 2020-027-SIP-NR."

*Response*

**The commission has taken the project numbers out of the AO headers, consistent with previous SIP agreed orders. In addition, references in the SIP narrative to "PSCO" will be changed to "PSO".**

*Comment*

SWEPCO and PSO proposed several revisions and typographical corrections to the text of project 2020-028-SIP-NR for consideration. These suggested revisions are intended to clarify and provide completeness, internal consistency, and/or accuracy. These suggestions are not intended to change the intent or meaning of the proposed SIP revision. SMEC expressed support for those revisions.

*Response*

**The commission appreciates the suggested non-substantive revisions and will revise project no. 2020-028-SIP-NR for clarification, completeness and internal consistency and accuracy where appropriate.**

Appendix B: *Agreed Order with Southwestern Electric Power Company (SWEPCO) H.W. Pirkey Power Plant in Harrison County, (Project No. 2020-021-SIP-NR; Docket No. 2020-0078-SIP)*

Appendix C: *Agreed Order with Lower Colorado River Authority (LCRA) Sam Seymour Fayette Power Project in Fayette County (Project No. 2020-022-SIP-NR; Docket No. 2020-0077-SIP)*

Appendix D: *Agreed Order with Luminant Generation Company, LLC Martin Lake Steam Electric Station in Rusk County (Project No. 2020-023-SIP-NR; Docket No. 2020-0076-SIP)*

Appendix E: *Agreed Order with NRG Texas Power, LLC Limestone Electric Generating Station in Limestone County (Project No. 2020-024-SIP-NR; Docket No. 2020-0075-SIP)*

Appendix F: *Agreed Order with San Miguel Electric Cooperative, Inc. San Miguel Electric Plant in Atascosa County (Project No. 2020-025-SIP-NR; Docket No. 2020-0074-SIP)*

Appendix G: *Agreed Order with Southwestern Public Service Company (SPS) Harrington Station in Potter County (Project No. 2020-026-SIP-NR; Docket No. 2020-0073-SIP)*

Appendix H: *Agreed Order with Texas Municipal Power Agency (TMPA) Gibbons Creek Steam Electric Station in Grimes County (Project No. 2020-032-SIP-NR; Docket No. 2020-0178-SIP)*

Appendix I: *Agreed Order with Public Service Company of Oklahoma (PSO) Oklaunion Power Station in Wilbarger County (Project No. 2020-027-SIP-NR; Docket No. 2020-0072-SIP)*

Bryan W. Shaw, Ph.D., P.E., *Chairman*
Toby Baker, *Commissioner*
Jon Niermann, *Commissioner*
Richard A. Hyde, P.E., *Executive Director*



## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

December 2, 2015

Gina McCarthy
Administrator
U.S. Environmental Protection Agency
Office of the Administrator (1101A)
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Re: Petitions Submitted to EPA Regarding Certain Coal-fired Power Plants in Texas

Dear Administrator McCarthy:

The U.S. Environmental Protection Agency (EPA) has received the following petitions requesting EPA action regarding certain coal-fired power plants in Texas:

- Citizen Petition for Action to Enforce the Texas State Implementation Plan and Title V of the Clean Air Act (submitted by Environmental Integrity Project and others, May 27, 2015)

- Petition Requesting that the Administrator Object to the Issuance of the Proposed Title V Operating Permit for the H. W. Pirkey Power Plant, Permit Number O31 (submitted by Environmental Integrity Project, October 30, 2014)

These petitions both concern, in part, an interpretation of Texas law, specifically two rules in the Texas State Implementation Plan (SIP), 30 Texas Administrative Code § 111.111 and § 111.153, administered by the Texas Commission on Environmental Quality (TCEQ). The history of the adoption and application of these two rules, which were approved as revisions to the Texas SIP 19 and 6 years ago, respectively, is essential to understanding the Texas SIP and for an accurate response by EPA to each of these two petitions. States are in the best position to interpret their rules, and those interpretations are entitled to great weight and deference, as EPA has acknowledged this in various SIP approval notices.

Gina McCarthy
Page 2
December 2, 2015

The enclosed narrative provides detailed information regarding these two TCEQ rules that are discussed in the two petitions.  It is not intended as a comprehensive reply regarding either petition.  TCEQ requests EPA consider the narrative as it develops any responses to these petitions.

If further information is needed, please contact attorneys for TCEQ, Janis Hudson at 512-239-0466 or John Minter 512-239-0663.

Sincerely,

Steve Hagle, P. E., Deputy Director
Office of Air
Texas Commission on Environmental Quality

SH/jbh

Enclosure

cc:     Ron Curry, Regional Administrator, U.S. Environmental Protection Agency,
            Region 6, Dallas
        Richard A. Hyde, P.E., Executive Director
        Janis Hudson, Attorney, Environmental Law Division
        John Minter, Attorney, Environmental Law Division

## Information Regarding Rules of the
## Texas Commission on Environmental Quality (TCEQ)
## 30 Texas Administrative Code § 111.111 and § 111.153(b)[1]

The following discussion is limited to the rules regarding opacity and particulate matter (PM) emissions from coal-fired electric generating units (EGUs) that use electrostatic precipitators (ESPs).[2]

## § 111.111 and § 111.153(b) Rulemaking History

Section 111.111 establishes certain control requirements for visible emissions from stationary sources.[3]  The relevant subsection for this discussion is (a). Maintenance, startup and shutdown emissions are covered by subsection (a)(1)(E).  To understand the substance and applicability of this rule, the history of the regulation of opacity and PM emissions for coal-fired EGUs with ESPs in Texas must be considered.

In 1971, Radian Corporation (Radian) conducted a study and prepared a report[4] for the Texas Air Control Board (TACB)[5] to serve as the basis for TACB to develop rules to regulate emissions of PM in three areas, (1) opacity of a stack plume; (2) allowable mass emission rate; and (3) air quality surrounding the pollution source.[6]  Radian specifically evaluated different types of PM and opacity control devices, including ESPs used by coal-fired EGUs.[7]  As part of this study, Radian reviewed EPA's current State Implementation Plan (SIP) rules, which included EPA's proposed rules for visible emissions.  EPA's rule, as characterized in the report, states that the shade or density visible emission limits must be not be equal or darker than a No. 1 on the Ringelmann chart or 20 percent opacity, although a Ringelmann No. 3 or 60 percent opacity for up to three minutes in any 60 minute period is allowed.[8, 9]  And, the EPA rule also

---

[1]  States are in the best position to interpret their rules, and those interpretations are entitled to great weight and deference, and EPA has acknowledged this in various SIP approval notices. *Florida Power & Light Co. v. Costle*, 650 F.2d 579, 588 (5th Cir. 1981); *Texas Gen. Indem. Co. v. Finance Comm'n*, 36 S.W.3d 635, 641 (Tex. App.—Austin 2000, no pet.) ("[A]n administrative agency unquestionably has the power to interpret its own rules, and . . . its interpretation is entitled to great weight and deference by a court called upon to interpret or apply such rules.").

[2]  This discussion is limited to coal-fired EGUs because that is the only type of EGU common to both petitions, discussed below at p. 7-8.

[3]  Attachment A.

[4]  Technical Note 100-007-01, Technical Basis for Texas Air Control Board Particulate Regulations (August 20, 1971), p. 1 (Attachment B).

[5]  Predecessor agency to the TCEQ.

[6]  *Infra*, footnote 2.

[7]  *Id.* at § 3.2 and Table 3-8.

[8]  *Id.* at § 4.1. EPA also provided an exception to compliance when uncombined water is the only reason for the failure of the source to meet the limitation.  The report cites as its reference material 36 *Fed. Reg.* 6680 (April 7, 1971).

provided that no source burning solid fuel may emit PM in excess of 0.10 pounds per million British Thermal Unit (lb/MMBtu).[10]

For coal-fired EGUs, Radian assumed that PM would be controlled to a PM removal efficiency of at least 99 percent,[11] and concluded that the PM control device removal efficiencies were "vital to devising reasonable" PM limits.[12] This assumption and Radian's conclusion require an understanding of how ESPs are designed to control PM emissions, and how effective they are in various periods of operation. During routine operating conditions, an ESP is designed to be effective at removing PM from the exhaust gas. However, when the exhaust gas is below a minimum temperature, as occurs during periods of startups and shutdown, an ESP cannot remove PM or reduce opacity as effectively. Operation of ESPs when the exhaust gas is below a minimum temperature will also cause safety and equipment degradation issues. During those periods, there is no technology available that will cause ESPs to remove PM from the EGU's exhaust gases, or will allow the operation of some ESPs to occur safely and without equipment degradation issues.

The Radian report excludes an evaluation of emissions from startups and shutdowns during which the emissions controls do not work effectively, and therefore it is reasonable to assume that Radian would not be asked to evaluate emissions for which the agency was regulating in a different fashion on a concurrent rulemaking schedule.[13]

In 1972, the TACB conducted rulemaking that updated its rules regarding limits for visible emissions and added limits for PM emissions using the findings in the Radian report. The new rule for visible emissions shifted the standards for evaluating opacity from antiquated smoke charts to a standard based on the percentage obstruction of the diffusion of light through ambient air.

> No person may cause, suffer, allow, or permit visible emissions from any stationary flue to exceed an opacity of 30% averaged over a five-minute period. No person may cause, suffer, allow, or permit visible emissions from any stationary flue beginning construction after January 31, 1972, to exceed an opacity of 20% averaged over a five-minute period. Visible emissions during the cleaning of a firebox or the building of a new fire, sootblowing, equipment changes, ash removal and rapping of precipitators may exceed the limits set forth in Rule 103.1 for a

---

9 EPA's rule, adopted approximately four years after the TACB rules, is not as stringent.
10 Technical Note 100-007-01 at § 4.1 (Attachment B), and EPA rule published at 37 *Fed. Reg.* 10842, 10895 – 10898 (May 31, 1972).
11 *Id.* at § 4.3.1.
12 *Id.* at § 5.
13 TACB Rules 8, 12.1 and 12.2 (1972) (Attachment C). *See infra* text accompanying footnotes 17-18 and 25-34.

> period aggregating not more than five minutes in any sixty
> consecutive minutes, nor more than six hours in any ten-day
> period.[14]

For PM, this rulemaking included the following:

> Rules 105.1 and 105.2 shall not apply to solid fossil fuel fired steam
> generators.[15]

> No person may cause, suffer, allow, or permit emissions of particulate
> matter from any solid fossil fuel fired steam generator to exceed 0.3 lb.
> per million B. T. U. heat input.[16]

Because those opacity and PM limits were based on the Radian report, they
were premised on the exhaust gas from each coal-fired EGU being controlled by
an ESP (or similarly effective control), and were not intended to apply during
periods when ESPs are not effective at controlling PM emissions or opacity, or
could not be used to do so. As a result, those opacity and PM limits did not
apply during periods of startups or shutdowns of coal-fired EGUs with ESPs.

The 1972 TACB rulemaking also specifically implemented a control strategy for
emissions from maintenance, startup and shutdown (MSS) activities.[17]
Specifically, emissions from MSS activities were subject to reporting
requirements rather than being regulated by rule based on the type of air
contaminant or by permit which, at the time, authorized emissions from only
routine operations. These reporting rules, together with the rules for visible and
PM emissions, were submitted to EPA and approved as part of the SIP.[18]

The next substantive relevant rulemaking by the TACB took place in 1989,[19]
with the visible emissions rule for coal-fired EGUs designated as § 111.111.[20]
Nothing in § 111.111 caused the opacity limit in that rule to begin to apply during
periods of startup or shutdown of coal-fired EGUs with ESPs.

With regard to the PM limit, the original rule, § 105.3, was renumbered as §
111.153 in the same 1989 rulemaking.[21] Subsection (b) contains essentially the

---

[14] TACB Rule 103.1 (1972) (Attachment D).
[15] TACB Rule 105.3 (1972). Rules 105.1 and 105.2 establish general limitations on PM
emissions from sources and multiple sources, respectively. *See* Attachment D.
[16] TACB Rule 105.31 (1972).
[17] TACB Rules 8, 12.1 and 12.2 (1972) (Attachment C).
[18] 37 *Fed. Reg.* 10842, 10895 – 10898 (May 31, 1972).
[19] During this rulemaking, the rule numbering system and structure were changed, and these
are still in use today. In prior rulemakings in 1975 and 1980, the numbering system was
changed for the visible emissions and PM emissions rules, as well as for the MSS reporting
rules, but there were no substantive changes to these rules.
[20] Attachment A.
[21] 14 *Tex. Reg.* 3290 (Jul. 4, 1989).

*Enclosure to Letter to EPA Administrator McCarthy*
*From Texas Commission on Environmental Quality*
*December 1, 2015*

same text as was adopted in the 1972 rule.[22]  Therefore, nothing in § 111.153 caused the PM limit to begin to apply during periods of startup or shutdown of coal-fired EGUs with ESPs.  EPA approved this rule in 2009, noting only that the rule was one of a set of rules that were a recodification of existing SIP approved rules (some with substantive revisions).[23]

As the rule history shows, the minor changes in these rules did not change the premise on which the rules were developed, or the current applicability of the rules.  Therefore, the opacity and PM limits in § 111.111 and § 111.153(b), respectively, do not apply during periods of startup or shutdown of coal-fired EGUs with ESPs.

## Permit Condition that References § 111.111 and §111.153

In 2011, owners and operators of coal-fired EGUs in Texas that control PM emissions with ESPs applied for New Source Review (NSR) authorization of their planned startup, shutdown and maintenance activities[24] from boilers and turbines, as well as from auxiliary equipment.  Those permit actions were the final phase of a regulatory regime that had been in place for almost 40 years following EPA's 1972 approval of the original Texas SIP.[25]

Under that regulatory regime, and up until planned MSS emissions began to be authorized by permit, SIP-approved regulation of MSS activities generally involved (1) notification of an MSS activity to TCEQ (or its predecessor agency); and (2) a determination by TCEQ whether the emissions occurring during the MSS activities were exempted from complying with any applicable emissions limits.[26]  The "exemption" terminology continued in use when TCEQ re-promulgated the current Chapter 111 limits in 1989,[27] and again when EPA SIP-approved those limits in 1996.[28]

---

[22] TACB Rules 8, 12.1 and 12.2 (1972) (Attachment C), and 14 *Tex. Reg.* 3290 (Jul. 4, 1989).
[23] 74 *Fed. Reg.* 19144 (Apr. 28, 2009).  The notice states that EPA proposed approval on Oct. 28, 1999 (64 *Fed. Reg.* 57983).
[24] TCEQ rules do not define "planned MSS activity," but define "unplanned MSS activity" in 30 Tex. Admin. Code § 101.1(109); "planned" generally means "authorized" emissions.  It should be noted that the term "planned" is not the equivalent of "scheduled."  The use of the term "scheduled MSS activities" is related to the TCEQ reporting requirements for unauthorized emissions, as required by the Texas Clean Air Act, Tex. Health & Safety Code § 382.0215, and 30 Tex. Admin. Code § 101.1(91) and § 101.221.
[25] *See* 37 *Fed. Reg.* 10,842, 10,895 (May 31, 1972).
[26] *See* TACB Rules 8, 12.1 and 12.2 (1972) (approved by EPA at 37 *Fed. Reg.* 10842 (May 31, 1972) (Attachment C); amended § 101.6 and §101.7 (16 Tex. Reg. 2007 (April 2, 1991)); and repealed § 101.6 and §101.7, new § 101.6 and §101.7, and amended § 101.11 (22 *Tex. Reg.* 7040 and 7057 (July 29, 1997)).  These last two amendments were not approved as SIP revisions.
[27] 14 *Tex. Reg.* 3290 (Jul. 4, 1989).
[28] 61 *Fed. Reg.* 20,732 (May 8, 1996).

Over the years, the regulation of MSS activities, both planned and unplanned, and associated emissions became more stringent and prescriptive.

In 2000, TCEQ[29] amended its rules, in response to EPA's review of rule amendments made in 1991 and 1997, to add criteria that an owner or operator was required to satisfy before the agency's executive director would determine that the exemption applied to emissions from MSS activities.[30] EPA approved the exemption language that included the more stringent criteria as part of the Texas SIP.[31] Because the criteria must be satisfied before the exemption would apply to emissions from MSS activities, the exemption was not automatic, and, instead, it was effectively an affirmative defense.[32]

In 2003, in response to a subsequent EPA request, TCEQ amended language in its rules to replace "exempt from compliance" with applicable limits to "subject to an 'affirmative defense'" to enforcement penalties for planned MSS activities.[33] This affirmative defense for emissions from planned MSS activities was temporary. In 2005, TCEQ adopted a schedule for phasing out the use of that affirmative defense as an incentive for owners and operators to obtain permit authorization for their planned MSS activities.[34]

In response to those rules, owners and operators of coal-fired EGUs with ESPs in Texas applied for and obtained authorization for their planned MSS activities. For each of these permit actions, the TCEQ included a permit condition for control of opacity during planned MSS activities that requires certain work practices, monitoring and recordkeeping, as well as compliance with § 111.111 and § 111.153. The condition in the permit for the Pirkey Power Plant that is the subject of a Title V Petition reads as follows:

> 18. Opacity greater than 20 percent from the boiler is authorized when the permit holder complies with the planned MSS duration limitations in Special Condition No. 14[35] and the applicable work practices identified below.

---

[29] Action taken by Texas Natural Resource Conservation Commission, the previous name for TCEQ.

[30] 25 *Tex. Reg.* 6750-52 (Jul. 14, 2000).

[31] 65 *Fed. Reg.* 70729 (Nov. 28, 2000).

[32] 25 *Tex. Reg.* 6750-52 (Jul. 14, 2000).

[33] 28 *Tex. Reg.* 118 (Jan. 2, 2004).

[34] 30 Tex. Admin. Code § 101.222(h)(1); 30 *Tex. Reg.* 8956 (Dec. 30, 2005).

[35] Permit Special Condition No. 14 is the permit condition concerning planned startup and shutdown activities. The permit contains other conditions that require the owner or operator to minimize emissions during planned MSS. Examples include a permit condition that limits the time the EGU can operate in planned startup and planned shutdown mode, and a permit condition that imposes stringent work practices that apply during each planned startup and planned shutdown.

A.   Opacity during planned startup and shutdown activities shall be minimized by employing the following work practices:  During planned startup and shutdown activities, the permit holder shall comply with the parts of the boiler and ESP manufacturer's operating procedures or the procedures in the permittee's written <u>Standard Operating Procedures</u> manual that impact opacity, and shall operate the boiler and ESP in a manner consistent with those procedures to minimize opacity by placing the ESP into service as soon as practical during planned startups or removing the ESP from service as late as possible during planned shutdowns.  The boiler and ESP manufacturer's operating procedures or written <u>Standard Operating Procedure</u> manual shall be located on-site and available to the TCEQ regional investigator.

B.   Periods of opacity greater than 20 percent from planned online and offline maintenance activities identified in Attachment A or B are authorized for no more than 600 minutes in a calendar year.

C.   The permit holder shall keep records to identify periods of planned MSS, the opacity measured by the continuous opacity monitoring system (COMS) for the duration of the planned startups and shutdowns, and the planned maintenance activities identified in Attachments A or B, and the work practices in Special Condition No. 18A followed during the planned MSS activities for the purpose of demonstrating compliance with this permit special condition.

D.   For periods of MSS other than those subject to Paragraphs A - C of this condition, 30 TAC § 111.111, 111.153, and Chapter 101, Subchapter F apply.

This permit condition was not created as an exemption from requirements, but to clarify that § 111.111 and § 111.153 are not applicable for certain defined activities for specific durations.  Sections 111.111 and 111.153 are applicable at all other times.  More importantly, because this permit condition does not provide an exemption from § 111.111 or § 111.153, TCEQ did not circumvent the requirements of the federal Clean Air Act nor its SIP by use of this permit condition in permits for any of the coal-fired EGUs with ESPs.

## Response to Misrepresentations Regarding § 111.111 and §111.153 In Two Petitions Submitted to EPA[36]

---

[36] This document is not intended to be a comprehensive response to either of these petitions.

Neither the Pirkey Petition [37] nor the Citizen Petition,[38] accurately states the applicability of the rules or the permit condition at issue.  The TCEQ provides the responses below to address the misstatements and inaccurate comprehension in the two petitions.

## Pirkey Petition

In this Title V Petition, the Petitioners allege NSR permit condition 18 "purports to create an exemption" to the opacity and PM SIP limits established by TCEQ rule.[39]  Petitioners acknowledge that neither paragraph B of the condition nor the maximum allowable emission rate table (MAERT) in the permit expressly state that the alleged new opacity or PM exemption and increased PM limit are meant to relax applicable SIP limits, but that paragraph D makes clear the intent to do so.  The Petitioners state that the SIP limits [in § 111.111 and § 111.153(b)] apply at all times, including planned MSS activities for three reasons.  The TCEQ responds below to each of these:

1. The rules establishing the limits do not provide for any exception for planned MSS events.

The commission agrees that these rules do not provide any exception for MSS activities, but the rules are not applicable to MSS activities because the Pirkey EGU is a coal-fired EGU with an ESP.  No exemption can be provided if the rules do not apply.

2. These limits are SIP limits and SIP limits are not subject to exemptions during MSS and malfunction activities [citing to the Federal Register notice that approved TCEQ rules for reporting of unauthorized emissions from MSS activities].

The commission agrees that these rules do not provide exemptions from compliance during MSS activities, but the rules are not applicable activities because the Pirkey EGU is a coal-fired EGU with an ESP.  No exemption can be provided if the rules do not apply.  Malfunctions are unauthorized emissions and are not raised in the Pirkey petition.

3. EPA has spent the better part of the last decade working with the TCEQ to end the historic (and illegal) practice of allowing blanket exemptions from compliance with SIP limits.

---

[37] Petition Requesting that the Administrator Object to the Issuance of the Proposed Title V Operating Permit for the H. W. Pirkey Power Plant, Permit No. O31 (Oct. 30, 2014).
[38] Petition for EPA Action Addressing Startup, Shutdown, and Maintenance Exemptions in Revised Permits for Texas Coal-fired Power Plants to Administrator McCarthy (May 27, 2015).
[39] Pirkey Petition at p. 5.

As discussed above, TCEQ notes that the term "exemption" was removed from certain TCEQ rules in 2002, which EPA approved as a SIP revision in 2003. And, as discussed above, the "exemption" for the planned MSS in question was removed and the coal-fired EGUs obtained permit authorization of their planned MSS activities, as EPA requested. Moreover, the word "exemption" was not (and is not) included in § 111.111 or § 111.153(b).

## Citizen Petition

In the Citizen Petition, Petitioners make the following arguments in support of request for specific relief from EPA with regard to application and interpretation of § 111.111 or § 111.153(b). [40] The TCEQ responds below to each of these:

1.  At least 19 coal-fired units are exempted from a Texas SIP emission limit in § 111.111 and § 111.153(b) without the required SIP review and approval.

Petitioners' reading of the rules is erroneous because it ignores the history and the factual basis of the rules' applicability (as discussed above) which demonstrates that § 111.111 and § 111.153(b) do not apply during periods of startup or shutdown of coal-fired EGUs with ESPs. Without that information, no SIP revision or EPA approval was required, and the allegation is unfounded.

2.  TCEQ violated specific requirements for changing SIP opacity limits.

As discussed above, TCEQ did not change any SIP opacity limits and therefore was not subject to additional procedural requirements that are necessary for SIP revisions, which TCEQ discusses below.

3.  Exemptions apply to an unlimited number of startups and shutdowns.

As discussed above, the permit condition does not exempt compliance with § 111.111 or § 111.153 because those rules are not applicable during periods of startup and shutdown of coal-fired EGUs with ESPs.  Further, the TCEQ does not interpret the terms "planned startup" and "planned shutdown" as applicable to all startup or shutdown activities.

## SIP Revision Requirements

Texas is required by the federal Clean Air Act to submit a SIP revision, or a site-specific SIP revision, to EPA if there is a desire to regulate an individual or

---

[40] *Supra*, footnote 38, at p. 4 and Section III at p. 12-15.

group of stationary sources or facilities in a way that is not compliant with the SIP. Such a revision will require adequate justification and public notice.[41]

This procedure was not required for issuance of a permit with a condition like Pirkey's permit condition number 18, paragraph (D), because it does not include an exemption from SIP compliance, nor was there any failure by the TCEQ to comply with its SIP in issuing permits with this permit condition. Non-applicability is not the same as exemption.

As discussed above, the opacity and PM limits established by § 111.111 and § 111.153(b) that are referenced in that permit condition apply to coal-fired EGUs with ESPs only during periods of routine operation, and do not apply during periods where the operation is below a minimum temperature, such as periods of startup or shutdown. Neither the permit condition nor the rules *exempt* coal-fired EGUs with ESPs from compliance. Rather, each has their own *applicability*. Neither § 111.111 nor § 111.153(b) were developed to apply during periods of startup or shutdown of coal-fired EGUs with ESPs.[42] The permit condition provides for certain work practices to be followed, and, for other operating periods where those requirements are not met, § 111.111 and § 111.153(b) apply. Therefore, no SIP revision was required.

## Summary

The technical and safety limitations regarding ESPs used for coal-fired EGUs that existed at the time of the Radian study in 1971 and that formed the basis for the rules adopted in 1972 that are the predecessor to current rules § 111.111 and § 111.153(b) remain the same today.[43] Because ESPs used for PM control at EGUs cannot effectively control startup and shutdown emissions, the TACB did not intend for the original opacity and PM limits to apply to such EGUs during any periods of startup or shutdown. Therefore, TACB's original opacity and PM limits which were premised on the exhaust gas from each coal-fired EGU controlled by an ESP, were not intended to apply and do not apply during periods that ESPs are not effective at controlling opacity or PM emissions (like startups and shutdowns), nor could be used to control opacity or PM emissions. Because the opacity and PM limits in § 111.111 and § 111.153(b) are the same as the opacity and PM limits in the 1972 rule (which was based on the Radian report), they also do not apply during periods of startup or shutdown of a coal-fired EGU controlled by an ESP.

---

[41] 42 U.S.C. § 7410.

[42] *See supra*, text accompanying footnotes 14-17.

[43] Section 111.111 was also amended in 1993, but that change is not relevant to this discussion.

ATTACHMENT A

Texas Commission on Environmental Quality
Excerpts from Chapter 111 - Control of Air Pollution From Visible Emissions and Particulate Matter

## §111.111. Requirements for Specified Sources.

(a) Visible emissions. No person may cause, suffer, allow, or permit visible emissions from any source, except as follows:

(1) Stationary vents. Visible emissions from any vent shall not exceed the following opacities and must meet the following requirements:

(A) Opacity shall not exceed 30% averaged over a six-minute period.

(B) Opacity shall not exceed 20% averaged over a six-minute period for any source on which construction was begun after January 31, 1972.

(C) Opacity shall not exceed 15% averaged over a six-minute period for any source having a total flow rate greater than or equal to 100,000 actual cubic feet per minute, unless an optical instrument capable of measuring the opacity of emissions is installed in the vent in accordance with subparagraph (D) of this paragraph. Facilities utilizing such instruments shall meet opacity limits outlined in subparagraph (A) or (B) of this paragraph as applicable. Records of all such measurements shall be retained as provided for in §101.8 of this title (relating to Sampling).

(D) Any opacity monitoring system installed as provided for in subparagraph (C) of this paragraph must satisfy the New Source Performance Standards requirement for opacity continuous emissions monitoring systems (CEMS) as contained in 40 Code of Federal Regulations (CFR) Part 60, Appendix B, Performance Specification 1. In order to demonstrate compliance with Performance Specification 1, the system shall undergo performance specification testing as outlined in 40 CFR 60.13. The facility will maintain records of all such testing for a period of not less than two years which shall be available for inspection by federal, state, and local air pollution control agencies. Compliance with this provision shall be accomplished within one year of the effective date of this rule, except as specified in paragraph (2) of this subsection.

(E) Visible emissions during the cleaning of a firebox or the building of a new fire, soot blowing, equipment changes, ash removal, and rapping of precipitators may exceed the limits set forth in this section for a period aggregating not more than six minutes in any 60 consecutive minutes, nor more than six hours in any ten-day period. This exemption shall not apply to the emissions mass rate standard, as outlined in §111.151(a) of this title (relating to Allowable Emissions Limits).

(F) Compliance with subparagraphs (A) - (C) of this paragraph shall be determined by applying the following test methods, as appropriate. The highest reading obtained shall determine compliance with the appropriate visible emission limit:

(i) CEMS as described in subparagraph (D) of this paragraph;

(ii) Test Method 9 (40 CFR 60, Appendix A);

(iii) Alternate Method 1 to Method 9, Light Detection and Ranging (40 CFR 60, Appendix A); or

(iv) equivalent test method approved by the executive director of the Texas Air Control Board (TACB) and the United States Environmental Protection Agency (EPA).

(G) Current certification of opacity readers for determining opacities under 40 CFR 60, Appendix A, Method 9, shall be accomplished by the successful

completion of a TACB visible emissions evaluator's course by opacity readers no more than 180 days before the opacity reading.

(2) Sources requiring continuous emissions monitoring. Beginning March 1, 1994, all stationary vents located at the sources specified in this paragraph shall be equipped with a calibrated and properly operating CEMS for opacity. The system shall be calibrated, installed, operated, and maintained as specified in 40 CFR 51, Appendix P, hereby incorporated by reference:

(A) steam generators fired by solid fossil fuel with an annual average capacity factor of greater than 30%, as reported to the Federal Power Commission for calendar year 1974, and with a heat input of greater than 250 million British thermal units per hour;

(B) steam generators that burn oil or a mixture of oil and gas and are not able to comply with the applicable particulate matter and opacity regulations without the use of particulate matter collection equipment, and have been found to be in violation of any visible emission standard contained in a state implementation plan;

(C) catalyst regenerators for fluid bed catalytic cracking units of greater than 20,000 barrels per day of total feed capacity.

(3) Exemptions from continuous emissions monitoring requirements. Opacity monitors shall not be installed or used to determine opacity from any gas stream or portion of a gas stream containing condensed water vapor which could interfere with proper instrument operation, as determined by the executive director. Opacity monitoring techniques as listed in paragraph (1)(F) of this subsection may be substituted with the approval of the executive director and EPA, the highest reading of which will be used to determine compliance with the appropriate opacity standard. If opacity is determined through 40 CFR 60, Appendix A, Method 9, readings shall be made daily, unless weather or other conditions prevent visual observation.

(4) Gas flares.

(A) Visible emissions from a process gas flare shall not be permitted for more than five minutes in any two-hour period, except as provided in §101.11(a) of this title (relating to Exemptions from Rules and Regulations). Process gas flares are those used in routine or scheduled facility operations. Acid gas flares, as defined in §101.1 of this title (relating to Definitions), are subject only to the provisions of paragraph (1) of this subsection. Beginning September 1, 1993, compliance with this subparagraph for process gas flares shall be determined:

(i) any time there is an operational change in the flare that requires a permit amendment under TACB Regulation VI. Compliance shall be determined using Reference Method 22 (40 CFR 60, Appendix A), Reference Method 9 (40 CFR 60, Appendix A), or an alternative test method approved by the executive director and the United States Environmental Protection Agency (EPA). The observation period for this compliance demonstration shall be no less than two hours unless noncompliance is determined in a shorter time period or operational changes are made to the flare that stop any observed smoking; and

(ii) by a daily notation in the flare operation log that the flare was observed including the time of day and whether or not the flare was smoking. For flares operated less frequently than daily, the observation will be made for each operation. The flare operator shall record at least 98% of these required observations. If smoking is detected, compliance with the emission limits of this paragraph shall be determined using Reference Method 22, Reference Method 9, or an alternative test method approved by the executive director and EPA. The observation period for this compliance determination shall

be no less than two hours unless noncompliance is determined in a shorter time period or operational changes are made to the flare that stop the smoking. A Method 22 or Method 9 observation will be waived provided the operator reports the flare to be in an upset condition under the requirements of §101.6 of this title (relating to Notification Requirements for Major Upset).

(B) Flares used only during emergency or upset conditions are exempt from the compliance monitoring requirements of subparagraph (A)(i) and (A)(ii) of this paragraph.

(5) Motor vehicles. Motor vehicles shall not have visible exhaust emissions for more than ten consecutive seconds. Compliance shall be determined as specified in 40 CFR 60, Appendix A, Method 22.

(6) Railroad locomotives or ships.

(A) Visible emissions shall not be permitted from any railroad locomotive, ship, or any other vessel to exceed an opacity of 30% for any five-minute period, except during reasonable periods of engine start-up.

(B) Compliance with subparagraph (A) of this paragraph shall be determined by applying the following test methods, as appropriate:

(i) Test Method 9, (40 CFR 60, Appendix A); or

(ii) equivalent test method approved by the executive director and EPA.

(7) Structures.

(A) Visible emissions shall not be permitted to exceed an opacity of 30% for any six-minute period from any building, enclosed facility, or other structure.

(B) Compliance with subparagraph (A) of this paragraph shall be determined by applying the following test methods, as appropriate:

(i) Test Method 9 (40 CFR 60, Appendix A); or

(ii) equivalent test method approved by the executive director and EPA.

(8) Other Sources.

(A) Visible emissions shall not be permitted to exceed an opacity of 30% for any six-minute period from all other sources not specified in §111.111 of this title (relating to Requirements for Specified Sources).

(B) Compliance with subparagraph (A) of this paragraph shall be determined by applying the following test methods, as appropriate:

(i) Test Method 9 (40 CFR 60, Appendix A), or

(ii) equivalent test method approved by the executive director and EPA.

(b) Compliance determination exclusions. Contributions from uncombined water shall not be included in determining compliance with this section. The burden of proof which establishes the applicability of this subsection shall be upon the person seeking to come within its provisions.

(c) Solid fuel heating devices.

(1) Operating restrictions. In the City of El Paso, including the Fort Bliss Military Reservation, no person shall operate a solid fuel heating device during a period when National Weather Service data indicates that an atmospheric stagnation condition exists or is predicted to exist. For the purposes of this section, a solid fuel heating device shall be defined as any fireplace, wood heater, wood stove, wood-fired boiler, coal-fired furnace, or similar device burning any solid fuel which is used for aesthetic, cooking (excluding commercial cooking), or heating purposes, and located inside a building.

(2) Exemptions. An exemption from the requirements of this section may be granted by the executive director of the Texas Air Control Board if one or more of the following conditions are met:

(A) the solid fuel heating device is in a period of burn down; that is, a period of time not to exceed three hours for the cessation of combustion within the device;

(B) the solid fuel heating device is the sole source of heat for the building in which it is situated; or

(C) the solid fuel heating device becomes the sole source of heat within the building because of a temporary power loss.

Adopted June 18, 1993                                   Effective July 23, 1993


## §111.153. Emissions Limits for Steam Generators.

(a) Section 111.151 of this title (relating to Allowable Emissions Limits) shall not apply to any oil or gas fuel-fired steam generator with a heat input greater than 2,500 million British thermal units (Btu) per hour or any solid fossil fuel-fired steam generator.

(b) No person may cause, suffer, allow, or permit emissions of particulate matter from any solid fossil fuel-fired steam generator to exceed 0.3 pound of total suspended particulate per million Btu heat input, averaged over a two-hour period.

(c) No person may cause, suffer, allow or permit emissions of particulate matter from any oil or gas fuel-fired steam generator with a heat input greater than 2,500 million Btu per hour to exceed 0.1 pound of total suspended particulate per million Btu input averaged over a two-hour period.

Adopted June 16, 1989                                   Effective July 18, 1989

# ATTACHMENT B



# Radian Corporation

8500 SHOAL CREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78757 • TELEPHONE 512/454-9535

TECHNICAL NOTE 100-007-01

TECHNICAL BASIS FOR TEXAS AIR CONTROL BOARD

PARTICULATE REGULATIONS

20 August 1971

Prepared by:

Delbert M. Ottmers, Jr.

Ben R. Breed

CHEMICAL RESEARCH • SYSTEMS ANALYSIS • COMPUTER SCIENCE • CHEMICAL ENGINEERING

Radian Corporation   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

## 1.0     INTRODUCTION

The Texas Air Control Board plans to issue new regulations governing the control of particulates in the very near future. For stack emissions, these regulations will be concerned with control in three areas: (1) opacity of the stack plume, (2) allowable mass emission rate, and (3) air quality surrounding the pollution source. The purpose of this technical note is to provide the TACB staff with the technical basis for developing "equivalent" particulate regulations in these three areas.

The State would like to use three types of regulations for controlling particulate emissions to reasonable level (see Figure 1-1). As stated by Rule 102 in TACB Staff Proposal, November 4, 1970, the State would like to control the visible emissions so that the opacity does not exceed 20% averaged over a five-minute period. Secondly, the State would like to control air quality surrounding a pollution source so as not to exceed a ground-level concentration of 250 $\mu g/m^3$ for any 60-minute sampling period. This regulation corresponds to the proposed Rule 103B with only the 60-minute sampling time criterion being retained. The third type of regulation involves limiting the particulate emissions rate (pounds per hour) as a function of the volumetric flow rate (cubic feet per minute) of exhaust gases.

Radian's task has been to provide the TACB staff with the information required for setting particulate regulations of this type which are "equivalent" to one another. Here "equivalent" is a key word since it will not be possible to make each regulation represent the same degree of control for the wide variety of particulate sources. Radian's responsibility has

Radian Corporation · 8500 SHOALCREEK BLVD. · P. O. BOX 9948 · AUSTIN, TEXAS 78758 · TELEPHONE 512 - 454-9535



**Emissions Rate Regulation**

Max. Level to be Specified
by Lb/hr. vs. CFM Curve
Possible Parameters:
$h_s$, $d_s$, $T_s$

**Opacity Regulation**

Max. Level = 20% for
any Five-Minute
Average

**Air Quality Regulation**

Max. Level = 250 µg/m³
for 60-Minute Sampling
Time

Figure 1-1

SCHEMATIC OF PROPOSED REGULATIONS
FOR PARTICULATE EMISSIONS

-2-

**Radian Corporation**   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

been to provide the TACB staff with relationships and computa-
tional results which will allow the TACB staff to determine
the appropriate "equivalence."

The relationships between opacity, emissions rate,
and air quality are presented in Section 2.0. A discussion
of the characteristics of stationary sources and particulate
control techniques follows this section. Section 4.0 suggests
possible particulate regulations and gives typical control
requirements for several processes.

**Radian Corporation**   8500 SHOALCREEK BLVD. • P. O. BOX 9948. • AUSTIN, TEXAS 78758 • TELEPHONE 512 • 454-9535.

## 2.0    TECHNICAL RELATIONSHIPS

The technical relationships which provide the basis
for developing "equivalent" opacity, emissions rate, and air
quality regulations are presented in this section. The relation-
ship between opacity of the stack plume and the mass concentration
of particulates in the stack effluent (most frequently expressed
as "grain loading") will be discussed first. This provides the
basis for relating opacity to emissions rate. Then, grain load-
ing will be related to air quality.

## 2.1    Relationship of Opacity to Grain Loading

The opacity of the effluent from a smoke stack is an
indication of the amount of particulate matter being put through
the stack and it is possible to control the emission of particu-
lates by controlling the opacity of smoke stacks. In the following
paragraphs the relationship of an opacity regulation to an emission
regulation is investigated.

The opacity of a smoke stack will be defined to be
one minus the transmittance of the smoke stack. The trans-
mittance in turn is defined to be the fraction of the light
energy incident on a stack plume which is transmitted through
the plume and which can be measured with appropriate instruments
on the opposite side of the plume. The transmittance depends
on the amount of light which is absorbed or scattered relative
to the amount which finds its way through the plume unhindered.
As it happens the amount of light absorbed or scattered by a
small layer of the plume is proportional to the amount incident
on the small layer and proportional to the thickness of the
layer. This behavior produces an exponential decay of light
intensity with distance into the plume. If T is the transmittance,

**Radian Corporation**   8500 SHOALCREEK BLVD.  •  P. O. BOX 9948  •  AUSTIN, TEXAS 78766  •  TELEPHONE 512 - 454-9535

and F and $F_0$ are the transmitted and incident light intensities respectively, then (CO-007)

$$T = F/F_0 = \exp(-naQD_s) \qquad (2-1)$$

where n is the particle density, a is the projected area of a particle, $D_s$ is the diameter of the stack, i.e., the longest path length light must travel to reach the other side of the plume, and Q is the extinction coefficient of the particle.

In general the particulates emitted by a stack will not be monodisperse; there will be particles of many different sizes, shapes and compositions. In such cases the particle parameters must be replaced by appropriate average parameters, $\bar{a}$ and $\bar{Q}$ such that

$$T = \exp(-na\bar{Q}D_s) \qquad (2-2)$$

gives the appropriate transmittance of the plume.

The theory of scattering and absorption of light by spherically shaped particles has been developed for some time (JA-020). In the long wavelength limit (when the particle diameter is small in comparison to the wavelength of the incident light) the well-known result for the scattering cross section $\sigma$ for a conducting particle is

$$\sigma = 10\pi/3 \; d_p^6 \; k^4 \qquad (2-3)$$

where $d_p$ is the particle diameter and k is $2\pi/\lambda$, where $\lambda$ is the wavelength. Since a is proportional to $d_p^2$, this expression says that the extinction coefficient will be proportional to $d_p^4$ when $d_p \ll \lambda$. This means that when particles are much smaller than

-5-

**Radian Corporation** · 8500 SHOALCREEK BLVD. · P. O. BOX 9948 · AUSTIN, TEXAS 78758, · · TELEPHONE 512 - 454/9535

the wavelength of light their effect upon the extinction of that
light decreases rapidly with particle size.  In scattering theory
this long wavelength region is known as the Rayliegh region.

The wavelength of visible light is in the range of
0.3 to 0.7 microns.  This means that particles which are much
smaller than this will not affect the opacity of a plume.  As
the particles become 0.5 micron size or larger the scattering
cross section tends to become proportional to the square of the
diameter of the particle.  This means that the extinction
coefficient tends to be independent of diameter since Q is
proportional to σ divided by a.

In summary, the extinction coefficient of a particle
decreases rapidly with particle diameter for diameters which
are small compared to ½ micron.  Above this size the extinction
coefficient tends to a constant (with the numerical value 2).
The behavior in the intermediate region depends on the optical
properties of the particle (the relative amount of scattering and
absorption being proportional to the real and imaginary parts
of the dielectric constant of the material at optical frequencies).
Examples of the dependence of extinction coefficients on particle
diameter and index of refraction (which is proportional to the
square root of the dielectric constant) are given in Figure 20
of reference CO-007.

The behavior of the cross section, or the extinction
coefficient, with particle size for nonspherical particles is
very similar to the behavior for spherical particles.  In general,
the scattering of a nonspherical particle is very similar in
magnitude to the scattering of an equivalent spherical particle
whose diameter is approximately equal to the largest dimension
of the nonspherical particle.  For this reason it is not a bad
approximation to perform calculations based on spherical particles
(unless the deviation from sphericity is extreme).

**Radian Corporation** 8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-4535

If $C_m$ is the mass concentration of particulates and if spherical particles are assumed, the transmittance can be written

$$\frac{T}{T_0} = e^{-\frac{3}{2}\frac{Q C_m D_s}{\rho d_p}}$$

$$T = \exp(-3 C_m Q D_s / 2 \rho d_p) \qquad (2\text{-}4)$$

where $\rho$ is the mass density of the particulate material. Since the opacity is one minus the transmittance it becomes evident that the relationship between opacity and mass density out of a smoke stack is dependent on a number of particle parameters.

In order to compare an opacity regulation with a grain loading regulation it is necessary to assume certain particle and stack parameters and also to consider the ranges over which these parameters may, in fact, vary over the state of Texas.

For particles with density $\rho = 2 \text{g/cm}^3$ and for 5 feet diameter stacks with exit temperatures of 300°F, the opacity depends on the areal average particle diameter as shown in Figure 2-1. The particle diameters are given in microns and the mass concentrations in grains/scf. The opacity is seen to fall off rapidly for particles smaller than 0.1 microns.

A fairly stringent standard suggested by the federal government for grain loading is .05 gr/scf. From Figure 2-1 it is noted that if the particulates are large enough that the areal average is greater than 5 microns or so, an opacity requirement of 20% is not strict compared to a reasonable grain loading requirement like .15 gr/scf. If the average particle diameter is ½ micron or so (as may happen when particles of larger size have been removed by utilization of a control device), the opacity requirement would be more strict.



Figure 2-1

Plume Opacity As A Function of Particle
Diameter and Dust Loading

## OPACITY

$$\% \ OPACITY = \left( 1 - e^{\left[ \frac{3Q\ C_M\ D_S}{2\rho\ d\rho} \right]} \right) \times 100$$

WHERE  $Q = 2$  FOR  $d\rho \geq .14$
$\quad\quad\quad Q = 5206\ (d\rho)^4$  FOR  $d\rho < .14$

$C_M$ = DUST LOADING IN GRAINS / CU. FT.
$\quad\quad$ AT EXIT TEMPERATURE.
$D_S$ = STACK DIAMETER IN FEET.
$\rho$ = PARTICLE DENSITY IN GRAINS / CU. FT.
$d\rho$ = PARTICLE DIAMETER IN FEET.

1 GRAM / CC $\equiv$ 437,053.4 GRAINS / CU. FT.
1 MICRON $\equiv$ $\dfrac{10^{-6}}{3048}$ FEET.

$$\therefore \ \frac{3\ Q\ C_M\ D_S}{2\ \rho\ (437,053.4)\ d\rho \left( \frac{10^{-6}}{3048} \right)} \ \frac{10^6\ (3048)}{} = \frac{1.046\ Q\ C_M\ D_S}{\rho\ d\rho}$$

WHERE  $C_M$ = GRAINS / CU. FT. AT EXIT TEMP.
$\quad\quad\quad D_S$ = FEET.
$\quad\quad\quad \rho$ = GRAMS / CC.
$\quad\quad\quad d\rho$ = MICRONS.

③ ①
pg. 82

$$\frac{\% \text{ OPACITY}}{100} = 1 - e^{-\left[\frac{1.046\, Q\, C_M\, D_S}{\rho\, dp}\right]}$$

$C_M$ = DUST LOADING, GRAINS / CU.FT.
AT EXIT TEMPERATURE.

$Q = 2$ FOR $dp \geq .14$

$Q = 5206 \cdot (dp)^4$ FOR $dp < 0.14$

$D_S$ = STACK DIAMETER IN FEET.

$\rho$ = PARTICLE DENSITY IN GRAMS / C.C.

$dp$ = PARTICLE DIAMETER IN $10^{-6}$ METERS.

$$e^{-[\ ]} = \left[1 - \frac{\% \text{ OPACITY}}{100}\right]$$

$$+ [\ ]\, \log e = -\log\left[1 - \frac{\% \text{ OPACITY}}{100}\right]$$
$$\log e$$

$$\frac{1.046\, Q\, C_M\, D_S}{\rho\, dp} = -\left[\frac{\log\left(1 - \frac{\% \text{ OPACITY}}{100}\right)}{\log e}\right] \frac{\rho}{(1.046)\, Q\, D_S}$$

$$C_M = dp\left[\frac{-\log\left(1 - \frac{\% \text{ OPACITY}}{100}\right)}{\log e}\right]\left[\frac{\rho}{(1.046)(Q)(D_S)}\right]$$

Assume:

1. % opacity = 20%   ✓
2. $d_p \geq .1 \mu$, ∴ $Q = 2$
3. $\rho = 2.0$   ✓
4. $D_s = 5.0$ FT.   ✓

$C_{M_{20}} = d_p (0.1067) \dfrac{\rho}{D_s}$          OPACITY = 20%

$C_{M_{30}} = d_p (0.1705) \dfrac{\rho}{D_s}$          OPACITY = 30%

$C_{M_{40}} = d_p (.2442) \dfrac{\rho}{D_s}$          OPACITY = 40%

$C_{M_{50}} = d_p (.331.3) \dfrac{\rho}{D_s}$          OPACITY = 50%



Figure 2-1

Plume Opacity As A Function of Particle
Diameter and Dust Loading

Radian Corporation.   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

It is noticed that the opacity is affected most by particles in the range 0.05 to 0.5 microns. This is the range of particles which are deleterious to health. It would seem reasonable then to adopt a grain loading regulation and an opacity regulation which are compatible in the particle size range to be expected from reasonable control devices and which strongly influence the opacity. This means making the regulations compatible in the 0.5 to 1.0 micron region.

## 2.2   Relationship Between Grain Loading and Air Quality

The dispersal of particulate matter from a smoke stack is an example of turbulent diffusion which was first investigated by G. I. Taylor in the early twenties. The study of atmospheric turbulent diffusion was originated by Sutton (SU-004) who formulated what has become known as Sutton's equation. If $\bar{u}_1$ is the mean wind speed at a reference height above ground level, $z_1$, and if the mean wind speed is assumed to increase with height according to

$$\bar{u} = \bar{u}_1 (z/z_1)^{n/(2-n)} \qquad (2-5)$$

then the concentration is a distance x downwind of a point source, such as a smoke stack, is given by (SU-004)

$$C(x,y,z) = \frac{E}{\pi C_z C_y \bar{u}_1 x^{2-n}} \exp\left[-\frac{1}{x^{2-n}}\left(\frac{y^2}{C_y^2} + \frac{z^2}{C_z^2}\right)\right] \qquad (2-6)$$

where E is the emission rate in mass per unit time and $C_z$ and $C_y$ are coefficients which determine the diffusion in the vertical and cross wind directions respectively.

When the atmosphere is stable (adiabatic lapse conditions) the value of n is near zero. This means that the mean wind

**Radian Corporation**   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78766 • TELEPHONE 512 - 454-9535

speed is nearly a constant. Under very unstable conditions n is about equal to one.

The difficulty with applying Sutton's equation is the lack of knowledge of the coefficients $C_y$ and $C_z$ and the fact that measurements have shown that these coefficients are not constants. This difficulty can be circumvented by using the Pasquill-Gifford modification of the equation. This modification is

$$C(x,y,z) = \frac{E}{2\pi\sigma_y\sigma_z u} \exp\left[-\tfrac{1}{2}\left(\frac{z^2}{\sigma_z^2} + \frac{y^2}{\sigma_y^2}\right)\right] \qquad (2\text{-}7)$$

where $\sigma_y$ and $\sigma_z$ replace $C_y\left(\frac{x^{2-n}}{2}\right)^{\frac{1}{2}}$ and $C_z\left(\frac{x^{2-n}}{2}\right)^{\frac{1}{2}}$ in Sutton's formulation.

The advantage of this approach is that the measurements of atmospheric diffusion can be used to obtain the proper functional dependence of the numbers $\sigma_y$ and $\sigma_z$ for the various stability classes. This has in fact been done by Pasquill and Gifford. The results are used in the Air Quality Display Model (AQDM) which relates emissions to air quality (TR-001). A good reference on the Pasquill-Gifford plume model is the workbook by Turner (TU-001).

The use of the AQDM to determine the maximum arithmetic mean ground level concentration as a function of stack height results in the data presented in Figure 2-2. The concentration is proportional to the stack emission rate, E, and inversely proportional to the mean wind speed, u, so that what is actually plotted is $C_{max}u/E$.

With a knowledge of the maximum arithmetic mean concentration, the expected yearly maximum concentration for

-10-



Figure 2-2

Maximum Arithmetic Mean Concentration As A
Function of Stack Height and Stability Conditions

**Radian Corporation**   8500 SHOALCREEK BLVD.  •  P. O. BOX 9948  •  AUSTIN, TEXAS 78758  •  TELEPHONE 512 - 454-4797

various averaging times can be found if it is assumed that the concentrations are distributed in a lognormal fashion.  In general, this has been found to be the case in large urban areas where the total air pollution concentration is due to many sources.  However, the use of such an assumption to predict the maximum from a single source is open to some question but is most likely not too far wrong.

The result of using a lognormal distribution to determine the expected yearly maximum is presented in Figure 2-3.  This is the maximum based on a 1-hour averaging period. The results were computed using the arithmetic means in Figure 2-2.  The requirement that the 2-hour maximum be less than 250 $\mu gm/m^3$ can be compared to emission rates as follows.  Assume parameters for a standard stack.  Let the stack diameter be 5 feet, the stack exit velocity be 30 fps and let the mean wind velocity be 8 mph.  Then the horizontal dashed lines in Figure 2-3 represent the 250 $\mu gm/m^3$ requirement of the various grain loadings indicated in grains/scf.

According to Sutton's equation, the maximum ground-level concentration is inversely proportional to the square of the stack height.  The two dashed curves plotted in Figure 2-3 represent this dependence.  It is noticed that the $1/H^2$ dependence is better for unstable conditions than for neutral or stable conditions.  While the neutral or stable conditions are more probable in Texas, the maximum 60-minute averaged value is most likely to occur in unstable conditions.  The upper dashed curve is more appropriate for this reason.

If a $1/H^2$ credit is given for taller stacks, it is noticed that a stack approximately 50 feet high would require a stack grain loading less than or equal to .05 gr/scf to satisfy the ground-level regulation.  However, a source with the "standard conditions" chosen above and at a 100 foot stack height could could satisfy the regulation with a 0.20 gr/scf grain loading.

-12-



**Figure 2-3**

Maximum 1 Hour-Averaged Concentration As A
Function of Stack Height and Stability Conditions

**Radian Corporation** · 8500 SHOALCREEK BLVD. · ?. P. O. BOX 9948 · AUSTIN, TEXAS 78758 · TELEPHONE 512 - 454-4535

To determine the air quality for a wind speed of 4 mph, one must remember that the concentration is inversely proportional to wind speed and proportional to emission rate E (for a constant effective stack height). Thus a 0.20 grain/scf grain loading at 8 mph is equivalent to a 0.10 grain/scf level at 4 mph. This means that (from Figure 2-3) a 0.10 grain/scf requirement in 4 mph weather requires a 100 ft. stack.

In a similar manner other parameters may be investigated. The standard stack diameter for the purpose of the calculation was five feet. The emission rate, E, is proportional to the diameter squared for a given velocity. Thus, the stack height required for a 5 ft. diameter stack emitting 0.20 gr/scf is the same as that required for a 10 diameter stack emitting 0.05 gr/scf and so forth.

The conclusions to be drawn from the relationships presented in this section are as follows:

(1) a 250 $\mu$gm/m$^3$ sixty minute maximum concentration regulation is consistent with a reasonable grain loading regulation (0.1 to 0.3 grains/scf) for reasonable stack heights.

(2) The maximum ground-level concentration is inversely proportional to the square of the stack height for the more critical stability classes.

In these calculations the effective stack height is the physical stack height plus $\Delta h$ where

$$\Delta H = \left(\frac{v_s D_s}{u}\right)\left[1.5\right] + 2.68 \times \left(10^{-3}\right) P\left(\frac{T_s - T_a}{T_s}\right) D_s \qquad (2\text{-}8)$$

where $v_s$ is the stack velocity, P is the atmospheric pressure, and $T_a$ and $T_s$ are the atmospheric and stack exit temperatures, respectively.

-14-

Radian Corporation    8500 SHOALCREEK BLVD.  •  P. O. BOX 9948  •  AUSTIN, TEXAS 78758   •  TELEPHONE 512 · 454-9535

## 3.0    PARTICULATE EMISSIONS IN TEXAS

The equivalence of three types of particulate regula-
tions is dependent upon several characteristics of the emission
source. The relationship between opacity and particulate con-
centration of the stack effluent involves (1) the diameter and
density of the particles being emitted and (2) the stack diameter.
The emissions rate (E) is the product of the mass concentration
($C_m$) and the volumetric flow rate (q), i.e.,

$$E = C_m \times q \qquad (3-1)$$

Thus, the relationship between opacity and emissions rate also
depends upon the volumetric flow rate. The relationship between
emissions rate and air quality (maximum ground-level concentration
of particulates surrounding the pollution source) is dependent also
upon the above parameters. In addition, the relationship depends
upon the physical stack height, the exit gas temperature, the
prevailing wind speed, and the atmospheric stability class.

The characteristics of the pollution sources and
atmospheric conditions for the State of Texas will now be dis-
cussed briefly since they do play a significant role in deter-
mining "regulation equivalence." This discussion will be
followed by a summary of particulate control techniques.

### 3.1    Characteristics of Pollution Sources

The stationary sources of particulate emissions can
be divided (MC-032) into the following categories: (1) stationary
combustion sources, (2) chemical process industries, (3) food and
agriculture industries, (4) metallurgical industries, (5) mineral
products industries, (6) petroleum refining, and (7) wood processing

**Radian Corporation** 8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

industries. A significant number of each of these types of
pollution sources operate within the State of Texas.

### 3.1.1    Particle Size

Particle size distributions for selected pollution
sources without control equipment are given in Table 3-1. The
effect of control equipment, of course, is to reduce the average
particle size. Table 3-2 presents average collection efficiencies
for various particulate sizes and types of control equipment.
These data indicate that most of the particulates being emitted
from sources with reasonable control equipment have a particle
diameter less than 5 microns. Figure 3-1 shows the range of
particle sizes that can be expected from various types of pollution
sources. These data indicate that most of the air-borne particu-
lates are above 0.01 microns in size. Actually, the data are suspect
on the small size portion of the spectrum. Both measurement and
collection of these particles are difficult.

In summary, the average particle diameter of particu-
lates emitted from Texas industries (equipped with reasonable
control devices) can be expected to be in the 0.05 to 5.0 micron
range, with average diameters in the 0.2 to 2.0 micron range the
more probable. Of course, the areal average particle diameter
(which is used to characterize plume opacity) will be smaller
than the mass average diameter (which characterizes the mass
concentration of the stack effluent).

### 3.1.2    Particle Density

The particle density of particulate emissions can also
vary widely depending upon the type of material being emitted.
The specific gravities for various industrial dusts and combustion

## TABLE 3-1

### Source: MC-032

**PARTICLE SIZE DISTRIBUTION FROM SELECTED SOURCES WITHOUT CONTROL EQUIPMENT**

| Type Source | Percent less than 5 microns | Percent 5-10 microns | Percent 10-20 microns | Percent 20-44 microns | Percent greater than 44 microns |
|---|---|---|---|---|---|
| **Stationary Combustion** | | | | | |
| Bituminous Coal | | | | | |
|   Pulverized | 13 | 17 | 20 | 25 | 25 |
|   Cyclone | 65 | 10 | 3 | 7 | 10 |
|   Stoker | 4 | 6 | 11 | 18 | 61 |
| Anthracite Coal | 33 | 5 | NA | NA | 45 |
| Fuel Oil | 50 | NA | NA | NA | 0 |
| Natural Gas | 100 | - | - | - | - |
| **Solid Waste Disposal** | | | | | |
| Refuse Incinerators | 12 | 10 | 13 | 18 | 47 |
| **Mobile Combustion** | | | | | |
| Gasoline-Powered Motor Vehicles | 100 | NA | NA | NA | NA |
| Diesel-Powered Motor Vehicles | 60 | NA | NA | NA | NA |
| Aircraft | 100 | NA | NA | NA | NA |
| **Chemical Process** | | | | | |
| Phosphoric Acid | 100 | NA | NA | NA | NA |
| Soap and Detergents | 3 | 18 | 40 | 23 | 16 |
| Sulfuric Acid | 100 | NA | NA | NA | NA |
| **Food and Agriculture** | Average size 2-10 microns | | | | |
| Alfalfa Dehydrating | NA | NA | NA | NA | 40 |
| Cotton Ginning | 15 | 15 | 20 | 25 | 15 |
| Feed and Grain | 5 | 1 | 3 | 10 | 97 |
| Fish Meal | 6 | 4 | 110 | 8 | |
| Phosphate Fertilizer | | | | | 50 |
| **Metallurgical** | | | | | |
| Primary Aluminum | 13 | 12 | 12 | 13 | 50 |
| Primary Zinc | NA | 17 | 40 | NA | NA |
| Iron and Steel | | | | | |
|   Sintering | 0 | 0 | 13 | 15 | 83 |
|   Blast Furnace | NA | NA | NA | NA | 70 |
|   Open Hearth | 46 | 22 | 17 | 20 | 5 |

| Type Source | Percent less than 5 microns | Percent 5-10 microns | Percent 10-20 microns | Percent 20-44 microns | Percent greater than 44 microns |
|---|---|---|---|---|---|
| Basic Oxygen | 64 | 8 | 8 | 14 | 14 |
| Bessemer Converter | 99.5 | 0.3 | 0 | 0 | 0 |
| Secondary Aluminum | - | - | - | 100 | - |
| Brass & Bronze | 34 | 30 | 23 | 10 | 3 |
| Gray Iron Foundry | 18 | 8 | 12 | 24 | 48 |
| Secondary Lead | 95 | 2 | 2 | 0 | 0 |
| Secondary Steel | 60 | 14.1 | 11 | 9 | 6 |
| Secondary Zinc | 100 | - | - | - | - |
| **Mineral Products** | | | | | |
| Asphalt Batching | 35 | 23 | 17 | 20 | 3 |
| Asphalt Roofing | 100 | - | - | - | - |
| Castable Clay | 18 | 14 | - | 40 | 28 |
| Castable Refractories | 100 | - | - | 25 | 8 |
| Cement | 22 | 22 | 23 | 20 | 14 |
| Concrete | | 21 | 27 | 13 | 13 |
| Frit | 45 | 3 | 16 | 15 | 6 |
| Glass | NA | 95% smaller than 10 microns | | | NA |
| Gypsum | NA | NA | NA | NA | NA |
| Lime | 2 | 2.5 | 10 | 25 | 60 |
| Mineral Wool | 0.5 | 20 | 10 | 13 | 60 |
| Perlite | 22 | 15 | 15 | 13 | 35 |
| Phosphate Rock | 60 | 5 | 5 | 10 | 75 |
| Stone Quarrying & Processing | | | | | |
|   Crushing | 5 | 5 | 5 | 10 | 75 |
|   Conveying & Screening | 37 | 20 | 5 | 18 | 12 |
| Petroleum Refinery | | | | | |
| Catalyst Regenerator | 50 | 13 | NA | NA | NA |
| Wood Processing | | | | | |
| Fiberboard | NA | NA | NA | NA | 25 |

NA = No further breakdown of particle distribution available.

**Radian Corporation.** 8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 -454-9535

## TABLE 3-2

### AVERAGE COLLECTION EFFICIENCIES FOR VARIOUS PARTICLE SIZES AND VARIOUS PARTICULATE CONTROL EQUIPMENT[a],[b]

Source: MC-032

| Type Collector | Overall | Efficiency, %, in micron range | | | | |
|---|---|---|---|---|---|---|
| | | 0-5 | 5-10 | 10-20 | 20-44 | >44 |
| Baffled Settling Chamber | 58.6 | 7.5 | 22 | 43 | 80 | 90 |
| Simple Cyclone | 65.3 | 12 | 33 | 57 | 82 | 91 |
| Long-cone Cyclone | 84.2 | 40 | 79 | 92 | 95 | 97 |
| Multiple Cyclone (12 in. diameter) | 74.2 | 25 | 54 | 74 | 95 | 98 |
| Multiple Cyclone (6 in. diameter) | 93.8 | 63 | 95 | 98 | 99.5 | 100 |
| Irrigated Long-cone Cyclone | 91.0 | 63 | 93 | 96 | 98.5 | 100 |
| Electrostatic Precipitator | 97.0 | 72 | 94.5 | 97 | 99.5 | 100 |
| Irrigated Electrostatic Precipitator | 99.0 | 97 | 99 | 99.5 | 100 | 100 |
| Spray Tower | 94.5 | 90 | 96 | 98 | 100 | 100 |
| Self-induced Spray Scrubber | 93.6 | 85 | 96 | 98 | 100 | 100 |
| Disintegrator Scrubber | 98.5 | 93 | 98 | 99 | 100 | 100 |
| Venturi Scrubber | 99.5 | 99 | 99.5 | 100 | 100 | 100 |
| Wet Impingement Scrubber | 97.9 | 96 | 98.5 | 99 | 100 | 100 |
| Baghouse | 99.7 | 99.5 | 100 | 100 | 100 | 100 |

a - References 366,367

b - Data based on standard silica dust with the following particle distribution:

| Particle Size Range Microns | Percent by Weight |
|---|---|
| 0-5 | 20 |
| 5-10 | 10 |
| 10-20 | 15 |
| 20-44 | 20 |
| >44 | 35 |

Radian Corporation. 8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78759 • TELEPHONE 612 - 454-9535



PARTICLE SIZE (Micron)

Figure 3-1

Sizes of Air-Borne Particulates (M.S.A.)

Source: 1004

**Radian Corporation**   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-4535.

products are given in Table 3-3. The specific gravities for most grains are in the range of 0.7 to 1.0.

These data would indicate that particle densities for particulate emissions in Texas should be in the range of 0.8 to 5.0 grams per cubic centimeter, with 2.0 g/cc a reasonable average.

### 3.1.3    Stack Characteristics

As one would expect, the stack characteristics for pollution sources in Texas vary over a wide range of values.

Review of the 1970 emissions inventory data for Texas shows that most stack heights are within the range of 15 to 200 feet, with 50 feet an approximate average value. Several stacks of 300 feet and higher do exist. Although tall stacks do tend to allow dispersion of particulates over a wide area, they do not have the more desirable effect of removing particulates from the atmosphere. For this reason, there would appear to be an upper limit to the credits for building tall stacks. A second reason exists due to the economics of constructing and operating an exhaust system with a tall stack. Figure 3-2 shows how the investment cost of power plant stacks increases rapidly above 500 feet. Of course, the operating cost of the exhaust fan also increases with stack height.

According to emissions inventory data, stack diameters vary from 0.5 to 15 feet, with an approximate "mass-average" value of 5 feet. Stack velocities are normally in the range of 5 to 100 feet per second, with a typical value of 30 ft/sec. Exit gas temperatures normally vary from 70 to 1000°F, with 300°F a typical value.

Radian Corporation   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78766 • TELEPHONE 512 - 454-9535

TABLE 3-3

SPECIFIC GRAVITIES OF WIND EROSION PRODUCTS, INDUSTRIAL DUSTS AND
COMBUSTION PRODUCTS

Source: SH-004

| Specific gravity | Wind erosion products | Industrial dusts | Combustion products |
|---|---|---|---|
| 0-1 | | sawdust | cenospheres, incinerator ash |
| 1-1.6 | most fibers, biological materials; starches, etc. | plastics, gums, resins, most organic compounds, many hydrated salts like $Na_2SO_4, 12H_2O, Na_2CO_3$, $CaCO_3, 5H_2O$ (Carnallite) | most smoke |
| 1.6-2.6 | sand | glass wool, KCl, $NaNO_3$, sand, paint spray, borax, clays, alums, sylvite, phosphates | public utilities, paint, flyash |
| 2.6-3.3 | calcite, feldspars, micas, dolomite | talc, micas, cryolite, fluorite | |
| > 3.3 | barite, aragonite, cinnabar, periclase, pyrolusite, realgar, rutile, siderite, sphalerite | asbestos, metal powders, corundum, lime, galena, garnets, barium, strontium, hematite, lead salts, etc., magnetite, marcasite, pyrite, willemite, zincite | |

**Radian Corporation**   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78759 • TELEPHONE 512 · 454-9535·



Figure 3-2
Cost of Power Plant Stacks
Source:  TE-001

-22-

Radian Corporation  8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512-454-1535

### 3.1.4    Atmospheric Conditions

The average atmospheric conditions for a pollution source must be considered in relating particulate emission rates to ground-level concentration. Meteorological data for Houston, Dallas-Fort Worth, and San Antonio have been reviewed to determine the atmospheric conditions prevailing in various locations. The average wind speed and the "fastest mile" speed for several Texas cities are listed in Table 3-4. The "fastest mile" speed is the fastest wind speed observed for a 1-minute interval. Meteorological data for the State would indicate that 9 mph is a representative average wind speed and that 2 to 20 mph represent a reasonable range of wind speed values.

Table 3-5 lists the frequency of occurrence of the five stability classes for the Houston, Dallas-Fort Worth, and San Antonio areas. These data indicate that the neutral and stable classes are the most frequently occurring conditions. As indicated by Figure 2-3, less credit should be given to building tall stacks when the atmospheric conditions tend to be unstable.

### 3.1.5    Source and Atmospheric Parameters

A summary of the characteristic values for source and atmospheric parameters is given in Table 3-6.

**Radian Corporation** · 8500 SHOALCREEK BLVD. · P. O. BOX 9948 · AUSTIN, TEXAS 78758 · TELEPHONE 512 - 454-4836

## TABLE 3-4

### WIND SPEEDS FOR SELECTED TEXAS CITIES (1969)

|  | Wind Speed, mph | |
| City | Average | Fastest Mile |
| Houston | 7.9 | 46 |
| Dallas-Ft. Worth | 10.2 | 36 |
| San Antonio | 9.1 | 37 |

## TABLE 3-5

### STABILITY CLASSES FOR SELECTED TEXAS CITIES*

|  | Frequency of Occurrence for Stability Class | | | | |
| | 1 | 2 | 3 | 4 | 5 |
| Houston | 0.01 | 0.05 | 0.09 | 0.50 | 0.35 |
| Dallas-Ft. Worth | 0.02 | 0.09 | 0.11 | 0.37 | 0.41 |
| San Antonio | 0.06 | 0.06 | 0.10 | 0.52 | 0.26 |

*Houston and San Antonio data are for the five-year period 1965-69. Dallas-Ft. Worth data are for 1969 only.

**Radian Corporation** 8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-7535

## TABLE 3-6

### SOURCE AND ATMOSPHERIC PARAMETERS

| | Characteristic Value | | |
|---|---|---|---|
| | Low | Average | High |
| Stack Height, $h_s$ (ft) | 15 | 50 | 200 |
| Stack Diameter, $D_s$ (ft) | 0.5 | 5 | 15 |
| Stack Exit Velocity, $v_s$ (ft/sec) | 5 | 30 | 100 |
| Exit Temperature, $T_s$ (°F) | 70 | 300 | 1000 |
| Average Particle Diameter, $d_p$ (μ) | 0.05 | 0.5 | 5 |
| Particle Density, $\rho$ (g/cc) | 0.8 | 2 | 5 |
| Wind Speed, u (mph) | 1 | 8 | 20 |
| Stability Class* | 1 | 4 | 5 |

*Choice of low and high designation was arbitrary. Stability class 1 represents the most unstable atmospheric condition, stability class 5 is the most stable.

-25-

**Radian Corporation**   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78766 • TELEPHONE 512 - 454-9535

3.2    <u>Control Techniques</u>

The purpose of this section is not to present a
comprehensive review of particulate control equipment. Numerous
reviews (NA-029, BR-016, DA-004, WA-011, SO-002) of this nature
are available in the literature. Only a brief summary of (1) the
types of particulate control equipment used by industry, (2) the
relative advantages and disadvantages, and (3) typical removal
efficiencies will be presented.

Table 3-7 lists the methods of particulate control
devices used by selected industries. Table 3-8 summarizes the
advantages and disadvantages of various collection devices.
These devices range from the low-cost, low-efficiency gravita-
tional separators to the more expensive electrostatic precipita-
tors, fabric filters, and afterburners. Table 3-2 shows average
collection efficiencies for various control devices as a function
of particle size.

Table 3-9 lists typical performance data for electro-
static precipitators for various industrial applications.

**Radian Corporation**   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

TABLE 3-7

TYPES OF CONTROL EQUIPMENT USED BY SELECTED INDUSTRIES

Source: NA-029

| Industry or process | Source of emissions | Particulate matter | Method of control |
|---|---|---|---|
| Iron and steel mills | Blast furnaces, steel making furnaces, sintering machines. | Iron oxide, dust, smoke. | Cyclones, baghouses, electrostatic precipitators, wet collectors. |
| Gray iron foundries | Cupolas, shake out systems, core making. | Iron oxide, dust, smoke, oil, grease, metal fumes. | Scrubbers, dry centrifugal collectors. |
| Metallurgical (non-ferrous) | Smelters and furnaces. | Smoke, metal fumes, oil, grease. | Electrostatic precipitators, fabric filters. |
| Petroleum refineries | Catalyst regenerators, sludge incinerators. | Catalyst dust, ash from sludge. | High-efficiency cyclones, electrostatic precipitators, scrubbing towers, baghouses. |
| Portland cement | Kilns, dryers, material handling systems. | Alkali and process dusts. | Fabric filters, electrostatic precipitator, mechanical collectors. |
| Kraft paper mills | Chemical recovery furnaces, smelt tanks, lime kilns. | Chemical dusts. | Electrostatic precipitators, venturi scrubbers. |
| Acid manufacture-phosphoric, sulfuric. | Thermal processes, phosphate rock acidulating, grinding and handling systems. | Acid mist, dust. | Electrostatic precipitators, mesh mist eliminators. |
| Coke manufacturing | Charging and discharging oven cells, quenching, materials handling. | Coal and coke dusts, coal tars. | Meticulous design, operation, and maintenance. |
| Glass and glass fiber | Raw materials handling, glass furnaces, fiberglass forming and curing. | Sulfuric acid mist, raw materials dusts, alkaline oxides, resin aerosols. | Glass fabric filters, afterburners. |
| Coffee processing | Roasters, spray dryers, waste heat boilers, coolers, conveying equipment. | Chaff, oil aerosols, ash from chaff burning, dehydrated coffee dusts. | Cyclones, afterburners, fabric filters. |

-27-

**Radian Corporation**  8500 SHOALCREEK BLVD.  •  P. O. BOX 9948  •  AUSTIN, TEXAS 78766  •  TELEPHONE 512 • 454-9535

## TABLE 3-8

## ADVANTAGES AND DISADVANTAGES OF COLLECTION DEVICES

### Source:  NA-029

| Collector | Advantages | Disadvantages |
|---|---|---|
| Gravitational | Low pressure loss, simplicity of design and maintainance. | Much space required.  Low collection effi ciency. |
| Cyclone | Simplicity of design and maintainance. | Much head room required. |
| | Little floor space required. | Low collection efficiency of small particles. |
| | Dry continuous disposal of collected dusts. | Sensitive to variable dust loadings and flow rates. |
| | Low to moderate pressure loss. | |
| | Handles large particles. | |
| | Handles high dust loadings. | |
| | Temperature independent. | |
| Wet collectors | Simultaneous gas absorption and particle re moval. | Corrosion, erosion problems. |
| | | Added cost of wastewater treatment and rec lamation. |
| | Ability to cool and clean high-temperature, moisture-laden gases. | Low efficiency on submicron particles. |
| | Corrosive gases and mists can be recovered and neutralized. | Contamination of effluent stream by liquid entrainment. |
| | Reduced dust explosion risk. | Freezing problems in cold weather. |
| | Efficiency can be varied. | Reduction in buoyancy and plume rise. |
| | | Water vapor contributes to visible plume under some atmospheric conditions. |
| Electrostatic precipitator | 99+ percent efficiency obtainable. | Relatively high initial cost. |
| | Very small particles can be collected. | Precipitators are sensitive to variable dust loadings or flow rates. |
| | Particles may be collected wet or dry. | Resistivity causes some material to be eco nomically uncollectable. |
| | Pressure drops and power requirements are small compared to other high-efficiency collectors. | Precautions are required to safeguard person nel from high voltage. |
| | Maintenance is nominal unless corrosive or adhesive materials are handled. | Collection efficiencies can deteriorate gradu ally and imperceptibly. |
| | Few moving parts. | |
| | Can be operated at high temperatures (550° to 850° F). | |
| Fabric filtration | Dry collection possible. | Sensitivity to filtering velocity. |
| | Decrease of performance is noticeable. | High-temperature gases must be cooled to 200° to 550° F. |
| | Collection of small particles possible. | Affected by relative humidity (condensation). |
| | High efficiencies possible. | Susceptibility of fabric to chemical attack. |
| Afterburner, direct flame. | High removal efficiency of submicron odor- causing particulate matter. | High operational cost.  Fire hazard. |
| | Simultaneous disposal of combustible gaseous and particulate matter. | Removes only combustibles. |
| | Direct disposal of non-toxic gases and wastes to the atmosphere after combustion. | |
| | Possible heat recovery. | |
| | Relatively small space requirement. | |
| | Simple construction. | |
| | Low maintenance. | |
| Afterburner, catalytic. | Same as direct flame afterburner. | High initial cost. |
| | Compared to direct flame: reduced fuel re quirements; reduced temperature, insula tion requirements, and fire hazard. | Catalysts subject to poisoning. |
| | | Catalysts require reactivation. |



## TABLE 3-9

### TYPICAL PERFORMANCE DATA FOR ELECTROSTATIC PRECIPITATORS

Source: ST-001

**Left panel**

| Type of plant | Gas flow ft³/min at temperature | Dust concentrations gr/ft³ at operating temp — inlet | outlet | Collecting efficiency % |
|---|---|---|---|---|
| *1. Power Stations:* | | | | |
| Pulverized fuel fired boilers | 161,850 | 5.72 | 0.071 | 98.67 |
| Pulverized fuel fired boilers | 144,231 | 4.76 | 0.027 | 99.43 |
| Refuse burning boilers | 50,600 | 7.3 | 0.252 | 96.6 |
| Lignite stoker fired boilers | 235,300 | 0.7–0.874 | 0.00743–0.01616 | 98.15 |
| Lignite (pulverized fuel fired boiler (hammer mills)) | 942,000 | 2.015 | 0.0698 | 96.5 |
| *2. Coal Industry:* | | | | |
| Lignite rotary type steam dryer | 17,650 | 15.52 | 0.1225 | 99.25 |
| Lignite rotary type steam dryer | 15,300 | 7.96 | 0.0394 | 99.40 |
| Lignite plate type steam dryer | 14,700 | 3.42 | 0.0272 | 99.20 |
| Combustion gas lignite | 24,700 | 6.25 | 0.0481 | 99.50 |
| Lignite mill dryer | 23,580 | 10.93 | 0.1445 | 98.67 |
| Lignite conveying system de-dusting | 12,050 | 23.8 | 0.121 | 99.40 |
| Bituminous coal tube type steam dryer or | 25,300 | 7.09 | 0.0355 | 99.50 |
| Bituminous coal convey-ing system de-dusting | 6,480 | 9.75 | 0.0535 | 99.30 |
| Bituminous coal-coke grinding plant | 2,825 | 6.02 | 0.0245 | 99.59 |
| *3. Coal Gas Industry:* | | | | |
| Peat gas producer | 2,650 | 2.32 | 0.00351 | 99.85 |
|  | 5,120 | 0.0976 | 0.000875 | 99.20 |
| Cracking plant for natural gas | 7,650 | 164 | 0.0875 | 99.47 |
| Producer gas from lignite briquettes | 28,250 | 12.47 | 0.0437 | 99.7 |
| Producer gas from semi-bituminous lignite | 20,000 | 17.4 | 0.0026 | 99.9 |
| Shale-gas cleaning plant | 1,825 | 10.5 | 0.00437 | 99.9 |
| Coke oven town gas | 1,350 | 7.35 | 0.00131 | 99.9 |
| Coke oven gas cleaning | | | | |

**Right panel**

| Type of plant | Gas flow ft³/min at temperature | Dust concentrations gr/ft³ at operating temp — inlet | outlet | Collecting efficiency % | Gas flow ft³/min at temperature | cor ope inlet |
|---|---|---|---|---|---|---|
| Oil carburetted water gas cleaning | 8,230 | 12.17 | 0.0342 | 99.8 | 12,380 | 5 |
|  | 7,360 | 2.06 | 0.0171 | 99.2 | | |
| Tail gas for sulphuric acid concentration | | | | | | |
| Elemental sulphur fume from hydrogen sulphide combustion plant | 2,358 | 4.57 | 0.0219 | 99.5 | 2,530 | 11 |
| *7. Mineral Earths and Salts Processing:* | | | | | | |
| Bauxite dryer 180 ton/day | 5,570 | 24.398 | 0.0205 | 98.5 | 11,830 | 6 |
| Bauxite calcining and processing kiln 220 ton/day | 8,230 | 1.79 | 0.0157 | 99.1 | 25,900 | 2 |
| Alumina calciner with multicyclone pre-cleaner 45 ton/day | 1,470 | 2.99 | 0.0179 | 99.4 | | 129 |
| Potassium chloride dryer | 2,530 | 5.33 | 0.0267 | 99.5 | 8,950 | |
| Fullers earth dryer | 2,940 | 3.29 | 0.0306 | 99.1 | 17,100 | 3 |
|  | 78,000 | 1.214 | 0.058 | 93.5 | 17,650 | 1 |
| *8. Non-Ferrous Metallurgical Industry:* | | | | | | |
| Vertical blast furnace: lead ore | 80,000 | 90 | 0.084 | 99.06 | 5,880 | 5 |
| Vertical blast furnace: lead ore | 74,750 | 2.75 | 0.032 | 98.85 | 9,410 | |
| Rotary kiln processing: zinc ores | 85,400 | 9.26 | 0.029 | 99.68 | 4,710 | 17 |
| Rotary kiln processing: zinc ores | 85,400 | 4.82 | 0.105 | 98.2 | 7,360 | 1 |
| Vertical blast furnace tin ores | 73,600 | 0.78 | 0.021 | 97.3 | 5,700 | |
| Vertical blast furnace tin ores | 21,200 | 21.3 | 0.052 | 99.75 | 2,120 | |
| Vertical blast furnace: tin ores | 14,100 | 22.3 | 0.057 | 99.6 | 3,650 | |
| Vertical blast furnace: antimony ores | 8,840 | 1.64 | 0.043 | 99.7 | | |
| Copper converters | 6,480* | 0.95 | 0.0162 | 98.3 | 18,530 | |
| Rotary kiln for nickel bearing iron ores | 7,660 | 0.525 | 0.00157 | 99.7 | 26,500 | 1 |
|  | 9,440 | 2.23 | 0.0325 | 98.5 | | |
| Arsenic and sulphuric acid mist removal | 8,250 | 1.18 | 0.0000022 | 99.99 | | |

*4. Paper Industry:* Pyrites roaster 25 ton/day; Pyrites roaster 35 ton/day; Acid mist from sulphur burning furnace 7.5 ton/day; Sulphuric acid mist following cooler tower; Sulphuric acid mist following cooler tower; Black liquor burning plant.

*5. Cement Industry:* Rotary kiln dry process 320 ton/day; Lepol rotary kiln dry process 470 ton/day; Rotary kiln wet process 350 ton/day; Rotary kiln with calciner, wet process 350 ton/day; Vertical kiln; Raw material dryer; Cement mill; Packing machine.

*6. Chemical Industry:* Pyrites roaster 29 ton/day; Pyrites roaster 35 ton/day; Blende roaster; Arsenic and sulphuric acid mist removal.

\* Linear velocity through the precipitator; data from R.L. Cottham. Paper No.2* Clean Air Conference, Sydney, 1962.

† Linear ... through precipitator; data from G. Funke, *Zement, Kalk, Gips*, 12, 189 (1959).

Radian Corporation   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-4535

## 4.0     FORMULATION OF REGULATIONS

Guidelines for developing "equivalent" opacity, air
quality, and emissions rate regulations will be presented in
this section. First, particulate regulations used or suggested
by other governmental agencies will be reviewed briefly. Next,
possible particulate regulations will be presented. Then the
control requirements imposed on selected industries by these
regulations will be discussed.

## 4.1     Other Regulations

The Environmental Protection Agency (EPA) has recently
issued guidelines for states' preparation of implementation
plans (EN-017). This document includes an example set of regula-
tions for particulate emissions. These regulations are divided
into the following categories: (1) visible emissions, (2) fugitive
dust, (3) incineration, (4) fuel burning equipment, and (5) process
industries.

The regulation on visible emissions states that stationary
sources may not emit any air contaminant which yields a density
equal to or greater than a Ringelmann No. 1 or 20 percent opacity.
The regulation does allow (1) a Ringelmann No. 3 or 60 percent
opacity for up to 3 minutes in any 60 minute period and (2) an
exception to the visibility regulation where uncombined water
is the only reason for failure of a source to meet this requirement.

The regulation on fuel burning equipment states that no
source burning solid fuel may emit particulate matter in excess
of 0.10 pounds per million Btu. (For a typical coal-fired unit,
this corresponds to a 0.056 gr/scf grain loading. For a typical
lignite-fired unit, this corresponds to a 0.049 gr/scf grain loading.)

Radian Corporation · 8500 SHOALCREEK BLVD. · P. O. BOX 9948 · AUSTIN, TEXAS 78766 · TELEPHONE 512 - 454-4595

Oil-fired fuel burning equipment rated equal to or greater than 250 million Btu per hour may not emit particulates in excess of 0.025 pounds per million Btu per hour. For a coal-fired unit using 10 percent ash coal, the regulation for solid fuel corresponds to 99 percent particulate removal. For combustion of a high-ash residual fuel-oil, the fuel-oil regulation corresponds to 80 percent particulate removal.

The regulation on process industries uses an emissions rate vs. process weight curve to define allowable emissions. This curve is represented by the equation

$$E = 4.10 * P^{0.67} \qquad (4-1)$$

for process weight rates up to 60,000 lbs/hr. Here E is the rate of emissions in pounds per hour and P is the process weight rate in tons per hour. This regulation is essentially the one put forth by the Los Angeles County Air Pollution Control District (LACAPCD). Above a process weight rate of 60,000 lbs/hr, the LACAPCD regulation becomes more stringent and is represented by the equation

$$E = 55 * P^{0.11} - 40 \qquad (4-2)$$

The regulation utilizing Equations (4-1) and (4-2) is the one proposed by the TACB staff in November 1970. In the EPA example regulation, a 0.03 gr/scf graining loading restriction is also imposed upon the process industries. That is, the regulation does not allow emissions in excess of (1) 0.03 gr/scf of exhaust gas or (2) the emissions rate specified by the process weight curve, whichever is less.

The example regulation displayed by EPA does not allow a credit for tall stacks. A number of other proposed regulations

**Radian Corporation** 8500 SHOALCREEK BLVD. • P.O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-5595

do allow this credit. One proposal (CR-013) suggests that their grain loading regulation be increased by $(H/100)^2$ for stack heights greater than 100 feet. This credit applies only to less than 10 micron particulates. Of course, the reasoning behind this proposal is that fine particulates discharged aloft from tall stacks will be widely dispersed before fall-out. Whether this proposal would in fact be suitable would depend on prevailing wind current, the amount of thickly-populated area downwind, and the amount of particulate pollution already existing downwind. This would be a suitable regulation in a coastal area where wind currents would normally blow the particulates out to sea. The particulate regulation adopted by the State of New Jersey in 1964 (CR-013) is a variation of the process weight concept which gives consideration to the height of the stack, the distance from the stack to the plant property line, the particle size of the particulates, and their hazardous nature.

Numerous other regulations are reported in the literature (CR-013, DA-004, ST-001). However, air pollution control legislation is constantly changing, with the trend towards tighter control. Thus, the regulations reported in the literature tend to be less restrictive than the regulations which are currently being proposed.

## 4.2   Possible Regulations

The bases for developing particulate regulations have been presented. Although it is not the purpose of this note to design particulate regulations, it would appear appropriate to outline possible regulations which could be utilized by the TACB.

### 4.2.1   Opacity and Grain Loading

First of all, let us consider a means by which "equivalent" opacity and grain loading regulations can be set. Figure 2-1

Radian Corporation · 8500 SHOALCREEK BLVD. · P. O. BOX 9948 – AUSTIN, TEXAS 78758 · TELEPHONE 512 - 454-9535

gives the relationship between opacity and grain loading for
different particle diameters. This figure shows that opacity
is strongly dependent upon particle diameter. Particulate
emissions with an areal average particle diameter of 0.15 microns
produce a very opaque plume. For a 5-foot diameter stack with an
exit gas temperature of 300°F and a particle density of 2 g/cm³,
the grain loading would need to be below 0.01 gr/scf to satisfy
a 20% opacity regulation if the areal average particle diameter
were 0.15 microns. This means that a 20% opacity regulation
would be very severe for such a source.

The above situation represents the most restrictive
case for the 20% opacity regulation. This pollution source
could attain compliance by installing several stacks with smaller
diameters. For example, if several one foot diameter stacks
were used, a 0.05 gr/scf grain loading would just about satisfy
the 20% opacity regulation. The above statement can be easily
verified by observing in the opacity equation that decreasing
the stack diameter $D_s$ has the same effect as decreasing the grain
loading $C_m$.

In a similar fashion, Figure 2-1 and the opacity equation
shown on this figure can be used to generate opacity values corres-
ponding to given grain loadings for various source ($D_s$, $d_p$, $\rho$, and
$T_s$) parameters. Selected values are shown in Table 4-1. The
effect of exit gas temperature is to modify the volumetric flow
rate of exit gas. The grain loadings shown in Figure 2-1 are
based upon an exit temperature of 300°F, the grain loading
shown on Figure 2-1 should be modified by multiplying them by
the factor $(T + 460)/(760)$.

These data indicate that the opacity reading is strongly
dependent upon the stack parameters. Two alternatives could be

**Radian Corporation**   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

## TABLE 4-1

### SELECTED OPACITY VALUES FOR VARIOUS SOURCE PARAMETERS

| Grain Loading (gr/scf) | Stack Diameter (ft) | Particle Density (g/cc) | Particle Diameter (microns) | Opacity (%) |
|---|---|---|---|---|
| 0.050 | 5 | 2 | 0.76 | 20 |
| 0.100 | 5 | 4 | 0.76 | 20 |
| 0.025 | 5 | 1 | 0.76 | 20 |
| 0.050 | 2.5 | 2 | 0.38 | 20 |
| 0.100 | 2.5 | 4 | 0.38 | 20 |
| 0.025 | 2.5 | 1 | 0.38 | 20 |
| 0.050 | 1.0 | 2 | 0.15 | 20 |
| 0.100 | 1.0 | 4 | 0.15 | 20 |
| 0.025 | 1.0 | 1 | 0.15 | 20 |
| 0.050 | 5 | 4 | 0.76 | 11 |
| 0.050 | 5 | 1 | 0.76 | 36 |

**Radian Corporation**  8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 • 454-9535

be considered for equilibrating opacity and grain loading regulations. One approach would be to include all of these parameters in the equilibration step. This approach would appear to be too cumbersome and result in regulations which are difficult to enforce. The particle size distribution and density of the stack emissions would have to be measured.

The second approach would be to equilibrate the opacity and grain loading at one key point. For the "standard" source plotted on Figure 2-1, a possible point for this equilibration is at 0.05 gr/scf grain loading for an areal average particle diameter of 0.076 microns. For "standard" sources with an average particle diameter above 0.76 microns, the opacity regulation will be less stringent than a 0.05 gr/scf grain loading regulation, whereas for particles with an average diameter smaller than 0.76 microns the reverse is true.

For sources with "non-standard" parameters, similar reasoning can be applied to determine which regulation will be the most stringent. For example, if a source with $D_S$ = 5 feet and $T_S$ = 300°F emits particles with an areal average diameter of 0.76 microns and a density of 1.0 g/cc, the opacity regulation will be more stringent than a 0.05 gr/scf grain loading regulation. If a pollution source were confronted with this type of situation, it could (1) build a stack with a smaller diameter, (2) dilute the exit gas, or (3) heat the exit gas to avoid the more stringent opacity regulation.

As noted in various particulate regulations covering visible emissions, the opacity regulation should not be applied to a stack which is opaque due to the presence of uncombined water. Some provision in the regulations could except sources from the opacity criterion when the opacity is due to uncombined moisture.

-35-

Radian Corporation   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

## 4.2.2   Emissions Rate

Next let us consider what type of emissions rate
regulation is desirable. The example particulate regulation
displayed by EPA (EN-017) in the Federal Register has one rule
for fuel combustion sources and one for industrial process sources.
The "example" rule for solid-fuels combustion sources corresponds
to a grain loading of 0.056 gr/scf for typical coal-fired units
and 0.049 gr/scf for typical lignite-fired units. The "example"
rule for industrial process sources uses an emissions rate vs.
process weight curve and a 0.03 gr/scf grain loading regulation.
The process source must satisfy the minimum emissions indicated
by these two criteria. The TACB staff would prefer to devise an
emissions rate regulation which is based upon a "grain loading"
concept for all sources rather than use the process weight rate
concept. The process weight rate concept suffers the disadvantages
of not being able to accurately define or determine the process
weight rate for all pollution sources.

Thus, let us consider a "grain loading" type of regu-
lation. That is, let us construct a curve for allowable emissions
rate (E) which is a function of the volumetric flow rate (q) of
exit gas.



Figure 4-1
Emissions Rate Curve

Radian Corporation    8500 SHOALCREEK BLVD.  •  P. O. BOX 9948  •  AUSTIN, TEXAS 78758  •  TELEPHONE 512 - 454-1535

This curve is represented by the equations

$$\ln E = b \ln q + \ln a \qquad (4\text{-}3a)$$
$$E = aq^b \qquad (4\text{-}3b)$$

where $\qquad E = q \, C_m \qquad (4\text{-}4)$

Combination of Equations (4-3) and (4-4) indicates that a curve of $C_m$ versus q specifies a E versus q curve.

The next question to be answered is should all sources be allowed to emit particulates at the same concentration ($C_m$) regardless of the source size. Many agencies have adopted the philosophy that large sources will be contaminating the environment more than small sources so the large sources should be required to control to lower grain loadings. The sketch below indicates two types of regulations.



Figure 4-2

Grain Loading Curve

The A curve represents a constant grain loading regulation, whereas the B curve represents a decreasing grain loading

Radian Corporation.   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78766 • TELEPHONE 512 - 454-1935

restriction for increasing size.  Using the notation given in
Equations (4-3) and (4-4), the equation

$$C_m = a \, q^{b-1} \qquad (4-5)$$

would represent (1) the A curve provided b is equal to one and
(2) the B curve provided b-1 is negative.

One way of achieving the goal of placing a more
restrictive grain loading on large sources and at the same time
maintaining a good "tie" between the opacity and emissions rate
regulations would be to let the product $C_m$ times $D_s$ be a constant
for all gas flow rates, i.e.,



Figure 4-3
$C_m \, D_s$ Product Curve

$$C_m \, D_s = (C_m \, D_s)_{Std}, \text{ a constant} \qquad (4-6)$$

Use of Equation (4-6) implies that the opacity is also a constant
(for the same particulates and stack temperature).

For the emissions rate expressed in lbs/hr (E), the
mass concentration expressed in gr/scf ($C_{ms}$) and the volumetric
flow rate expressed in scf/minute ($q_s$),

**Radian Corporation**  8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

$$E = 8.57 \times 10^{-3} \; C_{ms} \; q_s \qquad (4-7)$$

The volumetric flow rate $(q_s)$ is related to the stack velocity $v_s$ (in ft/sec) and the stack diameter $D_s$ (feet) by the relation

$$q_s = 47.1 \; D_s^2 \; v_s (492)/(T_s + 460) \qquad (4-8)$$

For a standard stack with $v_s = 30$ ft/sec and $T_s = 300°F$,

$$q_s = 913 \; D_s^2 \qquad (4-9)$$

If a 0.05 gr/scf grain loading is selected as the basis for the "standard" stack with $D_s = 5$ feet, the $C_{ms} \; D_s$ product can be set by

$$C_{ms} \; D_s = 0.25 \qquad (4-10)$$

Combining Equations (4-9) and (4-10),

$$C_{ms} = 7.56 \; (q_s)^{-\frac{1}{2}} \qquad (4-11)$$

which is the equation for the grain loading curve. Combining Equations (4-7) and (4-11),

$$E = 6.48 \times 10^{-2} \; (q_s)^{\frac{1}{2}} \qquad (4-12)$$

This is the emissions rate curve that corresponds to $C_m \; D_s = 0.25$ gr-ft/scf. It should be emphasized that this expression was developed based upon holding $C_m \; D_s$ constant and for the "standard" stack parameters ($D_s = 5$ feet and $v_s = 30$ ft/sec). The criterion of holding $C_m \; D_s$ constant places a stringent grain loading restriction on large diameter stacks. This may force pollution sources into building multiple stacks when the

**Radian Corporation** · 8500 SHOALCREEK BLVD. · P. O. BOX 9948 · AUSTIN, TEXAS 78759 · TELEPHONE 512 - 454-9535

benefit for doing so is not that great. However, the opacity regulation has the same effect.

Of course, numerous other emissions rate curves could be constructed based upon $C_m D_S$ being held constant. If the less stringent criterion of $C_m D_S = 0.50$ gr-ft/scf is used as a basis, the corresponding emissions rate curve is defined by

$$E = 1.30 \times 10^{-1} (q_S)^{\frac{1}{2}} \qquad (4-13)$$

Figure 4-4 displays Equations (4-12) and (4-13) graphically. Equations (4-12) and (4-13) are designed as the $B_1$ and $B_2$ curves, respectively.

A constant grain loading regulation could be adopted. This would not force the larger sources to comply with a more stringent grain loading regulation. If 0.05 gr/scf is chosen as the regulation basis,

$$E = 4.28 \times 10^{-4} (q_S) \qquad (4-14)$$

The A curve in Figure 4-4 represents this equation displayed graphically. Of course, other grain loadings could be chosen as the basis.

Another possibility is to compromise between the constant $C_m D_S$ (opacity) and constant grain loading concepts. One such compromise would be to have the emissions rate dependent upon the $3/4^{th}$ power of the volumetric flow rate, i.e.,

$$E = 5.26 \times 10^{-3} (q_S)^{3/4} \qquad (4-15)$$

Equation (4-15) is based upon a 0.05 gr/scf grain loading at the stack parameters of $D_S = 5$ feet, $v_S = 30$ ft/sec and $T_S = 300°F$.

Radian Corporation   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-7535.

4.2.3     Emissions Rate and Air Quality

The relationship between stack emissions rate and air quality was presented in Section 2.2. Figure 2-3 displays the maximum ground-level concentration averaged over 60 minutes as a function of effective stack height and atmospheric stability class. The horizontal dashed lines correspond to ordinate values for grain loadings of a "standard" source ($D_s = 5$ feet, $v_s = 30$ ft/sec, $T_s = 300$ F, and $u = 8$ mph).

This figure shows that a stack approximately 50 feet high emitting particulates at 0.05 gr/scf would result in a maximum ground-level concentration of 250 $\mu g/m^3$. If the stack height is increased, the allowable grain loading for this standard source decreases. For the moderately unstable (Class 2) and slightly unstable (Class 3) atmospheric conditions, the ground-level concentration dependence is closely approximated by a $1/H^2$ dependence (dashed lines on Figure 2-3). As the atmospheric conditions become more stable, a higher order dependence is observed (note that the lower dashed line does not parallel the lines for Stability Classes 4 and 5).

The dependence of ground-level concentration on effective stack height shown in Figure 2-3 would indicate that a credit proportional to $H^2$ could be applied to the allowable emissions rate. This credit would correspond to the dependence for the most critical atmospheric conditions (stability Classes 2 and 3). The maximum 60 minute concentration is much more likely to occur for these conditions than for the neutral or stable atmospheric conditions.

If a more conservative credit for stack height is desired, a credit proportional to $H$ could be applied. This type of credit

**Radian Corporation**  8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78759 • TELEPHONE 512 - 454-9535

would discourage the use of tall stacks as a pollution control technique.

The adjustment to allowable emissions rate for various stack heights should be bounded. The particulate regulation should probably include a minimum physical stack height, say around 15 feet above nearby structures. The credit for taller stacks should probably be limited to physical stack heights of about 200 feet.

The effective stack height to be used in any crediting for taller stacks should be the physical stack height H* plus the plume rise Δh, i.e.

$$H = H^* + \Delta h \qquad (4\text{-}16)$$

The plume rise formula used in the AQDM (TR-001) is given by Equation (2-8). It is suggested that a modified form of this formula be used in the TACB particulate regulation. Standard values for (1) the mean wind speed, (2) atmospheric pressure, and (3) ambient air temperature should be substituted into Equation (2-8). Substituting u = 8 mph, P = 1013 millibars, and $T_a$ = 70°F (average values for Houston) into Equation (2-8) and converting the units

$$\Delta h = 0.128 \ v_s \ D_s \ [1.00 \ + \ 0.550 \ D_s(T_s - 70)/(T_s + 460)] \qquad (4\text{-}17)$$

where $v_s$ is expressed in ft/sec, $D_s$ in ft, and $T_s$ in °F.

Radian Corporation · 8500 SHOAL CREEK BLVD. · P. O. BOX 9948 · AUSTIN, TEXAS 78756 · TELEPHON

4.3    Typical Control Requirements

In this section, the impact of the particulate
lations outlined in Section 4.2 upon several pollution s
will be discussed.  The purpose of this section is to de
whether or not these regulations are reasonable.

4.3.1    Solid-Fuel Combustion Sources

As examples of large pollution sources which c
to the particulate pollution problem, coal and lignite f
power plants will be discussed.  First, let us consider
burning power plant to illustrate how the regulations ou
here correspond to the example regulation displayed by E
the Federal Register.  This regulation restricts particu
emissions from solid-fuel combustion sources to 0.10 lbs
As mentioned earlier in this note, this correspond     s
gr/scf grain loading for a typical coal-fired unit.  A
power station will produce about $1.1 \times 10^6$ scf per minut
$4.64 \times 10^4$ lbs of fly ash (based upon 10% fly ash from c
per hour.  If the power station were to remove 99% of th
particulates, the power station would be emitting 0.049
and thus be in compliance with the EPA example regulatio

Now let us consider applying the regulations
in the previous section to this pollution source.  For
station this large, several stacks would be utilized.
10 foot diameter stacks could accommodate the gas flow
exit gas velocity of 60 ft/sec and temperature of 300°F
$D_s$ = 10 ft and $C_m$ = 0.049 gr/scf, it can be seen from F
that the 20% opacity regulation could be met if the are
particle diameter is 1.5 microns or larger.  This seems
for fly ash.

-43-

Radian Corporation ___ 8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78766 • TELEPHONE 512 - 454-4535

Compliance with the emissions rate curves in Figure 4-4 depends upon the manner in which these curves are applied. If the flow rates from each of the six stacks are summed to yield a total flow rate from this particular pollution source and the total allowable emissions rate is determined based upon this gas flow rate, most of the regulations on Figure 4-4 will be very stringent for this type of source. On the other hand, if the emissions rate curve is applied to each stack separately and thus the total allowable emissions rate is computed, compliance would more likely be attainable.

The allowable emissions rate indicated by each of the curves on Figure 4-4 are summarized in Table 4-2. Only the constant grain-loading type regulation (Curve A) could be satisfied by 99% particulate removal with this 6 stack network. If the emissions rate curve were applied to each stack separately, the use of multiple stacks would be encouraged. To achieve compliance with a $B_1$, $B_2$, or C curve regulation, this pollution source would need to attain higher removal efficiencies or build more stacks.

Application of an air quality regulation must also consider the question of how it should be applied to multiple stacks. If the network of six stacks is considered to be one source, the $(C_{max} - 1 \text{ hour} * u)/E$ value based upon an 8 mph wind velocity would be $1.53 \times 10^{-5} m^{-2}$. As can be seen from Figure 2-3 ($1.53 \times 10^{-5} m^{-2}$ does not intersect upper dashed line), the pollution source could not attain compliance with 99% removal and a 200 foot high stack. To attain compliance with this type of regulation, this pollution source would need to attain 99.67% removal efficiencies and build a 200 foot stack. The 99.67% removal figure corresponds to 140 lbs/hr of particulate emissions.



GAS FLOW RATE, SCFM

Figure 4-4

Allowable Emissions Rate Curves

-45-

Radian Corporation  8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

## TABLE 4-2

ALLOWABLE EMISSIONS FOR A TYPICAL COAL-FIRED POWER STATION

Total Allowable Emissions (lbs/hr)

| Regulation | Based on Total Flow Rate | Based on Stack Flow Rate |
|---|---|---|
| Curve A | 470 | 470 |
| Curve $B_1$ | 68.2 | 167 |
| Curve $B_2$ | 136.4 | 334 |
| Curve C | 179 | 280 |

Emissions corresponding to 99% particulate removal - 464 lbs/hr.

-46-

Radian Corporation   8500 SHOAL CREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78766 • TELEPHONE 512 - 454-9535

On the other hand, if each of the stacks is considered separately, the $(C_{max} - 1 \text{ hour} * u)/E$ value would be $9.14 \times 10^{-5} \text{ m}^{-2}$. This pollution source could be within compliance of the air quality regulation by building a 140 ft high stack and removing 99% of the particulates.

Lignite-fired power stations will produce more particulates per unit of heat generated than coal-fired plants. A typical lignite-fired plant will produce 16.9 lbs of fly ash per $10^6$ Btu of heat, whereas a typical coal unit produces about 8.7 lbs/$10^6$ Btu. A typical 500 mw lignite-fired plant will produce approximately $1.15 \times 10^6$ scfm of flue gas and $9.55 \times 10^4$ lbs/hr fly ash. For 99% removal of particulates, the grain loading of the exit gas would be 0.083 gr/scf (compared to 0.049 gr/scf for the coal unit). This means that a lignite-fired power station must devise a control scheme (or stack arrangement) which corresponds to twice the removal efficiencies of the coal-fired system.

## 4.3.2   Asphalt Batching Plants

Hot asphalt batching plants are potential sources of heavy dust emissions. Asphalt batching involves the mixing of hot dry sand, aggregate, and mineral dust with hot asphalt. The major source of dust is the direct-fired dryer. Exit gases range from 250° to 350°F at volumetric flow rates of 15,000 to 60,000 scfm (NA-029). Most dryers use simple cyclone separators to collect about 70 to 90% of the dust. Scrubbers can be used following the primary cyclones to achieve 99% overall dust removal efficiencies (FR-021). To achieve higher efficiencies, fabric filters have been used with success.

Consider a small asphalt batching plant exiting 8,200 scfm of gas through a 3 foot diameter stack at 300°F. Friedrich (FR-021) estimates an average dust loading of 75 gr/scf for a

**Radian Corporation** · 8500 SHOALCREEK BLVD. · P. O. BOX 9948 · AUSTIN, TEXAS 78758 · TELEPHONE 512 · 454-4535

kiln dryer. A primary cyclone followed by a wet scrubber could reduce effluent dust loadings to approximately 0.1 to 0.2 gr/scf (this corresponds to 99.73% removal). For $D_s = 3$ ft, $\rho = 3$ g/cc, and $C_m = 0.2$ gr/scf, the 20% opacity regulation could be met if the average particle diameter is 1.2 microns or larger. Based upon the data presented by Friedrich, the average particle diameter of the effluent stream could be smaller than 1.2 microns. If this is the case, effluent dust loadings of 0.1 gr/scf may be required to satisfy the opacity regulation (for $C_m = 0.1$ gr/scf, $d_p$ must be equal to or greater than 0.67 microns).

If a 0.10 gr/scf effluent dust loading is achieved, the emissions rate for a 8,200 scfm unit would be 7.0 lbs/hr. The maximum allowable emissions rate for the regulatory curves shown in Figure 4-4 are listed below:

| Regulatory Curve | Max. Allowable Emissions Rate (lbs/hr) |
|---|---|
| A | 3.6 |
| $B_1$ | 5.8 |
| $B_2$ | 11.7 |
| C | 4.7 |

Thus, a 0.10 gr/scf dust loading would only satisfy the $B_2$ regulation. If any of the curves A, $B_1$, or C were adopted, this source would probably be forced to use fabric filters.

Now let us determine whether or not the air quality criterion can be satisfied by this source. For an 8 mph wind speed and an emissions rate of 7.0 lbs/hr, $(C_{max} \cdot 1 \text{ hour} \cdot u)/D = 7.5 \times 10^{-4} \text{m}^{-2}$. This means this source could comply with a 250 µg/m³ concentration by having a 50 foot high stack.

-48-

Radian Corporation   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

5.0     SUMMARY

A basis for developing reasonable particulate emissions regulations is given in this note.  Technical relationships between plume opacity, emissions rate, and air quality have been discussed.  Plume opacity can be related to grain loading by means of the expression

$$\text{Opacity} = 1 - \exp\left(-\frac{3}{2}\frac{Q}{\rho}\frac{C_m D_s}{d_p}\right) \qquad Q = \text{Extinction Coefficient}$$

The parameters $d_p$, $\rho$, $D_s$, and $T_s$ have a strong influence on opacity (see Figure 2-1).  The grain loading (and thus emissions rate) can be related to air quality by means of (1) stack parameters ($d_s$, $v_s$, $T_s$, and $h_s$) and (2) atmospheric conditions (u and stability class).  For the more critical stability classes, the maximum ground-level concentration is inversely proportional to the square of the stack height (see Figure 2-3).

The characteristics of particulate emission sources in Texas were summarized.  Typical source parameters and atmospheric conditions were tabulated (see Table 3-6).  The removal efficiencies of various control devices and previously used or suggested control regulations were presented.  This information is vital to devising reasonable control regulations.

Several possible control regulations were suggested. Curves for the maximum allowable emissions rate as a function of gas flow rate were constructed.  The curves presented (see Figure 4-4) are based upon controlling particulate emissions by (1) holding the effluent grain loading ($C_m$) constant as the gas flow rate increases, (2) holding the product $C_m D_s$ constant, and (3) a compromise between the two concepts above.  The effect of various "possible" regulations upon two particulate emissions sources was discussed.

**Radian Corporation**   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-9535

## BIBLIOGRAPHY

BR-016   Brandt, Herbert (7434), "Dust Collectors, Problems, New Findings and Application," Text in German, Energie (Munich) 20(10): 297 302, October, 1968.

CO-007   Conner, W. D. and J. R. Hodkinson, Optical Properties and Visual Effects of Smoke-Stack Plumes, Department of Health, Education and Welfare, Public Health Service, 1967.

CR-013   Crocker, B. B. and R. B. Schnelle, "Introduction to Air Pollution Control," Text for AIChE Today Series, New York, AIChE, 1969.

DA-004   Danielson, John A., "Air Pollution Engineering Manual," PHS Publication No. 999-AP-40, National Center for Air Pollution Control, 1967.

EN-017   Environmental Protection Agency, "National Ambient Air Quality Standards," Federal Register 36(67), 6680-6701 (April 7, 1971).

FR-021   Friedrich, H. E., "Hot-Mix Asphalt Paving Batching Plants," J. of Air Pollution Control Assn., Vol. 19, No. 12, pp. 924-928, December 1969.

JA-020   Jackson, J. D., Classical Electrodynamics, New York, John Wiley and Sons, 1964, pp. 569-573.

Radian Corporation   8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78758 • TELEPHONE 512 - 454-7535

BIBLIOGRAPHY, Cont'd.

MC-032    McGraw, M. J. and R. L. Duprey, "Compilation
          of Air Pollutant Emission Factors," Environ-
          mental Protection Agency, Research Triangle
          Park, N. C., April 1971.

NA-029    National Air Pollution Control Administration,
          "Control Techniques for Particulate Air
          Pollutants," (January, 1969), NAPCA Publica-
          tion No. AP-51.

SH-004    Sheehy, James P., William C. Achinger, and
          Regina A. Simon, "Handbook of Air Pollution,"
          PHS Pub. No. 999-AP-44.

SO-002    Southern Research Institute, "An Electro-
          static Precipitator Systems Study," Final
          Report to NAPCA, Contract: CPA 22-69-73,
          October 30, 1970.

ST-001    Strauss, W., Industrial Gas Cleaning:
          "The Principles and Practice of the Control
          of Gaseous and Particulate Emissions," Inter-
          national Series of Monographs in Chemical
          Engineering, Vol. 8, Oxford, Pergamon, 1966.

SU-004    Sutton, O. G., Micrometeorology, New York,
          McGraw-Hill, 1953.

TE-001    Tennessee Valley Authority, "Sulfur Oxide
          Removal from Power Plant Stack Gas: Con-
          ceptual Design and Cost Study, Use of Limestone
          in Wet Scrubbing Process, prepared for NAPCA by
          TVA under Contract No. TV-29233A, 1969.

Radian Corporation · 8500 SHOALCREEK BLVD. • P. O. BOX 9948 • AUSTIN, TEXAS 78766 • TELEPHONE 512 · 454-9535

BIBLIOGRAPHY, Cont'd.

TR-001    TRW Systems Group, "Air Quality Display
          Model," prepared for U. S. Dept. of
          Health, Education, and Welfare, PHS
          Service, Washington, D. C., Contract No.
          PH-22-68-60, November 1969.

TU-001    Turner, D. B., Workbook of Atmospheric
          Dispersion Estimates, Department of Health,
          Education, and Welfare, Public Health Service,
          1969

WA-011    Walker, Alan Bruce, "Operating Principles of
          Air Pollution Control Equipment - Guidelines
          for Their Application," Des. Oper. Air Pollut.
          Contr. Pap. MECAR (Metrop. Eng. Counc. Air
          Resour.) Symp. 1968 (Publ. 1969), 49-73,
          C.A. 72:35428.

# ATTACHMENT C

GENERAL RULES

Rule 1.    Definitions

In addition to the terms which are defined by Article 4477-5,
V.T.C.S., the following terms shall have the meanings given
herein:

1.01    Act.  The Texas Clean Air Act, codified as Article 4477-5.

1.02    Ambient Air.  That portion of the atmosphere, external to
buildings, to which the general public has access.

1.03    Article.  When followed by a number, "article" refers to
provisions of the law as codified in Vernon's Revised Civil
Statutes of Texas, 1925, as amended.

1.04    Background.  Background concentration is defined as that
level of air contaminants that cannot be reduced by control-
ling emissions from man-made sources.  It is determined by
measuring levels in non-urban areas.

1.05    Combustion Unit.  Any boiler plant, furnace, incinerator,
flare, engine, or other device or system used to oxidize
solid, liquid, or gaseous fuels, but excluding motors and
engines used in propelling land, water, and air vehicles.

1.06    Commercial Incinerators.  An incinerator used to dispose of
waste material from retail and wholesale trade establishments.

1.07    Domestic Wastes.  The garbage and rubbish normally resulting
from the functions of life within a residence.

1.08    Downwind Level.  The concentration of air contaminants from
a source or sources on a property as measured at or beyond
the property boundary.

1.09    Exhaust Emission.  Air contaminants emitted to the atmosphere
from an opening downstream from the exhaust ports of a motor
vehicle engine.

1.10    Federal Motor Vehicle Regulation.  The Motor Vehicle Air Pol-
lution Standards, Title 45, Subtitle A, Part 85, Code of
Federal Regulations.

1.11    Flue.  Any duct, stack, chimney, or conduit used to conduct
air contaminants into the open air.

-1-

1.12    Forage.  Any vegetation which may be consumed by animals.

1.13    Garbage.  Solid waste consisting of putrescible animal and
        vegetable waste materials resulting from the handling, prep-
        aration, cooking, and consumption of food, including waste
        materials from markets, storage facilities, handling and sale
        of produce and other food products.

1.14    Hydrocarbons.  Compounds which contain carbon and hydrogen.

1.15    Incinerator.  An enclosed combustion apparatus and appurtenances
        thereto which is used in the process of burning wastes for the
        primary purpose of reducing its volume and weight by removing
        the combustibles of the waste, and which is equipped with a
        flue for conducting products of combustion to the atmosphere.
        An open trench type (with closed ends) combustion unit may be
        considered an incinerator when approved by the Executive Secre-
        tary.

1.16    Inorganic Fluoride Compounds.  All inorganic chemicals having
        an atom or atoms of fluorine in their chemical structure.

1.17    Major Upset.  An unscheduled occurrence or excursion of a
        process or operation that results in an emission of air contami-
        nants that contravenes the Texas Air Control Board Regulations
        and/or the intent of the Texas Clean Air Act and is beyond
        immediate control, or a release that is initiated to protect
        life in the immediate or adjacent areas.

1.18    Motor Vehicle.  A self-propelled vehicle designed for trans-
        porting persons or property on a street or highway.

1.19    Net Ground-Level Concentration.  The upwind level subtracted
        from the downwind level.

1.20    New Source.  Any stationary source, the construction or modi-
        fication of which is commenced after the date of adoption of
        these Regulations.

1.21    Non-Methane Hydrocarbons.  The total hydrocarbon content of
        the sample minus the methane content of the sample.

1.22    Opacity.  The degree to which an emission of air contaminants
        obstructs the transmission of light expressed as the percentage
        to which the light is obstructed as measured by an optical
        instrument or trained observer.

1.23   Outdoor Burning.  Any fire or smoke-producing process which is
       not conducted in a combustion unit.

1.24   Particulate Matter.  Any material, except uncombined water,
       that exists as a solid or liquid in the atmosphere or in a
       gas stream at standard conditions.

1.25   Process or Processes.  Any action, operation, or treatment
       embracing chemical, commercial, industrial, or manufacturing
       factors such as combustion units, kilns, stills, dryers,
       roasters, and equipment used in connection therewith, and all
       other methods or forms of manufacturing or processing that may
       emit smoke, particulate matter, gaseous matter, or visible
       emissions.

1.26   Process Weight Per Hour.  "Process Weight" is the total
       weight of all materials introduced or recirculated into any
       specific process which process may cause any discharge into
       the atmosphere.  Solid fuels charged into the process will be
       considered as part of the process weight, but liquid and gas-
       eous fuels and combustion air will not.  The "Process Weight
       Per Hour" will be derived by dividing the total process weight
       by the number of hours in one complete operation from the
       beginning of any given process to the completion thereof,
       excluding any time during which the equipment used to conduct
       the process is idle.  For continuous operation, the "Process
       Weight Per Hour" will be derived by dividing the process weight
       for a 24-hour period by twenty-four.

1.27   Property.  All land under common control or ownership on which
       any source or combination of sources is located, coupled with
       all improvements on such land, and all fixed or movable objects
       on such land, or any vessel on the waters of this State which
       may constitute a source.

1.28   Rubbish.  Nonputrescible solid waste, consisting of both
       combustible and noncombustible waste materials; combustible
       rubbish includes paper, rags, cartons, wood, excelsior, furni-
       ture, rubber, plastics, yard trimmings, leaves, and similar
       materials; noncumbustible rubbish includes glass, crockery,
       tin cans, aluminum cans, metal furniture, and like materials
       which will not burn at ordinary incinerator temperatures
       ($1600^{O}$F to $1800^{O}$F).

1.29   Smoke.  Small gas-borne particles resulting from incomplete
       combustion consisting predominantly of carbon and other com-
       bustible material and present in sufficient quantity to be
       visible.

1.30    Sour Gas. Any natural gas containing more than one and one-half ($1\frac{1}{2}$) grains of hydrogen sulfide per one hundred (100) cubic feet, or more than thirty (30) grains of total sulfur per one hundred (100) cubic feet.

1.31    Sour Crude. A crude oil which will emit a sour gas when in equilibrium at atmospheric pressure.

1.32    Source. A point of origin of air contaminants, whether privately or publicly owned or operated. Upon request of a source owner the Executive Secretary shall determine whether multiple processes emitting air contaminants from a single point of emission will be treated as a single source or as multiple sources.

1.33    Standard Conditions. A condition at a temperature of $70^\circ$F and a pressure of 14.7 pounds per square inch absolute. Pollutant concentrations from an incinerator will be corrected to a condition of 50% excess air if the incinerator is operating at greater than 50% excess air.

1.34    Standard Metropolitan Statistical Area. An area consisting of a county or one or more contiguous counties which is officially so designated by the U. S. Bureau of the Budget.

1.35    Submerged Fill Pipe. Any fill pipe the discharge opening of which is entirely submerged when the liquid level is six inches above the bottom of the tank or is always submerged during filling operations; or when applied to a tank which is loaded from the side, shall mean any fill pipe the discharge opening of which is entirely submerged when the liquid level is two times the fill pipe diameter in inches above the bottom of the tank.

1.36    Sulfur Compounds. All inorganic or organic chemicals having an atom or atoms of sulfur in their chemical structure.

1.37    Sweet Crude Oil and Gas. Those crude petroleum hydrocarbons that are not "sour" as defined.

1.38    System or Device. Any article, chemical, machine, equipment, or other contrivance, the use of which may eliminate, reduce, or control the emissions of air contaminants to the atmosphere.

1.39    Upwind Level. The representative concentration of air contaminants flowing onto or across a property as measured at any point.

-4-

1.40        Visible Emissions.  Particulate or gaseous matter which can
            be detected by the human eye.  The radiant energy from an
            open flame shall not be considered a visible emission under
            this definition.

1.41        Volatile Organic Compounds.  Any compound containing carbon
            and hydrogen or containing carbon and hydrogen in combination
            with any other element which has a vapor pressure of 1.5
            pounds per square inch absolute or greater under actual condi-
            tion of storage or use.

1.42        Volatile Organic Compound - Effluent Water Separation.  Any
            tank, box, sump, or other container in which any volatile
            organic compound thereof, floating on or entrained or contained
            in water entering such tank, box, sump, or other container, is
            physically separated and removed from such water prior to out-
            fall, drainage, or recovery of such water.


Rule 2.     Other Definitions.

            Unless specifically defined in the Act or in the Rules of the
            Board, the terms used by the Board have the meanings commonly
            ascribed to them in the field of air pollution control.


Rule 3.     Multiple Air Contaminant Sources or Properties.

3.1         In an area where an additive effect occurs from the accumula-
            tion of air contaminants from two or more sources on a single
            property or from two or more properties, such that the level of
            air contaminants exceeds the ambient air quality standards
            established by the Texas Air Control Board, and each source or
            each property is emitting no more than the allowed limit for an
            air contaminant for a single source or from a single property,
            further reduction of emissions from each source or property shal
            be made as determined by the Board.

3.2         Two or more property holders in a county having a population
            of less than 50,000 as determined by the most recent federal
            census may petition the Board to have their properties
            designated a single property for purposes of controlling
            emissions therefrom, if the properties are contiguous except
            for intervening roads, railroads, rights-of-way, canals and
            watercourses, which are considered a part of the area for pur-
            poses of this provision.  The petition shall describe generally

the manner in which control of emissions from the combined properties will be administered and shall name the party or parties accepting responsibility thereof. The petition shall be accompanied by an executed copy of a written agreement between the property holders who consent to having their properties so designated and shall also be accompanied by a detailed map of the vicinity showing geographical features such as roads, water courses, and well-known landmarks; the boundaries of the petitioner's properties; the area to be included in the single property designation; and present land uses in the areas surrounding the area to be included. The Board may place such conditions on the approval of the petition as it may deem appropriate.

Rule 4.        Circumvention.

No person shall use any plan, activity, device or contrivance which the Executive Secretary determines will, without resulting in an actual reduction of air contaminants, conceal or appear to minimize the effects of an emission which would otherwise constitute a violation of the Act or Regulations. Air introduced for dilution purposes only is considered a circumvention of the Regulations.

Rule 5         Nuisance.

No person shall discharge from any source whatsoever one or more air contaminants or combinations thereof, in such concentration and of such duration as are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property, or as to interfere with the normal use and enjoyment of animal life, vegetation or property.

Rule 6.        Traffic Hazard.

No person shall discharge from any source whatsoever such quantities of air contaminants, uncombined water, or other materials which cause or have a tendency to cause a traffic hazard or an interference with normal road use.

Rule 7.        Notification Requirements for Major Upset.

The Executive Secretary and the appropriate local air pollution control agency shall be notified as soon as possible of any major upset condition which causes or may cause an excessive emission that contravenes the intent of the Texas Clean Air Act and/or the Regulations of the Board. A list of persons to contact may be obtained from the Executive Secretary upon request.

Rule 8.      Notification Requirements for Maintenance.

         The Executive Secretary and the appropriate local air pollu-
         tion control agency shall be notified in writing at least ten
         (10) days prior to any planned maintenance, start-up, or
         shut-down which will or may cause an excessive emission that
         contravenes the intent of the Texas Clean Air Act and/or the
         Regulations of the Board.  If ten (10) days notice cannot be
         given due to an unplanned occurrence, notice shall be given
         as soon as practical prior to the shut-down.

Rule 9.      Monitoring.

         Any person affected by any Rule or Regulation of the Texas
         Air Control Board shall conduct sampling of the appropriate
         emissions.  The sampling must reflect the pattern of emissions
         with reasonable accuracy.  During periods of officially de-
         signated air pollution episode conditions, those persons
         affected by Rule 803 shall monitor their emissions.  The
         Executive Secretary may prescribe methods and frequency of
         monitoring under this rule and may exempt persons from the
         application of this rule.  The results of all monitoring shall
         be recorded and retained for at least five years and shall be
         made available to the Board or any members, employees, or
         agents of the Board and local air pollution control agencies
         upon request.

Rule 10.     Sampling Ports.

         Any person, at the request of the Board shall provide in connec-
         tion with each flue a power source near the point of testing in
         addition to such sampling and testing facilities and sampling
         ports, including safe and easy access thereto, exclusive of
         instruments and sensing devices, as may be necessary for the
         Board to determine the nature and quality of emissions which
         are or may be discharged as a result of source operations.  Evi-
         dence and data based on these samples and calculations may be
         used to substantiate violations of the Act, Rules and Regula-
         tions.  Agents of the Board shall be permitted to sample the
         stacks during operating hours.

Rule 11.     Filing of Emissions Data.

         Upon request by the Board or the Executive Secretary, any
         person affected by any Rule or Regulation of the Texas Air

-7-

Control Board shall file emissions data with the Board on forms supplied by the Board.

Rule 12.    Exemptions from Rules and Regulations.

12.1    Emissions occurring during major upsets may not be required to meet the allowable emission levels set by the Rules and Regulations upon proper notification as set forth in Rule 7 of these General Rules, if a determination is made by the Executive Secretary after consultation with appropriate local agencies and with appropriate officials of the subject source that the upset conditions were unavoidable and that a shut-down or other corrective actions were taken as soon as practicable.

.12.2    Emissions occurring during start-up or shut-down of processes or during periods of maintenance may not be required to meet the allowable emission levels set by the Rules and Regulations if so determined by the Executive Secretary upon proper notification as set forth in Rule 8 of these General Rules. The Executive Secretary may specify the amount, time, and duration of emissions that will be allowed during start-up and shutdown and during periods of maintenance.

12.3    Smoke generators and other devices used for training inspectors in the evaluation of visible emissions at a training school approved by the Board are not required to meet the allowable emission levels set by the Rules and Regulations, but must be located and operated such that a nuisance is not created at any time.

12.4    Equipment, machines, devices, flues, contrivances built or installed to be used at a domestic residence for domestic use are not required to meet the allowable emission levels set by the Rules and Regulations unless specifically required by a particular Regulation.

12.5    Sources emitting air contaminants which cannot be controlled or reduced due to a lack of technological knowledge may be exempt from the applicable Rules and Regulations when so determined and ordered by the Texas Air Control Board. The Board may specify limitation and conditions as to the operation of such exempt sources.

12.6    No nuisance conditions shall be permitted to occur under these exemptions.

Rule 13.    Board Seal.

The seal of the Board shall bear the words "Texas Air Control Board," the star, and the oak and olive branches common to other official State seals.

Rule 14.      Use and Effect of Rules.

These rules may be used by the Board as guides in the exer-
cise of discretion, where discretion is vested.  They shall
not be construed as a limitation or restriction on the exer-
cise of discretion, where it exists, nor shall they be con-
strued to deprive the Board of the exercise of any power,
duties and jurisdiction conferred by law, or to limit or
restrict the amount and character of data or information which
may be required for the proper administration of the law.

Rule 15.      Sampling Procedures and Terminology.

Where not otherwise specified in the Rules, Regulations,
determinations and orders of the Board, the procedures used
for sampling air and measuring air contaminants, and the
methods of expressing the findings shall be those commonly
accepted and used in the field of air pollution control.

Rule 16.      Invoking Jurisdiction of the Board.

Any person may petition the Board through the Executive
Secretary for such consideration and action related to air
pollution control as he may desire.  The Board will review and
act on the petition in such manner as the Board may prescribe.

Rule 17.      Petition for Variance.

Any person seeking a variance, amendment of a variance, or
extension of a variance issued to that person shall file a
petition on a form prepared by the Board.  The form shall be
furnished by the Board without charge upon request.  In order
to obtain a variance past the date by which compliance is to be
achieved, a person must have demonstrated continuous and substan-
tial progress toward compliance before the date of petition.

Rule 18.      Effect of Acceptance of Variance or Permit.

Acceptance of a variance or a permit constitutes an acknow-
ledgement and agreement that the holder thereof will comply
with its terms and with the Rules, Regulations, and orders of
the Board adopted pursuant to the Act.

Rule 19.        Initiation of Review.

The Board may initiate proceedings to revoke or amend a
variance or a permit on its own motion, on recommendation of
the Executive Secretary, or upon request of an interested
person who presents reasonable justifiable grounds therefor.

Rule 20.        Transfers.

A variance or a permit is granted in personam, and does not
attach to the realty to which it relates. A variance cannot
be transferred without prior notification to the Board. If a
transfer of ownership of a source covered by a variance is
contemplated by the holder of the variance, and the source and
characteristics of the emissions will remain unchanged, upon
notification, the Executive Secretary shall issue an endorse-
ment to the variance reflecting the name of the new owner.
Continuation of emissions by the new owner without prior noti-
fication to the Board makes the variance subject to forfeiture.

Rule 21.        Remedies Cumulative.

The administrative and judicial procedures available to the
Board to prevent, correct or remedy air pollution conditions
or violations are cumulative. Within the limits of the author-
ity set forth in the Act and these Rules, the Board or the
Executive Secretary may act under any one or more of these
procedures, as applicable to the facts of a particular air
pollution condition or claimed violation.

Rule 22.        Severability.

If any provision of any of the Regulations of the Board or
the application of that provision to any person, situation
or circumstance is for any reason adjudged invalid, the adjudi-
cation does not affect any other provision of the Regulations
or the application of the adjudicated provision to any other
person, situation, or circumstance. The Board declares that
it would have adopted the valid portions and applications of
the Regulations without the invalid part and to this end the
provisions of the Regulations are declared to be severable.

Rule 23.   It is the intention of the Texas Air Control Board to utilize and enforce the Ambient Air Quality Standards and emission limitations promulgated pursuant to the Federal. Clean Air Act, 42 U.S.C., 1857 et seq., as amended.

Rule 24.   The National Primary and Secondary Ambient Air Quality Standards as published in the Federal Register, 36 Fed. Reg. 818F (April 30, 1971), are to be applied throughout all parts of Texas.  The Primary Standards are to be achieved no later than three (3) years after the Implementation Plan is approved by the Environmental Protection Agency, and the Secondary Standards are to be achieved within a reasonable time thereafter as so determined by the Texas Air Control Board.

Rule 25.   The general rules contained herein shall be in force immediately and shall supersede all previous General Provisions and Procedural Rules of the Texas Air Control Board.

Date Adopted:   January 26, 1972

Date Filed with the Secretary of State:   February 4, 1972

Date Effective:   March 5, 1972

ATTACHMENT D

REGULATION I

CONTROL OF AIR POLLUTION FROM
SMOKE, VISIBLE EMISSIONS, AND PARTICULATE MATTER

Rule 101.    Outdoor Burning

101.1    No person may cause, suffer, allow or permit any outdoor
burning within the State of Texas, except as provided by
Rule 101.2.

101.2    Outdoor burning is authorized in the following instances
if no nuisance is or will be created:

101.21    Outdoor burning when conducted pursuant to a
written grant of authority by the Texas Air
Control Board or Executive Secretary.

101.22    Outdoor burning for the purpose of training
fire-fighting personnel when requested by
certified mail and when authorized in writing
by the local air pollution control agency or
local health unit.  If notice of denial from
the local air pollution control agency or
local health unit is not received within ten
(10) days of the request, the burning is
authorized.  Authorization to conduct outdoor
burning under this provision may be revoked by
the Texas Air Control Board if it is found that
this provision is used to circumvent Rule 101.

101.23    Outdoor burning of domestic waste at and from
a property designed for and used exclusively
as a private residence, housing not more than
three families when collection of the domestic
waste is not provided by the local governmental
entity having jurisdiction.

101.24    Outdoor burning consisting of campfires and fires
used solely for recreational or ceremonial pur-
poses, or in the non-commercial preparation of
food.

101.25    Outdoor burning in a rural area of trees, brush,
grass, and other dry vegetable matter from such
area in land-clearing, right-of-way maintenance

I-1

operations, forest management purposes, and range
land management purposes, if all the following
conditions are met:

101.251    The burning must be outside the cor-
porate limits of a city or town ex-
cept when it is necessary to eliminate
a naturally occurring fire hazard.

101.252    The wind direction at the time of
starting the burning must be away
from any nearby city, town, residence,
recreational, commercial, or indus-
trial area.

101.253    The burning must be at least one thousand
feet from any residence, recrea-
tional, commercial, or industrial area
except those located on the property where
the burning is to take place, except when
it is necessary to eliminate a naturally
occurring fire hazard.

101.254    Heavy oils, asphaltic materials, items
containing natural or synthetic rubber
or any material other than dry plant
growth which may produce unreasonable
amounts of smoke must not be burned.

101.255    If the burning will cause smoke to blow
onto or across a highway, it is the
responsibility of the person initiating
the burning to post flagmen on affected
roads in accordance with the requirements
of the Department of Public Safety.

101.256    The initial burning for land clearing and
right-of-way maintenance purposes may be
commenced after 9:00 a.m.  Material which
will not be completely consumed before
5:00 p.m. shall not be added to the fire.

101.257    Burning within an area should be
staggered so that total atmospheric
loads of smoke are reduced.

I-2

101.258    Burning shall not be conducted when meteoro-
logical forecasts predict wind movement of
less than three (3) miles per hour or greater
than fifteen (15) miles per hour or when a
significant shift in wind direction is pre-
dicted which could produce adverse effects
to personnel, animals, or property during the
burning period.

101.259    Burning shall not be conducted during periods
of actual or predicted persistent (12 hours or
more) low-level (below 1600 feet) atmospheric
inversions or in areas covered by a current
air stagnation advisory.

101.26  Outdoor burning of the garbage and rubbish generated by
a city or town having a population of less than 5,000,
as determined by the most recent federal census, or by
any unincorporated area serving less than 5,000, as
determined by the most recent federal census, may be
conducted if the following conditions are met:

101.261    The city or unincorporated area and the loca-
tion of the burning must be outside a defined
Standard Metropolitan Statistical Area.

101.262    Cities in newly designated Standard Metropoli-
tan Statistical Areas shall have eighteen (18)
months after the designation of the Standard
Metropolitan Statistical Area to comply with
Rule 101.

101.263    The location of the burning must not be within
a city or town; must be at least one mile from
any residential, recreational, commercial, or
industrial area; and must be at least 300 yards
from any public road.

101.264    The initial burning may be commenced only
between the hours of 9:00 a.m. and 1:00 p.m.
Combustible material must not be added to the
fire between 1:00 p.m. of one day and 9:00 a.m.
of the following day.

101.265    The exceptions provided by Rule 101.26 will
not apply after December 31, 1973, to cities
with a population over 3,000, as determined
by the most recent federal census.

101.27 Outdoor burning of hydrocarbons from pipeline breaks and oil spills may be allowed upon proper notification as set forth in Rule 7 of the General Rules, if the Executive Secretary determines that the burning is necessary to protect the public welfare.

101.3 No disposal or deposit outdoors of any material capable of igniting spontaneously is allowed except where the disposal or deposit is made pursuant to a specific grant of authority by the Texas Air Control Board or the Executive Secretary.

101.4 The authority to conduct outdoor burning under this Regulation does not exempt or excuse the person responsible from the consequences, damages, or injuries resulting from the burning and does not exempt or excuse anyone from complying with all other applicable laws or ordinances, Regulations and orders of governmental entities having jurisdiction even though the burning is otherwise conducted in compliance with the Regulation.

Rule 102.    Incineration

102.1 No person may cause, suffer, allow, or permit the burning of garbage or rubbish in a single-chamber residential or commercial incinerator unless the Executive Secretary approves an incinerator demonstrated to provide equivalent performance to multiple chamber incinerators.

102.2 No person may cause, suffer or permit the burning of garbage or rubbish in a single-chamber incinerator constructed after April 1, 1972, unless the Executive Secretary approves an incinerator demonstrated to provide equivalent performance to multiple-chamber incinerators.

Rule 103.    Visible Emissions.

103.1 No person may cause, suffer, allow, or permit visible emissions from any stationary flue to exceed an opacity of 30% averaged over a 5-minute period. No person may cause, suffer, allow, or permit visible emissions from any stationary flue beginning construction after January 31, 1972, to exceed an opacity of 20% averaged over a 5-minute period. Visible emissions during the cleaning of a firebox or the building of a new fire, sootblowing, equipment changes, ash removal and rapping of precipitators may exceed the limits set forth in Rule 103.1 for a period aggregating not more than five minutes in any sixty consecutive minutes, nor more than six hours in any ten-day period.

I-4

103.2 No person may cause, suffer, allow, or permit visible
emissions from a waste gas flare for more than five minutes
in any 2-hour period except as provided in Rule 12.1 of the
General Rules.

103.3 No person may cause, suffer, allow, or permit excessive
visible emissions from any building or enclosed facility.

103.4 No person may cause, suffer, allow, or permit excessive visible
emissions from motor vehicles for more than ten consecutive
seconds.

103.5 No person may cause, suffer, allow, or permit excessive
visible emissions from any railroad locomotive, ship
or any other vessel, except during reasonable periods of
of engine start-up.

103.6 No person may cause, suffer, allow, or permit visible
emissions from any stationary flue having a total flow
rate of 100,000 acfm or more to exceed an opacity of 15%
averaged over a 5-minute period unless an optical instru-
ment capable of measuring the opacity of emissions is in-
stalled in the flue.  Records of all such measurements shall
be retained as provided for in Rule 9 of the General Rules.
The provision shall not apply to flues having gas streams
containing moisture which interferes with proper instrument
operation, if so determined by the Executive Secretary.

103.7 Contributions from uncombined water shall not be included in
determining compliance with Rule 103.  The burden of
proof which establishes the applicability of Rule 103.7 shall
be upon the person seeking to come within its provisions.

Rule 104.   Particulate Matter From Materials Handling, Construction,
and Roads.

104.1 Rule 104 shall apply only in Standard Metropolitan Statistical
Areas where the federal air quality standards for particulate
matter are exceeded.

104.2 No person may cause, suffer, allow, or permit any fine material
to be handled, transported, or stored without taking at least
the following precautions to prevent particulate matter from
becoming airborne:

104.21 Application of water or suitable chemicals or
some other covering on materials stockpiles and
other surfaces which can create airborne dusts
under normal conditions;

I-5

104.22 Installation and use of hoods, fans and filters to enclose, collect, and clean the emissions of dusty materials;

104.23 Covering or wetting at all times when in motion, of open-bodied trucks, trailers, or railroad cars transporting materials in areas where the general public has access which can create airborne particulate matter.

104.3 No person may cause, suffer, allow or permit a building structure to be used, constructed, altered, repaired or demolished without taking at least the following precautions to prevent particulate matter from becoming airborne:

104.31 Use of water or chemicals where feasible for control of dust in the demolition of buildings or structures, in construction operations, or in the clearing of land;

104.32 Use of adequate methods to prevent airborne particulate matter during sandblasting of buildings or other similar operations.

104.4 No person may cause, suffer, allow, or permit a road to be used, constructed, altered, or repaired without taking at least the following precautions to prevent particulate matter from becoming airborne:

104.41 Application of asphalt, oil, water or suitable chemicals on heavily traveled dirt streets as necessary.

104.42 Paving of public or commercial parking surfaces having more than five parking spaces.

104.43 Removal as necessary from paved street and parking surfaces of earth or other material which have a tendency to become airborne.

104.5 Alternate means of control may be approved by the Executive Secretary of the Texas Air Control Board.

Rule 105.    Particulate Matter

105.1    No person may cause, suffer, allow, or permit emissions
of particulate matter from any source to exceed the allow-
able rates specified in Table 1 and/or Figure 1.

105.11   If a source has an effective stack height less
than the standard effective stack height as de-
termined from Table 2 and/or Figure 2, the allow-
able emission level must be reduced by multiplying
it by

$$\left( \frac{\text{Effective Stack Height}}{\text{Standard Effective Stack Height}} \right)$$

105.12   Effective stack height shall be calculated by
the following equation:

$$h_e = h + 0.083 v_e D_e \left[ 1.5 + 082 \left( \frac{T_e - 550}{T_e} \right) D_e \right]$$

Where:

$h_e$ =    Effective stack height in feet (ft)

$h$  =    Physical stack height above ground level
in feet (ft)

$v_e$ =    Stack exit velocity in feet per section (ft/sec)

$D_e$ =    Stack exit inside diameter in feet (ft)

$T_e$ =    Stack exit temperature in degrees Rankin ($^\circ$R)

105.2    No person may cause, suffer, allow or permit emissions of
particulate matter from a source or sources operated on a
property or from multiple sources operated on contiguous
properties to exceed any of the following net ground level
concentrations.

105.21   One hundred (100) micrograms per cubic meter
($\mu g/m^3$) of air sample, averaged over any five (5)
consecutive hours.

105.22   Two hundred (200) micrograms per cubic meter
($\mu g/m^3$) of air sampled, averaged over any three (3)
consecutive hours.

105.23   Four hundred (400) micrograms per cubic meter
($\mu g/m^3$) of air sampled, averaged over any one (1)
hour period.

105.3    Rules 105.1 and 105.2 shall not apply to solid fossil fuel fired steam generators.

    105.31  No person may cause, suffer, allow, or permit emissions of particulate matter from any solid fossil fuel fired steam generator to exceed 0.3 lb. per million B.T.U. heat input.

Rule 106.    Transient Operations.

106.1    Rules 103 and 105 shall not apply to portable hot-mix asphaltic concrete plants, portable rock-crusher, and other transient operations engaged in public works projects which are not operated at the same premise for more than six months if all the following conditions are met:

    106.11  The plant is located at least one mile outside the nearest corporate limits of any city or town.

    106.12  The plant is located at least one mile from any occupied facility or recreational area other than that located on the same property as the plant.

    106.13  The plant is equipped with cyclones, or wet scrubbers, or water sprays at the material transfer points open to the atmosphere, or other equipment or systems approved by the Executive Secretary, properly installed, in good working order and in operation.

106.2    The time requirement for Rule 106.1 may be extended by the Executive Secretary upon written request.

106.3    All emissions from sources operating under provisions of Rule 106 shall be controlled so as not to permit or create a nuisance.

106.4    Rule 106 shall not apply in Dallas or Harris Counties.

106.5    Rule 106 shall not apply to portable hot-mix asphaltic concrete plants after December 31, 1974.

Rule 107.    Agricultural Process.

107.1    Rules 103, 104, 105 and 108 shall not apply to any person affected by Section 3.10 (3) of the Texas Clean Air Act.

107.2    No person affected by Section 3.10 (3) of the Texas Clean Air
         Act may cause, suffer, allow, or permit emissions of particulate
         matter from any or all sources associated with a specific
         process to exceed the allowable levels specified in Table 3
         and/or Figure 3, except as provided by Rule 107.3.

107.3    Any person affected by Section 3.10 (3) of the Texas Clean
         Air Act who does not wish to be controlled by the process
         weight method, established by Rule 107.2, may select an
         alternate method of control which the Executive Secretary
         finds will provide emission control efficiency and measure-
         ment to achieve the same goals as Rule 107.2.

107.4    Any person affected by Section 3.10 (e) of the Texas Clean
         Air Act who does not select an alternate method and notify
         the Executive Secretary, in writing, prior to any plant
         investigation by the staff of the Texas Air Control Board,
         shall be controlled by the process weight method established
         by Rule 107.2, unless the Executive Secretary, at his dis-
         cretion, chooses to accept proposals for an alternate method
         at that time.

107.5    Nothing herein is intended to affect the limitations on
         burning set out in Rule 101.

107.6    Persons affected by Rule 107 shall be in compliance with
         the provisions set forth herein by February 15, 1973.

Rule 108.  Persons affected by this Regulation shall be in compliance
         with the provisions contained herein no later than
         December 31, 1973.  Not later than six months after the
         effective date of this Regulation, any person affected by
         his Regulation shall submit to the Texas Air Control Board
         a written report on his compliance status, including but
         not limited to, the minimum time required to design, procure,
         install and test abatement equipment or procedures.  Progress
         reports shall be submitted to the Board every four months
         commencing in July of 1972 until compliance is achieved.

         All persons shall continue to be governed by the provisions
         of Regulation I, which became effective on March 16, 1967,
         and amended on January 23, 1968, September 12, 1969, and
         May 18, 1971, and Regulation II, which became effective
         February 22, 1968, and amended on September 12, 1969, un-
         til December 31, 1973, at which time this Regulation shall
         supersede the previous Regulation I and II.

I-9

Date Adopted: __January 26, 1972__

Date Filed with Secretary of State: __February 4, 1972__

Date Effective: __March 5, 1972__

TABLE 1

ALLOWABLE PARTICULATE EMISSION RATES

FOR SPECIFIC FLOW RATES

| Effluent Flow Rate<br>acfm | Rate of Emission<br>lb/hr |
|---|---|
| 1,000 | 3.5 |
| 2,000 | 5.3 |
| 4,000 | 8.2 |
| 6,000 | 10.6 |
| 8,000 | 12.6 |
| 10,000 | 14.5 |
| 20,000 | 22.3 |
| 40,000 | 34.2 |
| 60,000 | 44.0 |
| 80,000 | 52.6 |
| 100,000 | 60.4 |
| 200,000 | 92.9 |
| 400,000 | 143.0 |
| 600,000 | 184.0 |
| 800,000 | 219.4 |
| 1,000,000 | 252.0 |

Interpolation and extrapolation of the data in this table shall be accomplished by the use of the equation $E=0.048\ q^{0.62}$ where E is the allowable emission rate in lb/hr and q is the stack effluent flow rate in acfm.

FIGURE 1

ALLOWABLE PARTICULATE EMISSION RATES

FOR SPECIFIC FLOW RATES



STACK EFFLUENT FLOW RATE (acfm)

TABLE 2

STANDARD EFFECTIVE STACK HEIGHT
BASED ON SPECIFIED FLOW RATES

| Effluent Flow Rate acfm | Standard Effective Stack Height ft |
|---|---|
| 1,000 | 12 |
| 2,000 | 15 |
| 4,000 | 19 |
| 6,000 | 22 |
| 8,000 | 24 |
| 10,000 | 26 |
| 20,000 | 34 |
| 40,000 | 43 |
| 60,000 | 49 |
| 80,000 | 55 |
| 100,000 | 59 |
| 200,000 | 75 |
| 400,000 | 96 |
| 600,000 | 110 |
| 800,000 | 122 |
| 1,000,000 | 132 |

Interpolation and extrapolation of the data in this Table shall be accomplished by the use of the equation $H_e = 1.05 \, q^{0.35}$ where $H_e$ is the standard effective stack height in feet and q is the stack effluent flow rate in acfm.



FIGURE 2

STANDARD EFFECTIVE STACK HEIGHT

BASED ON SPECIFIC FLOW RATES

TABLE 3

ALLOWABLE RATE OF EMISSION BASED ON PROCESS WEIGHT RATE

| PROCESS WEIGHT RATE | RATE OF EMISSION | PROCESS WEIGHT RATE | RATE OF EMISSION |
|---|---|---|---|
| lb/hr | lb/hr | lb/hr | lb/hr |
| 1,000 | 1.6 | 16,000 | 24.2 |
| 1,500 | 2.4 | 18,000 | 27.2 |
| 2,000 | 3.1 | 20,000 | 30.1 |
| 2,500 | 3.9 | 30,000 | 44.9 |
| 3,000 | 4.7 | 40,000 | 59.7 |
| 3,500 | 5.4 | 50,000 | 64.0 |
| 4,000 | 6.2 | 60,000 | 67.4 |
| 5,000 | 7.7 | 70,000 | 70.5 |
| 6,000 | 9.2 | 80,000 | 73.2 |
| 7,000 | 10.7 | 90,000 | 75.7 |
| 8,000 | 12.2 | 100,000 | 78.1 |
| 9,000 | 13.7 | 150,000 | 87.7 |
| 10,000 | 15.2 | 200,000 | 95.2 |
| 12,000 | 18.2 | 250,000 | 101.5 |
| 14,000 | 21.2 | 500,000 | 123.9 |

\* Interpolation of the data in this table for process weights up to 40,000 lb/hr shall be accomplished by the use of the equation $E = 3.12 \, (p^{0.985})$, and interpolation and extrapolation of the data for process weight rates in excess of 40,000 lb/hr shall be accomplished by use of the equation $E = 25.4 \, (p^{0.287})$ where E = rate of emission in pounds per hour and p = process weight rate in tons per hour.

FIGURE 3

ALLOWABLE PARTICULATE EMISSION LEVELS BASED ON
PROCESS WEIGHT RATE





TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

**ORDER ADOPTING AGREED ORDERS AND
REVISIONS TO THE STATE IMPLEMENTATION PLAN**

**Docket No. 2020-0071-SIP
Project No. 2020-028-SIP-NR
Docket No. 2020-0072-SIP
Project No. 2020-027-SIP-NR
Docket No. 2020-0073-SIP
Project No. 2020-026-SIP-NR
Docket No. 2020-0074-SIP
Project No. 2020-025-SIP-NR
Docket No. 2020-0075-SIP
Project No. 2020-024-SIP-NR
Docket No. 2020-0076-SIP
Project No. 2020-023-SIP-NR
Docket No. 2020-0077-SIP
Project 2020-022-SIP-NR
Docket No. 2020-0078-SIP
Project No. 2020-021-SIP-NR
Docket No. 2020-0178-SIP
Project No. 2020-032-SIP-NR**

On July 29, 2020, the Texas Commission on Environmental Quality (Commission), during a public meeting, considered adoption of Agreed Orders concerning Public Service Company of Oklahoma, Oklaunion Power Station, Southwestern Public Service Company Harrington Station, San Miguel Electric Cooperative San Miguel Electric Plant, NRG Texas Power LLC Limestone Electric Generating Station, Luminant Generation Company, LLC Martin Lake Steam Electric Station, Lower Colorado River Authority Sam Seymour Fayette Power Project, Southwestern Electric Power Company H.W. Pirkey Power Plant, Texas Municipal Power Agency Gibbons Creek Steam Electric Station and the State Implementation Plan (SIP) Revision regarding Planned Maintenance, Startup and Shutdown (MSS) Emissions for Certain Electric Generating Units. The Commission adopts the Agreed Orders and the Planned MSS for Certain Electric Generating Units SIP Revision. The voluntary Agreed Orders establish certain operational limits and work practices for periods of planned maintenance, startup and shutdown activities as federally enforceable emission limits for the electric generating units identified in the agreed orders.  The SIP narrative revision demonstrates that incorporating the Agreed Orders into the SIP meet the requirements of Federal Clean Air Act (FCAA) § 110(l) regarding noninterference with requirements for attainment and maintenance and reasonable further progress or any other requirement of the FCAA.  Under Tex. Health & Safety Code Ann. §§ 382.011, 382.012, and 382.023 (West 2016), the Commission has the authority to control the quality of the state's air and to issue orders consistent with the policies and purposes of the Texas Clean Air Act, Chapter 382 of the Tex. Health & Safety Code. Notice of the proposed Agreed Orders and SIP Revision regarding Planned Maintenance, Startup and Shutdown (MSS) Emissions for Certain Electric Generating

Units was published for comment in the April 24, 2020, issue of the *Texas Register* (45 TexReg 2736).

Pursuant to 40 Code of Federal Regulations § 51.102 and after proper notice, the Commission conducted a public hearing to consider the Agreed Orders and Planned MSS for Certain Electric Generating Units SIP Revision. Proper notice included prominent advertisement in the areas affected at least 30 days prior to the date of the hearing. A public hearing was offered remotely on May 18, 2020.

The Commission circulated hearing notices of its intended action to the public, including interested persons, the Regional Administrator of the EPA, and all applicable local air pollution control agencies. The public was invited to submit data, views, and recommendations on the proposed Agreed Orders and SIP revisions, either orally or in writing, at the hearing or during the comment period. Prior to the scheduled hearing, copies of the proposed Agreed Orders and SIP revisions were available for public inspection on the Commission's website.

Data, views, and recommendations of interested persons regarding the proposed Agreed Orders and SIP revisions were submitted to the Commission during the comment period and were considered by the Commission as reflected in the analysis of testimony incorporated by reference to this Order. The Commission finds that the analysis of testimony includes the names of all interested groups or associations offering comment on the proposed Agreed Orders and the SIP revisions and their position concerning the same.

IT IS THEREFORE ORDERED BY THE COMMISSION that the Agreed Orders and Planned MSS for Certain Electric Generating Units SIP Revision incorporated by reference to this Order are hereby adopted. The adopted Agreed Orders and the Planned MSS for Certain Electric Generating Units SIP Revision are incorporated by reference in this Order as if set forth at length verbatim in this Order.

IT IS FURTHER ORDERED BY THE COMMISSION that on behalf of the Commission, the Chairman should transmit a copy of this Order, together with the adopted Agreed Orders and Planned MSS for Certain Electric Generating Units SIP Revision, to the Regional Administrator of EPA as a proposed revision to the Texas SIP pursuant to the Federal Clean Air Act, codified at 42 U.S. Code Ann. §§ 7401 - 7671q, as amended.

       If any portion of this Order is for any reason held to be invalid by a court of competent jurisdiction, the invalidity of any portion shall not affect the validity of the remaining portions.

TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

_____
Jon Niermann, Chairman

_____
Date Signed